UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| SARA HAWES, individually, and on behalf of all others similarly situated,<br><br>               Plaintiff,<br><br>v.<br><br>MACY'S WEST STORES, INC.,<br><br>               Defendant. | Case No. 1:17-cv-00754<br><br>Judge Timothy S. Black |

## DEFENDANT'S MOTION TO STRIKE REPORT
## AND EXCLUDE OPINIONS OF MR. STEFAN BOEDEKER

Defendant Macy's West Stores, Inc., through undersigned counsel, respectfully moves the Court for an Order striking the expert report and excluding the opinions of Plaintiff's damages expert, Stefan Boedeker, pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

For the reasons stated more fully in the supporting Memorandum filed contemporaneously herewith and incorporated herein by this reference, Defendant respectfully requests that the Court strike the report and exclude the testimony of Stefan Boedeker as incomplete and unreliable.

This the 3rd day of May, 2021.

Respectfully submitted,

*/s/ Beth A. Bryan*
Beth A. Bryan (Ohio Reg. 0082076)
TAFT STETTINIUS & HOLLISTER LLP
425 Walnut Street, Suite 1800
Cincinnati, Ohio 45202
Phone: (513) 381-2838
Fax: (513) 381-0205
bryan@taftlaw.com

Jennifer K. Van Zant (*pro hac vice*)
NC State Bar No. 21280
Andrew L. Rodenbough (*pro hac vice*)
NC State Bar No. 46364
Ryan C. Fairchild (*pro hac vice*)
N.C. State Bar No. 47729
BROOKS, PIERCE, MCLENDON,
HUMPHREY & LEONARD, LLP
230 North Elm Street
2000 Renaissance Plaza
Greensboro, NC 27401
Telephone: (336) 373-8850
Facsimile: (336) 378-1001
jvanzant@brookspierce.com
arodenbough@brookspierce.com
rfairchild@brookspierce.com

*Attorneys for Defendant*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| SARA HAWES, individually, and on behalf of all others similarly situated, | Case No. 1:17-cv-00754 |
| Plaintiff, | Judge Timothy S. Black |
| v. | |
| MACY'S WEST STORES, INC., | |
| Defendant. | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION TO STRIKE REPORT AND EXCLUDE OPINIONS OF MR. STEFAN BOEDEKER**

Plaintiff cannot meet her burden to show that the opinions of her damages expert, Stefan Boedeker, are reliable and relevant as required by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). Although Plaintiff contends that the putative class paid more for sheets sold by Defendant Macy's West Stores, Inc. that they believed had a higher thread count, neither of Boedeker's proposed methodologies would aid the Court in determining whether class-wide damages are available in this case. Boedeker has not performed a hedonic regression or a conjoint survey—he has only made incomplete proposals to do so. Boedeker's hedonic regression methodology is fatally flawed because, among other flaws, he relies on pricing data that does not accurately reflect the prices paid by consumers and on randomly selected attributes that will not accurately isolate any premium consumers pay for thread count. Similarly, Boedeker's conjoint analysis ignores the real world experience of sheet purchasing and ignores or distorts fundamental economic principles in order to overestimate damages. Boedeker's

opinions are unreliable and irrelevant to the Court's class-certification analysis. Boedeker has failed to show that either method could be used in this case, and his opinions must be excluded.

## I.    BACKGROUND

Plaintiff retained Stefan Boedeker, a statistician and an economist, to determine whether "it is possible to quantify economic losses to consumers, including Plaintiff[] and the [putative] class" and to "provide a framework for the computation of class-wide damages." Expert Report of Stefan Boedeker ("Report") ¶¶ 2, 11, DE 84-4; *see also* Transcript of Boedeker Deposition ("Boedeker Tr.") 68:11-15, attached as Ex. 1. Boedeker drafted a report outlining two methodologies, which he purports could be used to demonstrate class-wide damages.

Boedeker proposes that he could calculate class-wide damages using a Bayesian Hedonic Regression. Report § 4.1. A hedonic regression is a statistical methodology that may be used to "isolate the contribution of a particular attribute to the price of a product that has many attributes." *In re Macbook Keyboard Litig.*, No. 5:18-CV-02813-EJD, 2021 WL 1250378, at *4 (N.D. Cal. Apr. 5, 2021); Expert Report of Sean Iyer ("Iyer Report") ¶ 52. Boedeker seeks to isolate the contribution of a sheet's thread count to the overall price of a set of sheets. Boedeker suggests he would observe consumers' purchases of a cross-section of bed sheets, using datasets Defendant provided during discovery. *See* Report § 4.1.2. Using the sheets' prices as the dependent variable and the various attributes comprising the sheets (e.g., thread count, size, weave) as the independent variables, Boedeker contends that he would conduct a regression to determine the effect that thread count has on the price consumers are willing to pay. *See* Report ¶¶ 58-60.

Boedeker also opines that he could calculate economic loss to consumers by performing a Choice-Based Conjoint analysis. Report § 4.2. Unlike hedonic regression, which relies on existing customer data, a conjoint analysis uses consumer surveys to gather data about consumer

preferences for different attributes of a product. Report ¶ 79; Boedeker Tr. 77:22-24. Boedeker would then analyze the survey results to evaluate consumers' willingness to pay for a product and its specific attributes. *See* Report ¶¶ 85-86.

Boedeker has not performed either analysis. Iyer Report ¶ 11 ("Mr. Boedeker has not actually done *any* empirical analysis. He has not actually conducted a conjoint analysis-based survey, only said that he intends to do one. Nor has he actually analyzed any transactional data."). Although Boedeker performed a "preliminary analysis" of Defendant's datasets to assess the correlation between ticket price and thread count, he has not performed the actual regression analysis needed to isolate the contribution of thread count to a sheet set's overall price. Nor has he conducted the conjoint survey—in fact, he has not even designed the survey at this stage. *See, e.g.*, Boedeker Tr. 112:21-22 ("I have not, not designed the conjoint menus yet . . . .").

## II. LEGAL STANDARD

In performing its "rigorous analysis" of Rule 23's requirements, a trial court "must resolve any material evidentiary disputes," including those related to expert testimony. *In re Polyurethane Foam Antitrust Litig.*, 314 F.R.D. 226, 236 (N.D. Ohio 2014). The holding in *Daubert* thus applies at the class certification stage where, as here, an expert's report is "critical to class certification." *Kondash v. Kia Motors Am., Inc.*, No. 1:15-CV-506, 2020 WL 5816228, at *6-7 (S.D. Ohio Sept. 30, 2020) (applying *Daubert* at class certification stage); *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 354 (2011) ("The parties dispute whether [a particular expert's] testimony even met the standards for the admission of expert testimony under Federal Rule of Civil Procedure 702 and our *Daubert* case. The District Court concluded that *Daubert* did not apply to expert testimony at the certification stage of class-action proceedings. *We doubt that is so*, but even if properly considered, [the expert's] testimony does nothing to advance respondents' case." (emphasis

added)); *In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184 (3d Cir. 2020) (finding abuse of discretion in failure to address challenge to plaintiffs' expert report at class certification); *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815-16 (7th Cir. 2010) (requiring district court to resolve challenges to expert's report when expert's report is "critical to class certification").[1]

A trial court has a duty to act as a "gatekeeper" by "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). A trial court may only admit an expert witness's testimony if it meets the requirements of Federal Rule of Evidence 702, meaning that (1) the expert's specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue; (2) the testimony is based on sufficient data or facts; (3) the testimony is the product of reliable principles and methods; and (4) the expert has reliably applied the principles and methods reliably to the facts of the case. The Sixth Circuit has identified "red flags" that demonstrate a lack of reliability, including "insufficient information about the case," "failure to consider other possible causes," and "lack of testing." *Kondash*, 2020 WL 5816228, at *5 (citing *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 177 (6th Cir. 2009)). Boedeker's Report raises those red flags.

---

[1] The Sixth Circuit has not yet definitively stated whether *Daubert* applies at class certification. *See Hicks v. State Farm Fire & Cas. Co*., 965 F.3d 452, 465 (6th Cir. 2020). Defendant respectfully submits that the better-reasoned decisions are those, such as *Kondash*, that apply the standard when a plaintiff relies on expert testimony to establish class certification. Even courts that have concluded that a standard less exacting than *Daubert* governs at class certification scrutinize whether an expert's opinion is sufficiently reliable for purposes of Rule 23. *See, e.g.*, *In re Behr Dayton Thermal Prod., LLC*, No. 3:08-CV-326, 2015 WL 13651286, at *6 (S.D. Ohio Feb. 27, 2015) ("[A]t the class certification stage, the relevant inquiry is 'whether an expert's opinion [is] sufficiently reliable to admit for the purpose of proving or disproving Rule 23 criteria, such as commonality and predominance.'" (alteration in original) (quoting *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 495 (C.D. Cal. 2012))). Regardless of the standard, Boedeker's opinions are not sufficiently reliable and should not be considered.

### III.     ARGUMENT

####  a.  **Boedeker's proposed hedonic regression analysis is incomplete and unreliable.**

> i.  *Boedeker's failure to conduct a regression analysis renders his opinion "so incomplete as to be inadmissible as irrelevant."*

Boedeker's opinion that a hedonic regression could be used to calculate damages must be excluded because he has not conducted any regression analysis and therefore cannot show that such an analysis could be used to calculate class-wide damages in this case.  *See* Iyer Report ¶ 11 ("Mr. Boedeker has not actually done *any* empirical analysis. . . . Instead, he recites a summary of general approaches to hedonic pricing along with a superficial and incomplete explanation of what explanatory variables he may use.").  At most, Boedeker has conducted a "preliminary analysis" of datasets that Defendant produced in discovery by comparing the prices of sheet sets with different thread counts.  Report ¶¶ 71-74.  From this initial review, he concludes that "the higher the thread count, the higher prices are," based on a positive correlation between price and thread count.  Report ¶ 74; Boedeker Tr. 93:13-94:7 (testifying that data shows that "keeping other things equal," a higher thread count is associated with better quality and higher prices); Iyer Report ¶ 49 ("[Boedeker] posits—in the most general terms—exemplary relationships.").  Boedeker assumes that he will be able to "test different model specifications" using hedonic regression.  Report ¶ 76.

An expert's opinion that a regression model *may* work is not sufficient to demonstrate that a model *will* work.  "[R]egression analysis is not a magic formula.  It is simply a mathematical tool for estimating a dependent variable based on a number of independent variables, which may or may not yield statistically significant results." *Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*, 100 F. App'x 296, 299 (5th Cir. 2004); *see also* Iyer Report ¶ 12 ("Any claim that . . . hedonic pricing [is a] well known approach[] and therefore applicable in the instant matter is a red herring and irrelevant.  What is important is the specific application of [the] model to the

context at hand to see if the predictions of the models work.").  Accordingly, courts have stricken expert opinions like Boedeker's that merely provide a "preliminary overview of how damages might be calculated." *Piggly Wiggly*, 100 F. App'x at 299 (affirming district court's decision to strike damages expert's regression opinion at class certification stage where expert's opinion opined that a formula could be found, but did not offer an actual formula).

As a further example, a court in the Central District of California struck a damages expert's testimony in *In re ConAgra Foods, Inc.*, 302 F.R.D. 537 (C.D. Cal. 2014), because the expert had not actually performed the hedonic regression he proposed.  Like Boedeker, the expert in *ConAgra* testified that a hedonic regression model could be used to calculate class-wide damages.  But the expert failed to (1) identify or define the relevant variables that he would use in his model; (2) confirm that the data required to execute his analysis existed or was obtainable; or (3) identify the set of products he would use in his analysis.  *Id.* at 551.  The court recognized that "[a]lthough the methodologies he describes may very well be capable of calculating damages in this action, Weir has made no showing that this is the case."  *Id.* at 552.  Without that showing, the expert's testimony was, as here, "so incomplete as to be inadmissible as irrelevant."  *Id.* (quoting *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002)).

Like in *ConAgra*, Boedeker's general opinion that a hedonic regression may be possible is insufficient to show that the model will effectively calculate class-wide damages in this case.  At most, Boedeker suggests he will "consider a regression equation where *Price* is a function of *Thread Count* and certain attributes, like, for example, Weave, Size, [and] Origin."  Report ¶ 77.  But other than providing these general examples, Boedeker has not identified the specific attributes he would use in his analysis, and concedes that he would need to run an "exploratory data survey" to determine which of the numerous bedsheet attributes are important to customers.  *See* Boedeker

6

Tr. 194:16-20; Iyer Report ¶ 49; *see also* Declaration of Danielle Swift ¶ 7 ("Swift Decl.") (explaining that Defendant has purchased at least 625 different CVC products from AQ Textiles for sale since 2013). Because Boedeker does not know which attributes he will need to include in his analysis, Boedeker has no way of knowing whether the data required to execute his analysis is available. Iyer Report ¶¶ 44-45 (explaining that because "Mr. Boedeker has not done any of the steps recommended by Dr. Rao, he does not—and cannot—know the set of salient attributes important to consumers."); *id.* ¶ 53 ("[W]ith several sheet characteristics, it is difficult to choose which variables to test without involving subjective judgments of the variables' importance. These are important considerations *before* selecting the hedonic regression method.").

Because Boedeker has not conducted any analysis, Boedeker has not demonstrated that he will actually be able to use hedonic regression to isolate the effect of thread count on price. As Defendant's expert, Sean Iyer, explains, possible multicollinearity can lead to erroneous conclusions about how thread count affects prices. *Id.* ¶ 55. "Multicollinearity refers to a situation in which more than two explanatory variables in a multiple regression model are linearly related." *Id.* ¶ 54. For example, fabric type and thread count may display multicollinearity "either because they are related or because they are both a proxy for a 'hidden' characteristic, such as touch and feel." *Id.* Put otherwise, thread count may be highly related to another bedsheet characteristic, rendering it impossible to separate the value consumers place on thread count from the value consumers place on other characteristics. *See id.* ¶ 55.

Boedeker does not sufficiently account for the possibility that multicollinearity could render his hedonic regression useless. *Id.* ¶ 56. Although he notes that multicollinearity "could arise if the attribute of interest is correlated with another attribute," he does not yet know the effect it will have on his analysis. Report ¶ 63. Instead, he leaves this issue for a later date, explaining

that he "will apply statistical tests to determine whether . . . multicollinearity [is] of issue" in his analysis. *Id.* Thus, because he has not performed *any such* analysis, Boedeker has not shown that hedonic regression will be a reliable method to assess damages. Iyer Report ¶ 56.

Finally, Boedeker's hedonic regression analysis might be much more complex than he claims. Boedeker opines that a single regression will be sufficient, but he concedes that it is possible that multiple regressions will be necessary. Boedeker Tr. 71:18-72:3. Although Boedeker maintains that "the methodology itself would work," he offers nothing to support that claim. *Id.* 72:6; Iyer Report ¶ 50 ("Mr. Boedeker has not proposed a model that would apply to the instance case, just a very general one that is not specified."). To the contrary, a hedonic regression would likely involve multiple tests to assess the impact of each characteristic on the price of sheets. Iyer Report ¶¶ 52-53. But each test lowers the final confidence level of the model and requires further statistical analysis. *Id.* ¶ 53. Boedeker does not address these potential impediments, *id.*, *much less* perform any further statistical analysis.

Because Boedeker has not performed *any* hedonic regression analysis, the Court cannot sufficiently evaluate whether his preliminary analysis is reliable and relevant to this case. As described above, Boedeker's hedonic regression could run into any number of problems, and there is no guarantee that he will be able to calculate damages. *See Piggly Wiggly*, 100 F. App'x at 299; Iyer Report ¶¶ 51 ("[T]he few paragraphs Mr. Boedeker spends on hedonic prices are too vague to be of any real use in determining whether he can reliably compute economic loss for putative class members."). Boedeker's incomplete opinion should be excluded.

        ii. *The little work Boedeker has performed demonstrates that his hedonic regression analysis will be unreliable.*

Even if Boedeker's preliminary overview could somehow constitute a workable model for hedonic regression—which it cannot—it is unreliable. There are two fatal flaws with Boedeker's

proposal: (1) he intends to use price data that does not reflect the actual amounts paid by consumers; and (2) he fails to take into account differences between the sheets' attributes.

First, Boedeker intends to use Defendant's datasets as the underlying data in his regression analysis. Report ¶ 73. But these datasets only include the "ticket price" of the sheets. Boedeker Tr. 156:19-24, 167:23:2. A ticket price is the price of the sheets without any markdowns, rebates, sales, or other adjustments. The ticket price does not reflect the price a consumer actually paid for the sheets. In fact, Defendant's customers often pay much less for sheets because of Defendant's frequent sales, promotions, and coupons. *See* Swift Decl. ¶ 22 ("Macy's offers frequent sales, promotions, and coupons. Sheets are one of the items that are frequently placed on sale.").

By using ticket price, rather than the actual sale price, Boedeker's regression analysis begins from the wrong starting point. Boedeker's analysis is based on the erroneous assumption that every putative class member paid full price for their sheets. This assumption will inflate the damages for customers who did not pay full price because it will overestimate the value these customers assign to thread count. Accordingly, Boedeker's hedonic regression opinion will be unreliable, and should be excluded under Federal Rule of Evidence 702 on this basis alone.

Second, Boedeker's proposed analysis is unreliable and must be excluded because he uses overly broad categories of attributes and excludes other important attributes from his analysis. Courts have excluded expert regression opinions that exclude major variables, recognizing that the omission of major attributes affects the entire integrity and reliability of the regression. *See, e.g.*, *Reed Constr. Data Inc. v. McGraw-Hill Cos.*, 49 F. Supp. 3d 385, 401 (S.D.N.Y. 2014) (excluding regression analysis under *Daubert* for failure to include major variable); *see also In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1273 (S.D. Cal. 2010) (excluding expert report and noting "where significant variables that are quantifiable are omitted from a regression analysis, the study

9

may become so incomplete that it is inadmissible as irrelevant and unreliable"); *see also* Iyer Report ¶ 53 ("[W]ith several sheet characteristics, it is difficult to choose which variables to test without involving subjective judgments of the variables importance.").

Likewise, the Northern District of New York excluded an expert's hedonic regression opinion in a vodka-labeling case, where the expert made "little attempt to identify a relevant set of product attributes," instead merely offering a "few suggestions." *Singleton v. Fifth Generation, Inc.*, No. 5:15-CV-474 (BKS/TWD), 2017 WL 5001444, at *22 (N.D.N.Y. Sept. 27, 2017). The expert also failed to include a "key attribute": product quality. *Id.* The court found that the expert's analysis was "too superficial to support the proposed [hedonic regression] model," and "failed to show that the proposed hedonic regression model may be used to measure damages tied to the class's theory of injury." *Id.* The proponent of the expert bears the burden of showing that all major attributes have been accounted for in a regression analysis. *In re REMEC*, 702 F. Supp. 2d at 1273. Plaintiff has failed to meet that burden.

Like in *Singleton*, Boedeker merely offers suggestions of attributes he may consider. Report ¶ 77 (explaining regression would consider "certain attributes, like, for example, Weave, Size, Origin"). And in conducting his "preliminary analysis" of whether higher thread counts correlated with higher prices, Boedeker also fails to accurately define his attributes, further rendering his analysis unreliable. Although Boedeker claims he only included king-sized sheets in his analysis, he testified that does not know whether he also included California king–sized sheets. Boedeker Tr. 169:7-16. Boedeker also does not know if he distinguished between sets of sheets that included two pillowcases from sets that included four pillowcases. *Id.* 169:20-25.

Boedeker also excluded important attributes from this preliminary analysis. For example, Boedeker excluded sateen sheets based on his mistaken belief that sateen sheets are "not one of

those cotton polyester mixes" at issue in this case. Boedeker Tr. 168:17-21. Sateen is not a fiber but a weave, however, and thus should be included as an attribute in the regression analysis. *See* Transcript of Ciniglo Deposition 53:11-15, attached as Ex. 2; Exhibit A to Swift Decl. (example of CVC sheets with sateen finish). Boedeker has also failed to consider testing color availability as an attribute, *despite* Plaintiff's testimony that the color of the sheets is the *primary attribute* she considers when purchasing sheets. Transcript of Hawes Deposition 35:20-23 ("Q. So describe to me the kind of bed sheets that you like to buy? A. I look for a certain hue of gray. That's what I look for first."), attached as Ex. 3. Boedeker also did not consider numerous other attributes that may affect price, such as whether the sheets are sure-fit, organic, Oeko-Tek, cooling, performance, or easy care. *See, e.g.*, Swift Decl. ¶ 18 (outlining myriad sheet attributes); *see also generally* Declaration of Sal Ciniglio and Exhibits (attaching various inserts showing sheet attributes).

Boedeker has not accurately defined the attributes he will use and has omitted other important attributes. Boedeker's analysis is "too superficial" to support his proposed regression analysis and will be unreliable. His opinion should be excluded under Rule 702.

b. **Boedeker's failure to design a survey or to consider important attributes renders his conjoint analysis incomplete and unreliable**.

    i. *Boedeker has not even designed his conjoint survey, and his opinion is thus inadmissible.*

Boedeker's proposed conjoint analysis is also incomplete and should be excluded on this basis alone. Boedeker has not surveyed a single participant. He has not even designed the survey and would need to do additional research and analysis before doing so. Boedeker Tr. 103:15-18 ("Q. In the conjoint analysis, you would include all of the thread counts for every sku that's at issue in the case? A. I have not gone to that level to make a decision about that, simply because I have not researched and analyzed the data. But whatever the data require, that's how I will design the conjoint analysis."); *id.* 143:8-10 ("Again, I haven't designed the study . . . ."); Iyer Report

¶ 11.  Neither has Boedeker identified a target population for the survey or even decided whether the survey will focus on California residents.  *E.g.*, Boedeker Tr. 187:18-20 (Q. "[D]o you have any idea what the average age of Macy's customers is? A. I have not the slightest idea, no."); *see also id.* 116:9-15 ("Q. Have you determined whether you'll be able to design your study so that they only address sheets sold in California? A. . . .  [T]he conjoint study in defining the type of population, could be focusing on people that bought sheets in California.").

Boedeker is also not sure which attributes he would use for the survey.  *Id.* 112:19-22 ("Q. Have you considered what attributes you would need to test in the conjoint analysis? A. I have not, not designed the conjoint menus yet."); Iyer Report ¶ 42. Although he includes a "rough outline" of potential attributes in his report, *see* Boedeker Tr. 190:2-6; Report ¶ 142, Boedeker testified that he "would have to do more research" to determine which attributes to include.  Boedeker Tr. 97:20-25.   He estimates that he might choose five or six options, although he has not decided.  Report ¶ 119; Boedeker Tr. 176:4-8. Nor has Boedeker addressed how he might deal with hypothetical bias in his survey.  Iyer Report ¶¶ 47-48.

Boedeker's skeletal proposal does not satisfy *Daubert*.  Because he has not completed *even the preliminary research necessary* to design a conjoint survey, Boedeker has no idea what attributes customers find important to sheet choice.  *See* Iyer Report ¶¶ 43-44.  Like in *ConAgra*, in which the Central District of California also excluded the expert's conjoint analysis, Boedeker "has not determined the characteristics of the survey sample he would use in the analysis, the list of relevant product attributes, the sample size of the survey, or whether he would conduct separate surveys in each proposed class state or one large multi-state survey."  *ConAgra*, 302 F.R.D. at 551; *see also* Iyer Report ¶¶ 42-44 (describing process for attribute selection in conjoint analysis).  His

12

opinion should therefore be stricken because it is "so incomplete as to be inadmissible as irrelevant." *ConAgra*, 302 F.R.D. at 552 (citation omitted).

Because Boedeker's opinion is incomplete, the Court cannot satisfy its duty as "gatekeeper." To illustrate, as discussed below, *infra* Section III.c.iv, an important question in evaluating the admissibility of a conjoint analysis is whether the expert has accurately accounted for supply-side considerations. Thus, before finding that an expert's conjoint analysis is admissible, the trial court must evaluate whether the analysis integrates "*accurate* supply-side considerations." *See MacDougall v. Am. Honda Motor Co.*, No. SACV 17-1079 JGB (DFMx), 2020 WL 5583534, at *6 (C.D. Cal. Sept. 11, 2020) (collecting cases excluding expert opinions for failure to consider supply-side considerations) (emphasis in original). In *MacDougall*, another case in which Boedeker testified as an expert at the class certification stage, the defendants challenged whether Boedeker had accurately reflected supply-side considerations in his survey. *Id.* at *5. In *MacDougall*—unlike here—Boedeker *actually designed and distributed* the conjoint survey prior to the class certification stage. *Id.* at *5. The court evaluated the survey itself and determined that the price values Boedeker had assigned to the different options did not reflect market realities. *Id.* at *6. Because of those failings, the court struck Boedeker's opinion.

The Court cannot even consider whether supply-side considerations have been met because Boedeker *has not designed a survey at all*. Although Boedeker contends that he will consider the supply side by using prices from "product offerings that occurred in the actual world," Boedeker Tr. 129:1-6, there is no way for the Court to evaluate that statement because Boedeker has not designed the survey. Boedeker's conjoint opinion is "so incomplete as to be inadmissible as irrelevant," and should be stricken. *ConAgra*, 302 F.R.D. at 552.

> ii. *Boedeker's proposed survey cannot account for hand feel.*

Even if Boedeker's report could constitute a "model" for calculating damages, it would still fail *Daubert* because Boedeker's online survey cannot accurately replicate a critical attribute that consumers evaluate in selecting sheets for purchase: hand feel.  This omission provides yet another reason that Boedeker's survey is unreliable and must be stricken.

Boedeker proposes that the conjoint survey would be conducted online.  Report ¶ 126; Boedeker Tr. 187:9-11.  But the Third Amended Complaint only alleges that the purported class purchased sheets *in store*; the allegations of the Third Amended Complaint do not encompass online purchases.  *See* Third Amended Compl. ¶ 12 (alleging Plaintiff purchased sheets in the Macy's store).  Thus, the survey would not represent the putative class's actual, in-store experience purchasing sheets, which includes being able to feel the sheets they are considering purchasing.

Although Boedeker brushes off hand feel as a "subjective" consideration, he underestimates the importance of this attribute in the bedding industry.  Boedeker Tr. 146:5-147:8. Stores purposefully display sheets in unsecured zippered pouches that allow customers to open the packaging to feel the sheets.  *See* Swift Decl. ¶¶ 12, 14.  Defendant recognizes that a sheet's hand feel is very important to customers when purchasing sheets, and can play a significant role in a customer's decision to purchase sheets.  *See id.*  When deciding whether to order sheets, Defendant considers whether the sheets have a "pleasing feel" that "will be appealing to customers." *Id.* ¶ 14.

An online survey cannot at all replicate hand feel, and Boedeker has not attempted to account for this failing.  This is unsurprising, however, given that Boedeker is not aware of how sheets are packaged or the importance of this attribute; indeed, Boedeker never purchased a set of sheets himself or visited a bedding department.  Boedeker Tr. 87:8-16.  He concedes that he

14

"ha[s]n't studied the impact of" hand feel. *Id.* 146:18-23. Nor has he ever seen the packaging for any of the sheets at issue in this matter. *Id.* 89:12-15.

This is not the first time Boedeker's opinions have failed to justify his attribute selection for a conjoint analysis. In *Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010 (C.D. Cal. 2018), the Central District of California found Boedeker's opinion insufficient, in part because Boedeker "fail[ed] to include attributes deemed important purchase drivers," thus "artificially inflat[ing] the importance of and dr[awing] undue attention to the limited attributes presented to respondents in the conjoint analysis." *Id.* at 1049. And in *Townsend,* Boedeker *actually designed and distributed* the conjoint survey prior to the class certification stage. *Id.* at 1020. If allowed to proceed, Boedeker's opinion threatens to have the same effect here (albeit while having done even less work than in *Townsend*): because he fails to account for hand feel, his survey will overemphasize the importance of other attributes, such as thread count. Boedeker's conjoint analysis opinion should be excluded for this additional reason.

> iii. *Even if he had designed a survey, Boedeker has not demonstrated that his proposed conjoint analysis could determine damages.*

Even if Boedeker had designed a conjoint survey, his proposed analysis includes numerous pitfalls that render it unsuitable for calculating damages here. First, Boedeker has not shown if it is even possible to isolate thread count from other sheet attributes. Iyer Report ¶ 46. In order for a conjoint analysis to succeed, each attribute must be "independent." *Id.* (citing a paper Boedeker himself cites: Byran Orme, "Formulating Attributes and Levels in Conjoint Analysis," *Sawtooth Software Research Paper Series*, p. 1 (2002)). But because Boedeker has not completed any analysis, he has not shown that thread count can be disentangled from other attributes, such as touch and feel. *Id.* ¶ 45. Accordingly, his opinion is not sufficiently reliable and should be excluded.

Second, even if Boedeker's conjoint analysis were successful—which he has not shown is even possible—it will not result in a damages calculation tied to any consumer's economic loss. Boedeker contends that he will be able to use a Hierarchical Bayes Estimation with Gibbs Sampling to determine the difference in value a customer would assign a product without misrepresentations. Report ¶¶ 88-96. In short, Boedeker contends he can determine the "partworth" of bedsheets' attributes, such as thread count. Report ¶ 82. But any individual survey respondent's answer will depend on every other respondent's answer choices. As Iyer explains:

> [I]f respondent Sue entered Mr. Boedeker's survey and gave certain answer choices, then Sue's estimated "partworths" would depend on respondent Jack's answer choices and every other respondent's answer choices. . . . Thus, respondent Sue may not care to pay more for higher thread levels, but Mr. Boedeker's methodology would suppress that information because her "partworth" for thread counts would depend on Respondent Jack's partworth and every other respondents' partworth for thread counts.

Iyer Report ¶ 33. As a result, rather than reaching a single value appropriate for all customers, Boedeker's method would result in an average value of damages for all customers. *Id.* ¶ 35. This single figure is not related to the harm of any particular class member. *Id.* ¶¶ 36, 39, 41. Nor can Boedeker show that the proposed class suffered a common impact from Defendant's actions. *Id.* ¶ 41. Boedeker's conjoint opinion is not helpful to the Court's analysis, because it does not aid the Court in determining whether damages are available on a class-wide basis.

iv. *Boedeker ignores fundamental economic principles in order to inflate damages.*

The little analysis Boedeker provides shows that he has warped supply-side considerations in his model to Plaintiff's advantage in a way that does not at all reflect reality. Boedeker contends he will be able to construct a hypothetical demand curve for bedsheets in a "but-for" world, i.e., the world in which customers had an "accurate" thread count. Report ¶ 22. But Boedeker's model

16

focuses exclusively on the demand curve.  *Id.* ¶ 37 & fig. 1.  Boedeker's proposed model will overestimates damages and is thus unreliable.

The first lesson in any economics class is that as the price of a good increases, consumer demand for that good decreases (the "demand curve"), and as the price of a good increases, manufacturers' willingness to supply that good increases (the "supply curve"); the "market equilibrium" price is where the two curves meet.  Iyer Rep. ¶ 20 & fig. 1.   In most cases, if the demand curve shifts, so will the supply curve.  If demand for bedsheets decreased, manufacturers would respond by reducing the supply.  Iyer Report ¶ 24.  The market price for bedsheets would reach a new equilibrium, i.e., the new intersection of the supply and demand curves.

Boedeker's analysis would only account for the shift in demand.  He intentionally fixes the supply side by assuming—without any basis in economic principle—that Defendant would have sold the same quantity of sheets in the "but for" world as it did in the "actual world."  Report ¶ 36; Iyer Report ¶ 23.  As a result, rather than an upward sloping supply curve, Boedeker assumes that the supply curve for sheets is perfectly vertical, meaning that no matter the demand, the amount of sheets in the market will always stay the same.  Iyer Report ¶ 23.

A vertical supply curve is only appropriate in limited circumstances not at issue here. Generally, a vertical supply curve applies when the nature of the product is perfectly inelastic, meaning that the supply is fixed regardless of price.  *Id.* ¶¶ 23-24.  For example, a rare piece of art has a vertical supply curve; regardless of the demand, the supply is always the same because there is only one of that piece of art.  *Id.* ¶ 24.  In contrast, sheets are easily duplicated and manufacturers can easily expand or reduce production, so the supply curve will shift with the demand curve. *Id.*

Boedeker does not offer an economic justification for ignoring supply.  Although he contends that he does not need to take into account the shape of the supply curve because his "focus

is to determine a price in the But-For-World for the units sold in the Actual World," this reasoning merely reflects his understanding of how damages should be calculated. Report ¶ 52. Nowhere in his report does Boedeker offer a justification rooted in economic principles.

Because Boedeker uses a vertical supply curve, his "model" will *always* result in a lower price as demand falls. Iyer Report ¶ 25. Boedeker's model will always find that there are damages and is thus biased in favor of Plaintiff. And his reliance on a vertical supply curve means that he overestimates damages. If demand fell, manufacturers would also reduce supply, thus mitigating the decrease in price. *Id.* ¶ 26. By ignoring the possibility that demand would shift, Boedeker overestimates damages. *Id.* ¶ 27.

The Southern District of New York illustrated this effect in a simple graph:



*In re Gen. Motors Ignition Switch Litig.*, 427 F. Supp. 3d 374, 385 (S.D.N.Y. 2019); *see also* Iyer Report ¶ 26 fig. 2. As demonstrated above, the new market price (i.e., the new intersection of supply and demand—which follows basic economic principles) is higher than the price taking into account demand alone (which Boedeker proposes without justification). This is because "the sellers might not be willing to accept the price that the quantity of buyers of non-defective products

18

are willing to pay for defective products, except at much lower quantities. In other words, sales of products with known defects *would not occur* in the market at that price." *Id.* at 385-86.

This would not be the first case in which Boedeker's opinion was excluded for failure to adequately account for supply-side considerations. The Southern District of New York expressly rejected Boedeker's use of a vertical supply curve. In *In re General Motors*, Boedeker asked respondents how they would value a car with a disclosed side airbag defect. *Id.* at 384. He then constructed a hypothetical demand curve for vehicles without the defect in the "but-for" world." *Id.* at 385-86. Like here, Boedeker's model only focuses on changes to the demand side, and fixes, without justification, a vertical supply curve. *Id.* Although the *General Motors* plaintiffs argued that a vertical supply curve was necessary "in light of the 'mandate to construe damages broadly,'" the court rejected that argument under California law, which requires a court to consider a seller's willingness to sell when calculating damages. *Id.* at 386 (citing Cal. Civ. Code § 1760). Although the court acknowledged that a damages model using a vertical supply curve "could conceivably succeed," it would have to be "supported by evidence that, in fact, sellers would accept anything consumers are willing to pay." *Id.* There is *no* such evidence here. Indeed, as explained by Iyer, a vertical supply curve is "typically limited to rare art or ancient artifacts." Iyer Report ¶ 24. There is no basis in economics, law, or fact, for comparing bedsheets to rare art or ancient artifacts.

Just last year, the Central District of California excluded Boedeker's expert report in support of class certification, finding that his failure to account for supply-side considerations "calculate[d] an inflated measure of damages." *MacDougall*, 2020 WL 5583534, at *5. There, as in this case, Boedeker measured only the change in customers' "willingness to pay" for a defective product. *Id.* The court in *MacDougall* found that

> measuring damages solely through the lens of a consumer's [willingness to pay] overestimates a consumer's damages because even if a consumer has a reduced

[willingness to pay] for a defective or undesirable product, the consumer does not suffer any loss if their reduced [willingness to pay] remains greater than the actual cost of the product.

*Id.* Thus, "[t]he integration of accurate and realistic supply-side considerations . . . plays a critical role in producing an accurate measure of damages." *Id.* Because "without the integration of *accurate* supply-side considerations, a choice-based conjoint analysis transforms into a formula missing half of the equation," the court struck Boedeker's report. *Id.* at *6.

At most, Boedeker suggests that he will "incorporate the supply side" by considering the prices consumers paid in the "actual world." *Id.* ¶ 54. But, as discussed above, Boedeker's model contemplates a fixed supply, and because has not actually designed the conjoint survey there is no way for the Court to assess whether the prices in his survey will accurately reflect supply. The court in *MacDougall* rejected this same argument because Boedeker's conjoint survey used random price values. 2020 WL 5583534 at *6. Because Boedeker offers even less assurance that his survey will be reliable here—and because the Court cannot evaluate any such survey because Boedeker has not yet done any of the necessary work—Boedeker's report should be stricken.

## IV. CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court exclude Mr. Boedeker's report and testimony.

This the 3rd day of May, 2021.

Respectfully submitted,

*/s/ Beth A. Bryan*
Beth A. Bryan (Ohio Reg. 0082076)
TAFT STETTINIUS & HOLLISTER LLP
425 Walnut Street, Suite 1800
Cincinnati, Ohio 45202
Phone: (513) 381-2838
Fax: (513) 381-0205
bryan@taftlaw.com

Jennifer K. Van Zant (*pro hac vice*)
NC State Bar No. 21280
Andrew L. Rodenbough (*pro hac vice*)
NC State Bar No. 46364
Ryan C. Fairchild (*pro hac vice*)
N.C. State Bar No. 47729
BROOKS, PIERCE, MCLENDON,
HUMPHREY & LEONARD, LLP
230 North Elm Street
2000 Renaissance Plaza
Greensboro, NC 27401
Telephone: (336) 373-8850
Facsimile: (336) 378-1001
jvanzant@brookspierce.com
arodenbough@brookspierce.com
rfairchild@brookspierce.com

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document was filed via the Court's

CM/ECF system, which will send electronic notification to all counsel of record.

This the 3rd day of May, 2021.

*/s/ Beth A. Bryan*
Beth A. Bryan

22