# EXHIBIT 1



Deposition of:

## Stefan Boedeker

*March 1, 2021*

In the Matter of:

## Hawes, et al v. Macy's West Stores, Inc.

Veritext Legal Solutions

800.743.DEPO (3376) | Calendar-carolinas@veritext.com |
www.veritext.com

Stefan Boedeker                                    March 1, 2021
Hawes, et al v. Macy's West Stores, Inc.

Page 68

1    BY MS. VAN ZANT:

2        Q.   What product did the plaintiff buy?

3             MR. LEGANDO:   Objection.

4             THE WITNESS:   From what I recall, they were

5    linen and bedsheets, but I don't know the specific

6    products that were bought by the plaintiff or plaintiffs.

7    BY MS. VAN ZANT:

8        Q.   And have you been retained to opine as to

9    damages related to the product purchased by the

10   plaintiff?

11       A.   At this stage, I have been retained to propose

12   a methodology and explain how that methodology is able to

13   quantify class-wide economic losses.  But I have not yet

14   conducted a study that would actually calculate the

15   damages.

16            So it is my understanding that this is a class

17   certification phase, and that at a later point, I may be

18   asked to perform expert opinions when it comes to what's

19   called the merit phase of the case, for lack of a better

20   term, but I have not been doing that work and have not

21   yet been retained for that work.

22       Q.   On what product or products have you been asked

23   to opine?

24       A.   What do you mean specifically by that, on what

25   products?

Stefan Boedeker                    March 1, 2021

Hawes, et al v. Macy's West Stores, Inc.

Page 71

1    methodology for both of these analyses that I'm

2    proposing.  I have seen some, some data spreadsheets that

3    show a lot of information for different products along

4    those dimensions that I testified about earlier.

5              But I have not sat down and issued designs of

6    the conjoint menu and to see which products to include.

7    Conjoint is flexible enough to do one product at a time

8    or to mix different products.

9              What I have done is looking at the spreadsheet

10   data that without really doing hedonic, but the data

11   requirements for a hedonic based on the spreadsheet data

12   that I've seen, is satisfied.  So they're granular

13   enough.  They have enough attributes of the products that

14   a hedonic can be applied.

15             But I have not done either one and have not

16   come, have not done any research in how I would actually

17   design either one of those two methodologies.

18        Q.   So you don't, is it fair to say that you don't

19   know yet whether you would do a hedonic regression on

20   each individual product?

21        A.   Depending on the, on the data situation, what

22   I've seen in my understanding with data samples, but if I

23   had broader data, then I could make that decision.

24             And a hedonic -- any statistical technique

25   requires sufficient data so, therefore, I would have to

Stefan Boedeker                                          March 1, 2021
Hawes, et al v. Macy's West Stores, Inc.

Page 72

1   assess the data situation first, and then I would decide

2   to do one at a time or together.  But either way, the

3   methodology, methodology itself would work.

4        Q.   Uh-huh.  On the conjoint analysis, do you know

5   if you could do that for all products together or whether

6   you would need to do the products individually?

7        A.   I have not done that research, but it depends

8   on how many common attributes and characteristics they

9   are and by how much they differ.

10            And then in conjoint particularly, it's very

11  important to keep the study, so that to design the study

12  that is not going to be too long because then the

13  participants suffer from fatigue potentially.

14            And so, therefore, it is, it is likely if the

15  product variations are large, that I would break it up

16  into smaller studies.  But I haven't done that analysis

17  yet.

18       Q.   Do you have an opinion as to the appropriate

19  measure of damages in this case?

20       A.   What do you mean by that?

21       Q.   Well, does the phrase benefit of bargain

22  damages mean anything to you?

23       A.   Yes, it does.

24       Q.   Okay.  Is benefit of bargain analysis an

25  appropriate measure of damages, in your opinion, in this

Page 76

1      Q.   Have your opinions changed at all since
2   February 1st when you issued this report?
3      A.   They have not.
4      Q.   Are there any corrections you're aware of that
5   need to be made to your report?
6      A.   Not at the moment.  Maybe there is a typo that
7   I overlooked, but nothing of substance.
8      Q.   In paragraph four, you mention retail
9   experience.  Do you see that?
10      A.   Retail experience in paragraph four.
11          MR. LEGANDO:  I'll object to the form of the
12   question.
13          THE WITNESS:  I see retail is listed between
14   healthcare and grocery.  I found it.
15   BY MS. VAN ZANT:
16      Q.   Have we talked about all of your retail
17   experience related to class actions and litigation?
18          MR. LEGANDO:  Object to form.
19          THE WITNESS:  We have not.
20   BY MS. VAN ZANT:
21      Q.   Okay.  What other work would you put in that
22   bucket, retail experience related to class actions?
23      A.   Yeah.  I've worked on, on really numerous
24   employment related class actions in the retail sector.
25   And have done consulting work in the retail sector,

Stefan Boedeker                        March 1, 2021
Hawes, et al v. Macy's West Stores, Inc.

                                                          Page 87

1        A.    Right now that doesn't ring a bell.

2        Q.    Have you read Ms. Hawes' deposition transcript?

3        A.    I have not, otherwise I would have listed it.

4        Q.    I believe you said you had never bought sheets

5    from Macy's; is that correct?

6        A.    I, I cannot recall having bought sheets from

7    Macy's.  That would be more my wife's department.

8        Q.    And have you ever been in the bedding or sheet

9    department at a Macy's?

10       A.    I don't recall.  Very likely that I have not.

11       Q.    But do you know how Macy's packages its sheets?

12       A.    No.  Because I have no recent experience, if

13   any experience, of having actually been to a bedding

14   department.

15       Q.    Have you ever bought a set of sheets yourself?

16       A.    I have not, no.

17       Q.    And do you know what type of sheets you have in

18   your home?

19       A.    I, yeah, I have a vague idea, so...

20       Q.    Okay.  What, what type of sheets do you have in

21   your home vaguely?

22       A.    Linen sheets, for example.  That's sheets that

23   I have.  Other sheets of different materials than linen.

24   But I couldn't name all of them, including the guest

25   room, my kids' rooms, and my own room.

Stefan Boedeker                                      March 1, 2021
Hawes, et al v. Macy's West Stores, Inc.

Page 89

1    time on the monitor is approximately 2:22 p.m. Eastern

2    Standard Time.  And we're off the record.

3                    (Recess.)

4              THE VIDEOGRAPHER:  This is the beginning of

5    media number three in the deposition of Stefan Boedeker.

6    The time on the monitor is approximately 2:36 p.m.

7    Eastern Standard Time, and we're back on the record.

8    BY MS. VAN ZANT:

9        Q.   Mr. Boedeker, have you ever seen the labeling

10   for any of the sheets at issue in this matter?

11       A.   I have not looked at the labeling.

12       Q.   Have you ever seen the packaging for any of the

13   sheets at issue in this matter?

14       A.   I have not looked at the packaging for the

15   sheets.

16       Q.   And do you know if the packaging or the

17   labeling differ among the different skus at issue in this

18   case?

19       A.   I do not know that.

20       Q.   I'm putting your report back on the screen.

21   There is a little funky thing here where we have

22   paragraph eight and then it's followed by paragraph 11.

23           Do you see that?

24       A.   Move up a little bit.  Oh, there we go.  Yes,

25   it goes from eight to 11.

Stefan Boedeker                              March 1, 2021
Hawes, et al v. Macy's West Stores, Inc.

Page 93

1       Q.   I'm so sorry.  How is thread count related to

2   longevity?

3       A.   Longevity was the last word that I missed.

4            Okay.  I have not done any independent analysis

5   of doing that and, again, this is not something that is

6   necessary in proposing a methodology.  Maybe later on in

7   the merits price actually doing data analysis, rather

8   than proposing a methodology, this may be something that

9   I may look into, but I haven't at the moment.

10      Q.   Okay.  In paragraph 13, you say that Latin

11  phrase, which means all other things the same, correct?

12      A.   Yes.

13      Q.   All other things the same, a higher thread

14  count is associated with a better quality and higher

15  price.  You see that statement?

16      A.   Yes, I do.

17      Q.   Okay.  And we talked about, have we talked

18  about all the basis for that statement?

19      A.   Yes.

20      Q.   Okay.  And how do you know that all other

21  things are the same when you are thinking about this

22  association with a higher thread count?

23           MR. LEGANDO:  Object to form.

24           THE WITNESS:  The data that I looked at when

25  you look at, let's say, the blend between cotton and

Stefan Boedeker                                    March 1, 2021
Hawes, et al v. Macy's West Stores, Inc.

Page 94

1    polyester, which could be whatever, 55, 45, 60, 40, then

2    some of the products at issue, and then the color, maybe

3    the weaving method, and compare that to keep that

4    constant, and then only look at the change in thread

5    count, that means keeping other things equal.  And so

6    that's where this is a statement that is validated by

7    looking at the actual data.

8    BY MS. VAN ZANT:

9        Q.   Okay.  And, but you haven't actually validated

10   that statement, have you?

11       A.   I did it with the pricing up with the thread

12   count, and there is a chart at the bottom of my report

13   somewhere.

14       Q.   Right.  And that, and that's later in your

15   report.  We'll get to that.

16           So other than that chart, which is figure two,

17   that's the only validation you've done on, on your

18   statement there in paragraph 13?

19       A.   Yes.  And, again, the 12, 13, the claims

20   against the defendants are based on the amended complaint

21   and the case materials.  And I have then verified that

22   higher thread count leads to higher prices.

23       Q.   And --

24       A.   Not leads, but goes together with higher

25   prices.

Stefan Boedeker                    March 1, 2021
Hawes, et al v. Macy's West Stores, Inc.

Page 97

1   would come up with a conjoint design that includes the

2   relevant attribute.

3           And then I would empirically test, based on

4   consumer responses, 500, a thousand consumers, whatever

5   is necessary to get statistic reliability.  And then I

6   would empirically calculate it.

7           So I would in a sense let the data do the

8   talking rather than assume something, and then what the

9   data indicate, will then be the results, which I would

10  report on.

11      Q.   Are you going to analyze all the different skus

12  or are you going to group them or analyze them

13  altogether?

14      A.   That is something that -- sorry.  Okay.  There

15  was a beep here.

16          Can you repeat that?

17      Q.   Are you going to analyze all the different skus

18  or are you going to group them in some way, or are you

19  going to analyze them altogether?

20      A.   That is an analysis that I have not yet done.

21  So I would have to do more research which, again, for the

22  conjoint, there is a specific design phase that I have to

23  go through.  And that is sometimes I may even have to do

24  what I call an exploratory data survey that would

25  definitely be a pretest.

Stefan Boedeker                    March 1, 2021
Hawes, et al v. Macy's West Stores, Inc.

Page 103

1        A.    Also, I'm not done with my answer.  I just have

2   one more cause or explanation.

3              Now, that would now be modeled along a curve.

4   So that curve is the best fitting curve for the data

5   points I have, and that basically enables me to have,

6   quote/unquote, I think we call in between values.

7              So I don't know if that's exactly what they

8   said, but that's how the statistical model will basically

9   do it along a curve, not just a discreet point.

10       Q.    And I apologize for interrupting you earlier.

11  I didn't mean to.

12             In the conjoint analysis, you would include all

13  of the thread counts for every sku that's at issue in the

14  case?

15       A.    I have not gone to that level to make a

16  decision about that, simply because I have not researched

17  and analyzed the data.  But whatever the data require,

18  that's how I will design the conjoint analysis.

19       Q.    And do you know if, do you know if there is

20  more than one sku, for example, with a 1200 thread count?

21       A.    I have not broken down the skus based on the

22  characteristics and attributes of the product.

23       Q.    And do you know if the degree of

24  misrepresentation is consistent across all the 1200 skus,

25  for example?

Stefan Boedeker                                    March 1, 2021
Hawes, et al v. Macy's West Stores, Inc.

Page 112

1    balance design, it is made sure, ensured that none of the

2    levels, none of the attributes, none of the combinations

3    is shown more often than any other.

4           And even pairs of combinations that show up on

5    the same menu are shown equally often.  So that's being

6    accomplished by a randomization of all possible

7    permutations.

8           But each participant on each menu just sees one

9    level per attribute so, therefore, the number of

10   attributes is important or has an important impact on how

11   many participants I need and how many conjoint menus I

12   need.

13          But that can all be calculated once a design is

14   basically done.  It's almost like a computer maximization

15   algorithm that finds the best randomization or the proper

16   randomization of all of these different permutations

17   under those constraints if nothing is shown more than

18   other things.

19   Q.   Have you considered what attributes you would

20   need to test in the conjoint analysis?

21   A.   I have not, not designed the conjoint menus

22   yet.  But, again, I would look at the data and see what

23   are involved in attributes within the data.  Then I would

24   probably do some additional research.

25          Sometimes I've been even done pilot studies or

Stefan Boedeker                                            March 1, 2021
Hawes, et al v. Macy's West Stores, Inc.

Page 116

1      A.   If it's not in the complaint, then it's based

2   on discussions with counsel.  That's the data that was

3   given to me.

4      Q.   Did they dictate that to you?

5      A.   Dictate, probably not dictate in a sense of

6   verbatim.  But it was part of a discussion we had if it's

7   not in the complaint, and then I put the sentence

8   together based on the discussion.

9      Q.   Have you determined whether you'll be able to

10  design your study so that they only address sheets sold

11  in California?

12     A.   The hedonic I would -- well, I can't restrict

13  the database on California sales.  And the conjoint study

14  in defining the type of population, could be focusing on

15  people that bought sheets in California.

16     Q.   Are you aware that the defendant here only sold

17  sheets in stores?

18          MR. LEGANDO:  Object to form.

19          THE WITNESS:  I mean, my understanding was that

20  these are store solds and not online sales.  But that's

21  also something based on a discussion that I had.

22  BY MS. VAN ZANT:

23     Q.   In paragraph 21 you cite the reference guide on

24  estimation of economic damages.

25          Do you see that?

Stefan Boedeker                    March 1, 2021
Hawes, et al v. Macy's West Stores, Inc.

Page 129

1      Q.   All right.  But you're not, you're not changing
2   the supply as the demand changes?
3      A.   The supply, first of all, the supply side in
4   the model is given by prices, product offerings that
5   occurred in the actual world.  So that is basically the
6   supply side.
7           Now, following the reference manual, I'm now
8   changing the level of information that the consumers
9   have.  They know I'm being, that the thread count, the
10   thread count mislabeling will not be disclosed to them,
11   but there is still a hundred thousand, that's in my
12   example, a hundred thousand people who bought that
13   product.
14           So for those 100,000 people, one now has to
15   find that the price that it would have sold in the
16   but-for-world, when the knowledge about the misstatement
17   is given to the consumers at the point of purchase.
18           That's not ignoring the supply side.  That's
19   focusing on the point of the supply service that is
20   relevant for the damages calculation.
21      Q.   Okay.  Looking at figure one of your report, is
22   this for one product?
23      A.   This is an example and it's for one product.
24   And it just shows what we're looking at at the to demand
25   curve and the point on the supply curve that is necessary

Stefan Boedeker                                    March 1, 2021
Hawes, et al v. Macy's West Stores, Inc.

Page 143

1    into the sheets would not be relevant to what you want to

2    do?

3        A.   Only insofar as they reflect prices that the

4    consumers pay.

5        Q.   So how would you control for that if the prices

6    may have increased over time due to the increases in the

7    raw materials?

8        A.   Again, I haven't designed the study, but

9    typically prices are calibrated to prices that were

10   charged in the class period.

11            There is information in the general questions

12   in this conjoint study to basically find out when the

13   bedsheets were bought, and then prices will be matched

14   with the purchase date.

15            For the hedonic, the transaction that I have

16   have dates in them.  So then the date then can be used to

17   test, I think I have seasonality as an example, but also

18   look at time trends in the data itself that would then

19   capture something like did raw materials get more

20   expensive or cheaper that could probably capture in that.

21       Q.   Why would you use hedonic pricing regression

22   here?

23            MR. LEGANDO:  Object to form.

24            THE WITNESS:  What do you mean by here?

25

Stefan Boedeker                        March 1, 2021
Hawes, et al v. Macy's West Stores, Inc.

Page 146

1    data?

2         A.   I don't know.  I mean, it's possible that they

3    both will give reliable results, and then will in a sense

4    corroborate each other by giving similar results.

5         Q.   Okay.  We discussed earlier that these, the

6    sheets at issue in this case were sold in store.  And

7    that means, doesn't it, that a potential purchaser could

8    test out the touch and feel of a sheet fabric in the

9    store; is that correct?

10        A.   Say that again?  I didn't hear the first part

11   of the question.

12        Q.   Because the sheets are sold in store --

13        A.   Okay.

14        Q.   -- does that mean that a potential customer

15   could actually touch the sheets and determine how they

16   feel?

17             MR. LEGANDO:  Objection.

18             THE WITNESS:  I mean, it's possible, right,

19   that people in the store actually touched the product.  I

20   haven't studied the impact of that.  But, again, you

21   would always get the product that you ultimately buy

22   being put in some kind of a container, box, whatever it

23   is.

24             So I don't know if you're touching the one that

25   you're actually buying, or if you're touching a floor

Stefan Boedeker                    March 1, 2021
Hawes, et al v. Macy's West Stores, Inc.

Page 147

1   sample.  I haven't studied that or the impact of that.

2   BY MS. VAN ZANT:

3       Q.   But touch and feel could be an important

4   consideration for customers, correct?

5       A.   It is something that the customer can

6   subjectively place or put importance on.  However, for

7   the damages calculation, I think I testified earlier the

8   reason why the customer buys something is secondary.

9            What is the primary issue is could they have

10  bought that product at a different price if the thread

11  count, the true thread count number had been disclosed at

12  the point of purchase.

13      Q.   And your hedonic approach would not include the

14  touch and feel variable, correct?

15      A.   Right now I have not thought about that.  The

16  touch and feel variable is, at least in the data that I

17  have seen, is not something that is being captured at the

18  point of purchase.

19           It's also a variable that is hard to measure.

20  It's what would be the at level for a touch and feel

21  variable because everything feels and has a different

22  touch from consumer across the spectrum.

23      Q.   What is multicollinearity?

24      A.   That is something that pertains to hedonic

25  regression.  And as I testified earlier, what I called

Stefan Boedeker                    March 1, 2021
Hawes, et al v. Macy's West Stores, Inc.

Page 156

1    is?

2        A.   Right now I don't see a cost column.  Can you

3    move it a little bit to the right.  The last thing I see

4    is NRF color.  Oh, there we go.

5        Q.   Okay.

6        A.   The cost column or the owned retail column, for

7    this exercise I have not yet identified the meaning of

8    all of the variables.  So right now I have not worked

9    with those two variables.

10       Q.   And owned retail, do you know what that number

11   means?

12       A.   Again, column I and J, I have not yet analyzed.

13       Q.   And ticket retail?

14       A.   Ticket retail, same thing.  But the name is

15   just more explanatory.  But I have not analyzed price

16   data for this part of my report.

17       Q.   Okay.  And what do you think ticket retail

18   means?

19       A.   That's probably the retail price on the

20   sticker, not including any sales.  But, again, since I've

21   not analyzed a full, what I would call a data dictionary,

22   I basically used, I don't know what ticket retail is.  I

23   used this basically to look at information about

24   attributes.

25       Q.   All right.  And then we have, we have a class

Stefan Boedeker                    March 1, 2021
Hawes, et al v. Macy's West Stores, Inc.

Page 167

1     Q.   So Exhibit 8 is notebook, and it pulled data
2     from Exhibit 7; is that correct?
3     A.   Yeah.  I didn't keep track of the numbering,
4     but it pulled data from one of the spreadsheets we looked
5     at earlier.
6     Q.   It was Exhibit 7 that we were just on.
7     A.   I take your word for it.
8     Q.   Okay.  Thank you.  I appreciate that.
9          And so then this, is this what helped you to
10    generate the figures in your report?
11    A.   Yeah.  And just scrolling down, there would be
12    these lines we see actually called computer commands?
13    Q.   Uh-huh.
14    A.   And then at some point there, it basically goes
15    in and puts data in from that spreadsheet, and then
16    ultimately produces the graph that is Exhibit 2 in my
17    report.
18    Q.   Okay.  So we can see down here that, that you
19    used king sheets.  That you pulled king sheets from
20    Exhibit 7 when you used this?
21    A.   Yes, sorry.  I didn't mean to interrupt you.
22    Q.   No.  That's okay.
23    A.   Yeah.  For comparison purposes in figure two, I
24    wanted to not mix the different sizes.  So I focused on
25    one, and that's in XM, I picked the king sheets, and then

Stefan Boedeker                                      March 1, 2021
Hawes, et al v. Macy's West Stores, Inc.

                                                      Page 168

1    I would plot in figure two the ticket price for king

2    sheets against the thread count.

3          Q.   Okay.

4          A.   That's a lot of syntax here, but it all boils

5    down to pulling those data out of the spreadsheet, and

6    then turning them into the chart that is Exhibit 2 to my

7    report.

8          Q.   Did you write this notebook or did someone else

9    write it?

10         A.   This particular, I think it was done by

11   Dr. Groehn.

12         Q.   Now, you have this, weave does not equal

13   sateen.

14              Do you see that?

15         A.   Oh, yeah, highlighted.  Okay.  I see it right

16   now.

17         Q.   Okay.  What, so does that mean that in this

18   workbook you excluded sheets that were marked as sateen?

19         A.   If you pull the chart, I did not improve that

20   because this was modeled, is my understanding not one of

21   those cotton polyester mixes.

22         Q.   All right.  So you selected king sheets.  And

23   you, and you also selected, you wanted the ticket price

24   to be greater than zero if you were going to use it.  And

25   then you excluded sateen sheets; is that right?

Stefan Boedeker                    March 1, 2021
Hawes, et al v. Macy's West Stores, Inc.

Page 169

1          A.    That's what this syntax says, yes.

2          Q.    Any other attributes addressed in this syntax?

3          A.    In this syntax, because I wanted to plot ticket

4     prices against thread count, I did not put any other

5     variables in there.  Indirectly the weave because for

6     weave I put in a restriction to exclude the sateen.

7          Q.    And do you know if king sheets included or

8     excluded California king sheets?

9          A.    I would have to look at the table, the

10    underlying spreadsheet, but I wanted to have it as

11    comparable as possible.  So if there was a separate

12    category of California king sheets that was listed in

13    there, then if it was just the king sheets, if that was

14    the descriptor, then California king sheets wouldn't be

15    in there.  But from the report itself, without looking at

16    the data, I couldn't tell.

17         Q.    All right.  Do you know what kind of weave the

18    sheets that Ms. Hawes purchased used?

19         A.    I do not recall that.

20         Q.    So in creating this notebook, did you account

21    for whether a sheet set included two pillowcases versus

22    four pillowcases?

23         A.    I don't recall that.  And I don't know how the,

24    if that's the end of the code, then I don't see it here.

25    So I don't know.

Stefan Boedeker                                March 1, 2021

Hawes, et al v. Macy's West Stores, Inc.

Page 176

1    conjoint methodology that I propose here, is viewed as

2    revealing their overall preferences, by stating a

3    preference on one particular set choice menu.

4           So the way where the distinction comes in by

5    choosing one out of five or six options they see, they

6    can also pick the no purchase option, the participants

7    stating their preference for that limited set of options

8    that they saw and had one choice in.

9           Now, by giving them 10, 12, 15, whatever

10   choices that are necessary, they're ultimately revealing

11   preferences across all attributes.

12          And then in the next step, using this

13   hierarchical Bayesian estimation approach, it is possible

14   to calculate the, quantify these revealed preferences

15   with something that the literature refers to as path

16   work.

17          And then the path work can be calculated for

18   individual participants but also for the group of, group

19   of all participants representing the target population.

20   Q.   Now, when you're testing the different examples

21   in the conjoint, those are theoretical combinations,

22   right, that you're testing?

23   A.   You mean by the theoretical, what is the

24   theoretical combination?

25   Q.   You described earlier that you put all the

Stefan Boedeker                              March 1, 2021
Hawes, et al v. Macy's West Stores, Inc.

Page 187

1              MR. LEGANDO:  Objection.  Form.

2              THE WITNESS:  Somehow I didn't hear the end of

3     the question.

4     BY MS. VAN ZANT:

5         Q.   Isn't it true that we're talking about in this

6     case in store sales, not Internet sales?

7              MR. LEGANDO:  Same objection.

8              THE WITNESS:  The sales at issue or in question

9     in this case were done in stores, but in this case the

10    panelists, the participants in the study will complete

11    the survey via the computer as an Internet based one.

12             But the description of the purchase situation

13    will tell them that they were in the store looking at

14    bedsheets.  And I haven't done the path, but there will

15    be an introduction as to what purchase situation they are

16    in.

17    BY MS. VAN ZANT:

18        Q.   Right.  So, I mean, do you have any idea what

19    the average age of Macy's customers is?

20        A.   I have not the slightest idea, no.

21        Q.   And how would you, how would you make sure that

22    your population from the study mirrored the population

23    that was likely to buy sheets in a Macy's store?

24        A.   Before the actual conjoint menus are shown,

25    there is a whole list of questions that identify the

Stefan Boedeker                                    March 1, 2021
Hawes, et al v. Macy's West Stores, Inc.

                                                        Page 190

1    attributes that I had seen in the spreadsheets.

2        Q.   Okay.  So this is more just a rough outline of

3    what attributes you might think about; is that correct?

4        A.   This, yeah, fitted and flat just show

5    illustratively speaking what attributes and levels of

6    attributes could look like.

7             MR. LEGANDO:  Jennifer, we're running at 90

8    minutes here uninterrupted, so when you're approaching a

9    break, it would be appreciated.

10            MS. VAN ZANT:  Sure.  We can take a break.  Ten

11   minutes.

12            MR. LEGANDO:  Okay.

13            THE VIDEOGRAPHER:  That's the end of the media

14   number three in the deposition of Stefan Boedeker.

15            The time on the monitor is approximately

16   6:08 p.m. and we're off the record.

17                      (Recess.)

18            THE VIDEOGRAPHER:  This is the beginning of

19   unit number four in the deposition of Stefan Boedeker.

20   The time on the monitor is approximately 6:17 p.m.

21   Eastern Standard Time.

22            And we're back on the record.

23   BY MS. VAN ZANT:

24       Q.   Mr. Boedeker, would it matter to your study

25   design if the thread count were incorrectly represented

Stefan Boedeker                          March 1, 2021
Hawes, et al v. Macy's West Stores, Inc.

Page 194

1   so, therefore, omitting an attribute would not

2   necessarily lead to a bias or I think you called it

3   distortion.  In the estimates for the others to repeat

4   the sentence.

5        Q.   What would you use as sources to determine what

6   attributes to include in a conjoint analysis in this

7   case?

8        A.   I mean, for one, I have the spreadsheets that I

9   analyzed more for the hedonic to see if hedonic was

10  possible, and they gave me a number of attributes.

11            Now, I think I testified earlier that, that

12  even though there may be heterogeneous offerings in terms

13  of how these products are package, but in a sense

14  bedsheets are bedsheets.  They don't have hundreds of

15  thousands of attributes.

16            So from then and the ones I have, I would

17  probably run some kind of a, what I call an exploratory

18  data survey to see how those rank on a scale to

19  consumers, and then also try to find out if there is any

20  additional ones.

21       Q.   And how would you go out about finding out if

22  there were additional attributes that were important to

23  consumers?

24       A.   That would be found out via a survey.  And

25  there is different techniques of how to elicit that