UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| SARA HAWES, individually, and on behalf of all others similarly situated, | Case No. 1:17-cv-00754 |
| Plaintiff, | Judge Timothy S. Black |
| v. | |
| MACY'S WEST STORES, INC., | |
| Defendant. | |

**DEFENDANT'S MOTION TO STRIKE REPORT
AND EXCLUDE OPINIONS OF MR. SEAN CORMIER**

Defendant Macy's West Stores, Inc., through undersigned counsel, respectfully moves the Court for an Order striking the expert report and excluding the opinions of Plaintiff's expert, Sean Cormier, pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

For the reasons stated in the supporting Memorandum filed contemporaneously herewith and incorporated herein by this reference, Defendant respectfully requests that the Court strike the report and exclude the testimony of Sean Cormier as incomplete and unreliable.

This the 3rd day of May, 2021.

Respectfully submitted,

 */s/ Beth A. Bryan*
Beth A. Bryan (Ohio Reg. 0082076)
TAFT STETTINIUS & HOLLISTER LLP
425 Walnut Street, Suite 1800
Cincinnati, Ohio 45202
Phone: (513) 381-2838
Fax: (513) 381-0205
bryan@taftlaw.com

Jennifer K. Van Zant (*pro hac vice*)
NC State Bar No. 21280
Andrew L. Rodenbough (*pro hac vice*)
NC State Bar No. 46364
Ryan C. Fairchild (*pro hac vice*)
N.C. State Bar No. 47729
BROOKS, PIERCE, MCLENDON,
HUMPHREY & LEONARD, LLP
230 North Elm Street
2000 Renaissance Plaza
Greensboro, NC 27401
Telephone: (336) 373-8850
Facsimile: (336) 378-1001
jvanzant@brookspierce.com
arodenbough@brookspierce.com
rfairchild@brookspierce.com

*Attorneys for Defendant*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| SARA HAWES, individually, and on behalf of all others similarly situated, | Case No. 1:17-cv-00754 |
| Plaintiff, | Judge Timothy S. Black |
| v. | |
| MACY'S WEST STORES, INC., | |
| Defendant. | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION TO STRIKE REPORT AND EXCLUDE OPINIONS OF SEAN CORMIER**

**<u>INTRODUCTION</u>**

Plaintiff seeks to support her Motion for Class Certification with the expert opinions of Sean Cormier, an instructor at the Fashion Institute of Technology in New York. Plaintiff relies on Cormier, who had neither opined about nor tested the thread count of sheets until this litigation, to support her central theory of this putative class-action case: that Defendant has engaged in a pervasive scheme to inflate the thread count of sheets sold in its retail stores. Like the rest of Plaintiff's class certification presentation, Cormier's report is characterized by reliance on the allegations of Plaintiff's pleadings despite the lack of evidentiary support for those contentions. These factual defects, combined with Cormier's lack of qualifications, render his opinions improper, unreliable, and unhelpful to establish any elements of class certification. Accordingly, the Court should strike Cormier's opinions and refuse to consider them at the class certification stage.

## FACTUAL BACKGROUND

Plaintiff retained Sean Cormier to offer opinions regarding the thread count of bedsheets—specifically, regarding the chief value cotton ("CVC") bedsheets supplied by AQ Textiles to Defendant Macy's West Stores, Inc. Cormier is an instructor at the Fashion Institute of Technology ("FIT") in New York City. Cormier Report 1. He earned an Associate's Degree in "Textile Development and Marketing" from FIT in 1990. He also holds a Bachelor's degree in business marketing and a Master's degree in adult education from the University of Phoenix.

Between roughly 1986 and 2014, Cormier was employed by different businesses in the textile industry. The companies for which he worked (most notably, women's apparel company Liz Claiborne, where he worked for 16 years) did not manufacture or sell bedsheets;[1] instead, they sold clothing and apparel products and slip covers for furniture. Ex. A, Transcript of Deposition of Sean Cormier ("Cormier Tr.") 19:2-20:11, 26:2-21, 47:19-48:2. Cormier's specific job functions were never related to the weaving of fabric; other than operating a hand loom as a student at FIT, he has no experience working with industrial looms. Cormier Tr. 24:1-10. In his work at those jobs, he worked and communicated with international textile testing labs such as SGS, Intertek, and CTL and trusted them to perform product testing. Cormier Tr. 52:21-54:23. He also found the labs to be "very nice and very professional." Cormier Tr. 58:12-59:2.

As part of his teaching at FIT, Cormier educates his students generally about ASTM International and the testing standards that ASTM promulgates, and sometimes has his students perform testing on textile materials in accordance with ASTM Standards. Cormier Tr. 38:22-39:15. However, he has never had his students test bedsheets, with the exception of a single test

---

[1] Liz Claiborne marketed bedsheets under its name at one point but, a third party handled the acquisition and management of the bedsheets. Thus, neither Liz Claiborne nor Cormier had any involvement with acquisition or management of the bedsheets, and Cormier's role with Liz Claiborne was limited to apparel products. Cormier Tr. 26:9-17.

for "hand feel." Cormier Tr. 38:4-13, 41:10-42:19. While Cormier has performed thread-count

tests himself, the first time that he ever tested the thread count of bed sheets was for his work in

this litigation. Cormier Tr. 150:9-16. He is not a member of ASTM, and has never received

training in applying ASTM standards. Cormier Tr. 144:14-146:2.

> In his report, Cormier opines:

> Macy's Chief Value Cotton (CVC) sheets supplied by AQ Textiles do not have the thread counts represented by Macy's on the marketing and labeling of the products to consumers; rather, the thread counts are significantly inflated because Macy's chose to use a non-standard and unacceptable alternative counting method that is contrary to the well-established and long-standing industry standard as defined by the American Society of Testing Materials (ASTM) Committee 13 governing the calculation and advertisement of thread counts. As a result of the inflated thread counts on the packaging of the products, consumers purchase the products reasonably believing that they were purchasing a product with the stated thread count and which is of higher quality, durability, longevity, and/or softness, and/or better for sleeping, than products with a lower thread count.

Cormier Report 3-4.

He bases this opinion, in large part, on his understanding that AQ Textiles uses, and

Defendant has adopted, a method of thread-count testing "requiring 'independent' labs to go

beyond the industry standard and count fibers" (as opposed to counting the threads composed of

fibers). Cormier Report 18. That assertion, however, finds no basis in the evidence. While

Cormier repeatedly said at his deposition that Larry Queen, AQ's president, had testified or made

statements to that effect,[2] Queen in fact flatly denied the idea that he (or anyone else) advocated

for counting "fibers" instead of threads. Ex. B, Transcript of Deposition of Larry Queen, 62:14-

63:14; 68:8-12. Moreover, while Cormier claims to have reviewed an April 27, 2017 email sent

from "AQ Textiles" to "SGS Testing Laboratories" in which AQ communicated its supposed

"alternative counting method" to the testing laboratory, the email in question was actually sent

---

[2] *See, e.g.*, Cormier Tr. 184:2-9, 222:16-224:1, 226:2-9.

from a representative of a company called "GCPL Experts" to Queen, with no testing lab involved at all. *See* Cormier Tr. 184:10-186:8 & Ex. 12. Even leaving aside that glaring error, Cormier's claim that the email says anything about counting "fibers" (versus threads) is simply false. When faced with this reality in his deposition, Cormier could not identify any other evidence supporting his assertion that AQ Textiles or Defendant had required testing labs to count individual fibers, rather than threads. Cormier Tr. 226:2-11.

In addition to his opinions regarding the purported "alternative method" for counting threads in bedsheets, Cormier also says that he tested the thread counts of the sheets purchased by Plaintiff Sara Hawes and three other sheet sets he purchased from a Macy's store in New York City (a test he had never performed on bed sheets before) and found them lacking. Cormier Report 17. Cormier admitted, however, that he failed to conduct the test as directed by the current version of the ASTM D3775 standard. Cormier Tr. 159:23-25. Specifically, instead of cutting five samples from the sheets to test, as provided in Section 9.1.1 of the standard, he tested only a single sample from each. Cormier Tr. 158:20-159:22, 236:24-240:3. In fact, in one instance, he casually counted only part of the sample, made up his mind that the thread count would be insufficient, and did not return to complete his count until a later date. Cormier Tr. 271:4-272:12. Cormier has not tested any sheet set other than the four referenced in his report. Cormier Tr. 247:12-14. Nor did he ask any independent testing lab with experience testing the thread count of bedsheets to confirm his calculations.

Cormier's failure to correctly perform thread-count tests pursuant to the ASTM D3775 standard is unsurprising given his lack of familiarity with basic details relating to the standard. For example, in his report, he cites to a 2003 version of the standard, ASTM D3775-03. In his deposition, he said he thought a version from 2012 (D3775-12) was the current version of the

standard; in fact, there have been multiple versions since then, with the most recent version (which is available for purchase on the ASTM's website) denominated as D3775-17e1. *See* Cormier Tr. 164:14-21 & Ex. 7; https://www.astm.org/Standards/D3775.htm (last visited May 3, 2021) (referencing, on ASTM website, D3775-17e1 as "active" standard).

In addition to his unfamiliarity with the ASTM D3775 standard, Cormier also demonstrated a lack of knowledge regarding the sheet products supplied by AQ Textiles to Defendant. Those sheets are woven pursuant to a group of patents, including U.S. Patent No. 9,131,790 (the " '790 patent") that describe a process involving the simultaneous insertion of a number of polyester weft yarns into a single "shed" formed by the cotton warp yarns.[3] *See* Cormier Tr., Ex. 5. At his deposition, Cormier was not aware of that process, even though it was explicitly discussed in— and the '790 patent was attached to—the April 27, 2017 email that he incorrectly claimed had been sent by AQ Textiles to a testing lab. Cormier Tr. 135:6-143:20, 190:19-192:2. In fact, he rejected the possibility that such a thing was even possible. Cormier Tr. 137:25-141:7. But Defendant's expert, Tushar Ghosh, explains in his own report that his more thorough examination of the sheets at issue confirmed that they had been manufactured by a process like that described in the '790 patent. *See* Expert Report of Tushar Ghosh ("Ghosh Report") ¶ 29. Ghosh also details the numerous errors made by Cormier in analyzing the sheet products at issue. Ghosh Report ¶¶ 40-46.

Cormier has only testified twice as a purported expert witness: once at a deposition in a case in which he evaluated shoes, handbags, and shirts, and once at trial where he opined about the importance of research and development in the development and sale of apparel products.

---

[3] A "shed" refers to the interlacing space between warp yarns through which the weft yarns are woven. *See* Ghosh Report ¶ 18.

Cormier Tr. 6:3-8:20. Never, before this case, has he testified or opined, in any legal proceeding, regarding the manufacture, weaving, composition, or thread count of bedsheets.

## ARGUMENT

### I. Legal Standard

A trial court has a duty to act as a "gatekeeper" by "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). A trial court therefore may only admit an expert witness's testimony if it meets the requirements of Federal Rule of Evidence 702, meaning that (1) the expert's specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue; (2) the testimony is based on sufficient data or facts; (3) the testimony is the product of reliable principles and methods; and (4) the expert has reliably applied the principles and methods reliably to the facts of the case.

In performing its "rigorous analysis" of Rule 23's requirements, a trial court "must resolve any material evidentiary disputes," including those related to expert testimony. *In re Polyurethane Foam Antitrust Litig.*, 314 F.R.D. 226, 236 (N.D. Ohio 2014). *Daubert* thus applies at the class certification stage when, as here, an expert's report is "critical to class certification."[4] *Kondash v. Kia Motors Am., Inc.*, No. 1:15-CV-506, 2020 WL 5816228, at *6-7 (S.D. Ohio Sept. 30, 2020) (applying *Daubert* at class certification stage); *see also In re Lamictal Direct Purchaser Antitrust*

---

[4] The Sixth Circuit has not yet definitively stated whether *Daubert* applies at class certification. *See Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452, 465 (6th Cir. 2020). Defendant respectfully submits that the better-reasoned decisions are those, such as *Kondash*, that apply the standard when a plaintiff relies on expert testimony to establish class certification. But even those courts that have concluded that a standard less exacting than *Daubert* governs at class certification nonetheless scrutinize whether an expert's opinion is sufficiently reliable for purposes of Rule 23. *See e.g.*, *In re Behr Dayton Thermal Prod., LLC*, No. 3:08-CV-326, 2015 WL 13651286, at *6 (S.D. Ohio Feb. 27, 2015) ("[A]t the class certification stage, the relevant inquiry is 'whether an expert's opinion [is] sufficiently reliable to admit for the purpose of proving or disproving Rule 23 criteria, such as commonality and predominance.'" (quoting *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 495 (C.D. Cal. 2012)). In any event, regardless of the standard this Court applies, Cormier's opinions are not sufficiently reliable and should not be considered.

*Litig.*, 957 F.3d 184 (3d Cir. 2020) (finding trial court abused its discretion by failing to address challenge to plaintiffs' expert report at class certification stage); *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815-16 (7th Cir. 2010) (requiring district court to resolve challenges to expert's report prior to ruling on class certification when expert's report is "critical to class certification"); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 354 (2011) ("The parties dispute whether [a particular expert's] testimony even met the standards for the admission of expert testimony under Federal Rule of Civil Procedure 702 and our *Daubert* case. The District Court concluded that *Daubert* did not apply to expert testimony at the certification stage of class-action proceedings. We doubt that is so, but even if properly considered, [the expert's] testimony does nothing to advance respondents' case." (emphasis added)).

"In determining whether proffered expert testimony is admissible, district courts must make three inquires.  First, the court must determine if the witness is qualified. Second, it must determine if the testimony is relevant. Third . . . the court must determine if the testimony is reliable."  *Kondash*, 2020 WL 5816228, at *4 (citing *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 316 (6th Cir. 2019)). Here, Cormier's proffered testimony fails each of those three inquires.

## II.    Cormier is not qualified to give opinions about the thread counts of bedsheets.

Federal Rule of Evidence 702 allows only persons who are "qualified" by "knowledge, skill, experience, training, or education" to give expert testimony. *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 316 (6th Cir. 2019) (quoting Fed. R. Evid. 702).  "Because an expert's qualifications bear upon whether he can offer special knowledge to the jury, the *Daubert* framework  permits—indeed,  encourages—a  district  judge  to  consider  the qualifications of a witness." *United States v. Vitek Supply Corp.*, 144 F.3d 476, 486 (7th Cir. 1998). The decision of whether an expert is qualified—one that rests squarely within the trial court's

discretion—depends not just on the expert's own qualifications, but "on the specific facts and circumstances of the case." *Gallagher v. S. Source Packaging, LLC*, 568 F. Supp. 2d 624, 634 (E.D.N.C. 2008). As a result, "the unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable *any* conceivable opinion the expert may express." *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004); *accord* 29 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 6264.2, Westlaw (updated April 2021) ("Even where a witness has specialized knowledge, qualification to testify as an expert also requires that the area of the witness's competence matches the subject matter of the witness's testimony.").

Applying those principles, numerous federal courts have disqualified experts where they lack experience with the specific subject matter of their proffered opinions and/or have developed such experience only for purposes of litigation. *See, e.g.*, *Berry v. City of Detroit*, 25 F.3d 1342, 1352-53 (6th Cir. 1994) (overturning trial court's decision to qualify former sheriff "as an expert in the field of proper police policies and practices" because his credentials and experience did not qualify him to give specific opinions regarding police disciplinary procedures or use of deadly force); *Redman v. John D. Brush & Co.*, 111 F.3d 1174, 1179 (4th Cir. 1997) (overturning admission of metallurgic engineer's opinion testimony regarding failure of safe because expert "had never before analyzed a safe, engaged in the manufacture or design of safes, or received any training regarding safes" and "his only knowledge of safes was acquired in preparation for this trial"); *In re Opus E., LLC*, 528 B.R. 30, 59 (Bankr. D. Del. 2015), *aff'd sub nom. In re: Opus E., LLC*, No. 09-12261, 2016 WL 1298965 (D. Del. Mar. 31, 2016), *aff'd sub nom. In re Opus E. LLC*, 698 F. App'x 711 (3d Cir. 2017) (refusing to consider expert's testimony where "his opinion was not generally accepted; he had never testified on this issue before, had not been qualified as

an expert, and could point to no one who had relied on his expertise in this area"); *Housley v. Orteck Int'l, Inc.*, 488 F. Supp. 2d 819, 825-27 (S.D. Iowa 2007) (disqualifying insurance adjuster offered as an expert on causation of tire accident where "[h]is highest degree obtained is a bachelors degree in economics, and he has no background in engineering" and he "had never adjusted a tire accident before"); *Silva v. Am. Airlines, Inc.*, 960 F. Supp. 528, 531 (D.P.R. 1997) (refusing to admit engineer's testimony regarding design of aircraft overhead bins where case "was the first for which he has served as an expert witness with regard to aircraft design," purported expert "had no experience in the design, manufacturing or operation of an aircraft" before writing his opinion, and "he had never before analyzed the ergonomics of seating and overhead compartment arrangements of aircraft interiors").

Here, as in those numerous prior cases, Cormier's testimony must be excluded because he is not qualified to opine regarding the specific subject of his opinions: testing the thread count of bedsheets. Cormier's only degree remotely related to bedsheets is an associate's degree from FIT in "textile development and marketing." Cormier Report 1; Cormier Tr. 10:5-10. Although he worked for many years in the textile industry, the companies for which he worked did not manufacture or sell bedsheets;[5] instead, they sold clothing and apparel products and slip covers for furniture. Cormier Tr. 19:2-20:11, 26:2-21, 47:19-48:2. Cormier has no experience working with the industrial looms that weave fabric. Cormier Tr. 24:1-10. He had never performed a thread count test on bedsheets prior to this lawsuit; nor does he have any publications or academic experience specific to bedsheets. *See* Cormier Report 19 (listing unrelated publications).

Cormier's lack of knowledge or curiosity regarding the products about which he purports to opine is also troubling. Cormier only tested four products, which he acknowledged was a "very

---

[5] Again, with the exception of the bedsheets sold under the "Liz Claiborne" name with which Cormier had no involvement.

small sampling" of the ones potentially at issue. Cormier Tr. 248:4-10. He could not say exactly how many were at issue; his interpretation of the products at issue was, vaguely, "any sheet that contained a polyester yarn." Cormier Tr. 248:15-24. Most concerning is his lack of experience with the specific manner of weaving the multi-pick-insertion sheets at issue, a process he knows absolutely nothing about. He did not review a critical patent describing the process (one that was discussed in, and attached to, a document he reviewed and referenced in his report). And after briefly reviewing the patent at his deposition, he insisted that the process was only "theoretical" and "not how we [meaning the textile industry] manufacture textiles." Cormier Tr. 140:25-141:9. The problem, of course, is that Cormier has not demonstrated <u>any</u> knowledge of how "the textile industry" weaves bedsheets.

Cormier's lack of relevant expertise, his lack of previous work performing the analysis that he constructed specifically for this litigation, and his failure to demonstrate a basic understanding regarding the products at issue are fatal to any finding that he is qualified to offer the opinions he has put forward in this case. His general background in textiles may have helped him learn about bedsheets for purposes of this litigation, but as another district court has shrewdly observed, "an expert must have specific knowledge, not mere capacity to acquire knowledge." *Silva*, 960 F. Supp. at 531. Because Cormier's qualifications are insufficient, his opinions must be struck.

### III. Cormier's proposed opinions will not assist the Court in determining any issue relevant to class certification.

Even if an expert is qualified, they may only testify about "<u>relevant matters</u> within their expertise." *Babb*, 942 F.3d at 316 (emphasis added). The second prong of this Court's analysis, therefore, is to determine whether Cormier's proposed opinions are relevant. In the specific context of class certification, in deciding whether to consider an expert report, a court therefore considers whether the opinions are relevant to the class certification inquiry. *See, e.g.*, *Schafer v.*

*State Farm & Fire Cas. Co.*, No. CIV.A. 06-8262, 2009 WL 799978, at *3 (E.D. La. Mar. 25, 2009) (saying, in addressing challenge to expert testimony at class certification, that "this Court must determine whether Dr. Adrian is qualified as an expert, whether his methodology is adequately reliable, and whether his opinions are relevant to class certification").

Here, the record demonstrates that Cormier's purported opinions are irrelevant to class certification. Cormier's central opinion in this case is that it is improper to count fibers, as opposed to yarn, when conducting thread-count testing.[6] But that is not disputed. No party in this case contends that individual fibers, which make up yarns, should be counted as threads. Indeed, as addressed above, Larry Queen directly rejected that idea in his deposition, and neither Cormier nor Plaintiff can point to any document where any person contends that "fibers" should be counted. As is more fully addressed in Defendant's Brief opposing the motion for class certification, this is simply an illusory dispute created by Plaintiff in an attempt to invent a "common issue" for purposes of the Rule 23 analysis. Cormier's opinion on this point therefore is not relevant to the class certification inquiry.

Cormier also offers opinions about the thread count of specific sheet products he tested, but those opinions do not apply across all products in the class. The issue at class certification is not whether particular products have insufficient thread counts, but whether all of the products suffer from a common thread-count defect that can be resolved on a class-wide basis. *See* Fed. R. Civ. P. 23(a)(2). Cormier cannot opine on that subject, because he has only tested four of the

---

[6] Cormier's report also includes, as an "opinion," the suggestion that AQ communicated to testing labs—and Defendant supposedly adopted—instructions about how to count threads. Cormier Report 6-7, 18. But this is not an "opinion"; it is a factual contention. To the extent Plaintiff is seeking to use Cormier as a vehicle to put forward factual evidence about the actions of AQ or Defendant, that is improper and Cormier's statements on those subjects should not be treated as factual evidence. *Cf. Williams v. Illinois*, 567 U.S. 50, 108 (2012) (explaining that although expert may base testimony on hypothetical facts, party must establish those facts by admissible, independent evidence).

sheets at issue,[7] and even accepting his own calculations as true, it is obvious that any thread-count defect is not "uniform." *See* Cormier Report 17 (purporting to list "accurate" thread counts). Moreover, although Cormier has reviewed certain thread-count reports from independent testing labs, he has not reviewed them for all products at issue. Cormier Tr. 226:17-227:25. Nor has he offered any coherent basis on which his results could be extrapolated to products he did not test (in fact, he cannot even clearly identify what those products are). Cormier Tr. 227:5-20. Cormier's opinions regarding the "accurate" thread counts of certain sheet sets, therefore, are similarly irrelevant as class certification.

Because Cormier's opinions are not relevant to class certification, his report should be struck.

## IV. Cormier's opinions are not reliable.

The final inquiry the Court must make is whether the expert's opinion testimony is "reliable." "An expert's testimony is reliable if it is grounded in 'scientific knowledge.'" *Kondash*, 2020 WL 5816228, at *4 (citing *Daubert*). This Court has previously recited the factors that *Daubert* instructed courts to consider in determining reliability, including

> (1) whether the theory or technique had been tested; (2) whether the theory or technique can be or has been peer reviewed or published; (3) the known or potential error rate; (4) the existence and maintenance of standards controlling the technique's operation; and (5) the general acceptance by the relevant scientific community and the testimony's degree of acceptance therein.

*Id.* The Sixth Circuit has further identified "red flags" that demonstrate a lack of reliability, including "improper extrapolation," "reliance on anecdotal evidence," "insufficient information about the case," "failure to consider other possible causes," and "lack of testing." *Id.* at *5 (citing

---

[7] As addressed below, to the extent Cormier purports to extrapolate his individual results to opine broadly about the thread count of all products purchased by the putative class, that opinion is not reliable and must be rejected. *See* Section IV.

*Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 177 (6th Cir. 2009)). Expert testimony may also

be suspect when it fails to demonstrate the expert's "professional rigor" in reaching his ultimate

opinion. *See Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 869-70 (7th Cir. 2001).

Cormier's analysis here suffers from several of these defects. First, his opinions appear to

be predominately based on an understanding of the facts that is inconsistent with the actual factual

record. As discussed above, Cormier places great importance on the idea that AQ Textiles

supposedly advocates for counting "fibers" rather than yarns when testing the thread count of

sheets. But there are no documents in the record that support that theory, and Cormier seems to

have premised this idea on misconstruction of Queen's deposition testimony and

mischaracterization of an April 27, 2017 email sent to Queen that Cormier wrongly claimed Queen

had sent.[8] Cormier Tr. 185:5-190:18, Ex. 12. He also lacks a basic understanding of the way the

sheet products at issue are manufactured, which further undermines the reliability of his

conclusions regarding their thread count. *See* Cormier Tr. 135:10-141:18.

Second, Cormier's opinions relating to the thread count of the four sheets he tested are not

the "product of reliable principles or methods" as required by Rule 702. Cormier acknowledges

(and no party appears to dispute) that ASTM D3775 is the applicable standard for testing the thread

count of bed sheets. Cormier admits that, instead of doing his testing like an "official test," he did

it informally, and not even all in one sitting. Cormier Tr. 158:20-159:25. Cormier offers no

explanation for this, except to say that he did not feel did not need to be done like a "lab report."

Cormier Tr. 159:18-19. Cormier's nonchalance about performing the test correctly—particularly

given that he opines, without basis, that Defendant and AQ promote an "alternative" version of

---

[8] As Dr. Ghosh points out in his report, even if Queen <u>had</u> sent the email to a testing lab, Cormier's condemnation of the statements in the email is unfounded. Ghosh Report ¶ 37.

that very test—smacks of the lack of "professional rigor" that concerned the Seventh Circuit in *Dhillon*.

Third, Cormier's thread-count testing is problematic because it was conducted solely for purposes of this litigation. The Sixth Circuit "has recognized for some time that expert testimony prepared solely for purposes of litigation, as opposed to testimony flowing naturally from an expert's line of scientific research or technical work, should be viewed with some caution." *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 434 (6th Cir. 2007). In analyzing such "prepared-solely-for-litigation" work, "[o]ne very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation." *Id.* (quoting *Daubert v. Merrell Dow Pharms., Inc.,* 43 F.3d 1311, 1317-18 (9th Cir. 1995)). Here, Cormier had never before performed thread-count testing on bedsheets, and there is no evidence that he ever showed any professional interest or demonstrated any expertise in the subject prior to being engaged in this lawsuit. His opinions in this case are not an outgrowth of any academic research or study; they were simply adopted to support Plaintiff's theory of the case. The prepared-for-litigation nature of Cormier's opinions is therefore a further reason to doubt their reliability.

Fourth, Cormier's informal thread-count testing suffers from a lack of confirmation or review by any peer or other qualified professional. Given that Cormier did not feel he needed to perform his thread-count testing like a "lab report," it begs the question of why Cormier (or Plaintiff's counsel) did not send the sheets at issue for formal testing by an independent testing lab. That failure is particularly confusing given that Cormier attacks the independent test reports obtained by the sheets' manufacturers as being tainted by "special instructions"[9] communicated to

---

[9] There is no evidence of such "special instructions."

the labs doing the tests—labs that Cormier himself characterized as professional and trustworthy. If that is the case, it would have presumably been simple for Cormier to obtain lab reports that were not similarly "tainted." The fact that Plaintiff did not choose to obtain its own independent laboratory results not only casts suspicion on the veracity of Cormier's own tests, but it leaves the test results obtained by the sheets' manufacturers and produced by AQ Textiles (which confirm the stated thread count of the sheets) as the only independent lab reports.[10]

Fifth, Cormier has not explained what basis there is for extrapolating his testing of the four sheet sets he tested to the numerous other products Plaintiff seeks to bring within the ambit of the class claims. He does not opine that the products he tested are similar to those that he didn't; nor did he state any basis he would have to make that determination based on the evidence he was presented by Plaintiff's counsel. Instead, it appears that Cormier's attempted extrapolation of his testing results is based almost solely on the specious theory—unsupported in the factual record—that AQ Textiles and/or Defendant endorsed, and forced on independent testing labs, an "alternative" method of counting threads. That tenuous thread, standing alone, is insufficient to justify any extrapolation from the four informal tests Cormier performed to the conclusion that all of the sheet products Plaintiff seeks to bring within the ambit of the class.

Finally, Cormier included language in his report, cribbed directly from Plaintiff's Third Amended Complaint, to the effect that by supposedly inflating thread counts of the bedsheets at issue, Defendant deceived consumers into thinking they were buying sheets that were of better quality, more durable, and softer than what the consumers actually received. *Compare* Cormier Report 3-4 *with* Third Am. Compl. ¶ 142, DE 64. It is not clear whether Cormier actually means

---

[10] Tellingly, Plaintiff did not submit any of these reports as evidence in connection with either the Cormier Report or her Class Certification Motion. Defendant has submitted examples of these reports as exhibits to the Declaration of Larry Queen, filed contemporaneously herewith.

to offer this opinion (or if that language even constitutes an "opinion") but if he does, there is plainly no basis for him to do so. Cormier has not conducted any consumer surveys (Cormier Tr. 253:20-21) and has not presented any evidence whatsoever that would allow him to compare the durability, quality, or softness of the sheets at issue to sheets having the "true" represented thread count (or any other sheets at all). Indeed, Plaintiff has put forth no evidence at all that would allow for a comparison of any kind between the sheets at issue in this lawsuit and other, hypothetical sheets that have "accurate" thread counts. Accordingly, any attempt by Cormier to restate the allegations of Plaintiff's pleading as an opinion regarding the softness, durability, or quality of the sheets at issue must be rejected as unreliable.

In summary, there are numerous factors that undercut the reliability of the opinions Cormier seeks to offer at class certification. As a result, his opinions should be struck and not considered by the Court in deciding Plaintiff's Motion for Class Certification.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court exclude Sean Cormier's report and testimony in deciding Plaintiff's Motion for Class Certification.

16

This the 3rd day of May, 2021.

Respectfully submitted,

*/s/ Beth A. Bryan*
Beth A. Bryan (Ohio Reg. 0082076)
TAFT STETTINIUS & HOLLISTER LLP
425 Walnut Street, Suite 1800
Cincinnati, Ohio 45202
Phone: (513) 381-2838
Fax: (513) 381-0205
bryan@taftlaw.com

Jennifer K. Van Zant (*pro hac vice*)
NC State Bar No. 21280
Andrew L. Rodenbough (*pro hac vice*)
NC State Bar No. 46364
Ryan C. Fairchild (*pro hac vice*)
N.C. State Bar No. 47729
BROOKS, PIERCE, MCLENDON,
HUMPHREY & LEONARD, LLP
230 North Elm Street
2000 Renaissance Plaza
Greensboro, NC 27401
Telephone: (336) 373-8850
Facsimile: (336) 378-1001
jvanzant@brookspierce.com
arodenbough@brookspierce.com
rfairchild@brookspierce.com

*Attorneys for Defendant*

17

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing document was filed via the Court's

CM/ECF system, which will send electronic notification to all counsel of record.

This the 3rd day of May, 2021.

/s/ Beth A. Bryan
Beth A. Bryan