## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| SARA HAWES *et al.*, | : | Case No. 1:17-cv-754 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| MACY'S STORES WEST, INC., | : | |
| | : | |
| Defendant. | : | |

## ORDER:

**1.  GRANTING PLAINTIFF'S MOTION TO CERTIFY A CLASS (DOC. 84);**

**2.  DENYING DEFENDANT'S MOTION TO STRIKE (INITIAL) REPORTS AND EXCLUDE OPINIONS OF PROPOSED EXPERTS BOEDEKER AND CORMIER (DOCS. 91 AND 92);**

**3.  DENYING PLAINTIFF'S MOTIONS TO STRIKE REPORTS AND EXCLUDE OPINIONS OF PROPOSED EXPERTS IYER AND GHOSH (DOCS. 114 & 116);**

**AND**

**4.  GRANTING DEFENDANT'S MOTION TO STRIKE THE SECOND REPORTS OF BOEDEKER AND IYER (DOCS. 120 AND 121).**

This civil case is before the Court on Plaintiff's motion for class certification (Doc. 84) and the parties' responsive memoranda (Docs. 87 and 112). Also before the Court are Defendant's motions to exclude the opinions and strike the reports of Plaintiff's proposed experts (Docs. 91, 92, 120 and 121) and responsive memoranda (Docs. 113, 115, 118, 119, 128, and 130) and Plaintiff's motions to exclude the opinions and strike the reports of Defendant's proposed experts (Docs. 114 and 116) and responsive memoranda (Docs. 122, 123, 126 and 127).

## I. BACKGROUND

This case concerns how to count threads in a bedsheet. More fundamentally, it is about the seemingly fine distinction between the whole and the parts of a polyester thread. Counting every polyester strand leads to a higher thread-count. Counting grouped polyester strands together as a single thread leads to a smaller thread-count. The proper method of counting may have implications for consumer choice. At this point, the Court does not need to decide. Rather, on the motions before it, the Court must determine if this dispute is suitable for class resolution and whether the experts called to opine on class certification and the merits are fit to do so.

At a store in Los Angeles, California, Plaintiff Sara Hawes ("Plaintiff") bought "Somerset"-label sheets from Defendant Macy's Stores West ("Macy's"), labelled with a thread-count of 900. (Doc. 64 at ¶12). She claims the sheets have an actual thread-count of 249, and they were therefore of lower-than-advertised quality. (*Id.*).

Plaintiff alleges Macy's has in fact misrepresented thread-counts in an entire category of sheets—namely Chief Value Cotton ("CVC") sheets sold to Macy's by former-Defendant AQ Textiles ("AQ"). (*Id.* at ¶ 36).[1] AQ's parent company, Creative Textiles ("Creative"), manufactures the sheets. (*Id.* at ¶18). AQ also provides the label inserts, which list the thread-counts and go on display at Macy's. (*Id.* at ¶19). Plaintiff claims that Macy's was aware that consumers associate higher thread counts with softer, more comfortable, generally higher-quality sheets. (*Id.* at ¶¶ 1–2, 11–12, 21–23). Thus,

---

[1] For the purposes of this case, CVC sheets are essentially sheets made from a blend of cotton and polyester. (*See* Doc. 84 at n.6)

Plaintiff alleges she has suffered because the sheets she purchased with inaccurate thread-counts did not perform with the same characteristics as sheets with the thread-counts as advertised. (*Id.* at ¶¶ 80, 160).

In the parlance of textiles, the central conflict concerns how to count warp ends and filling picks. (*See e.g.*, *id.* at ¶¶26-28). In plain English, the Court's understanding of the controversy is as follows: Yarn consists of strands of fiber twisted together. Twist two yarns together—twisting the twists—and they create a ply. With most materials, there appears to be a shared understanding of how to differentiate a strand from a yarn and a yarn from a ply—but perhaps not with polyester. (*Compare* Report of Sean Cormier Doc. 84-1 *with* Report of Linwood E. Wright, III, Doc. 117-7). Polyester strands are very thin.[2] (Doc. 117-7 at ¶20). A newly-patented weaving method allows these thin polyester strands to be "inserted simultaneously and in parallel," meaning a textile manufacturer can insert several polyester strands through a single opening in the weave together without twisting them. (*Id.* at ¶¶21-24).[3]

These polyester strands, that are "laid in parallel" by the patented weaving process, are the main problem here. Macy's and/or AQ count *each* untwisted strand inserted at the same time as individual threads. (*Id.*). On the other hand, Plaintiff argues that, twisted or parallel, the strands within the bundle cannot be individuated. Thus,

---

[2] Finding a neutral language in this dispute is near impossible. What Plaintiff calls a "fiber," Macy's would label a "yarn." What Plaintiff would call a "ply," Macy's would call a "multi-pick filling yarn package." *See* Doc. 100-3 at 24. The Court here uses "strand" as the closest thing to a neutral term—in other words, as used by the Court, a "strand" may or may not be worthy of counting as a "thread."

[3] U.S. Patent No. 9,131,790. *See also* Doc. 123-2.

according to Plaintiff, the *bundles* of polyester strands warrant counting, but the individual strands do not. (*See* Cormier Report, Doc. 84-1 at PageID# 1228). It is common sense how this discrepancy becomes one of magnitude.

The parties agree that the American Society for Testing and Materials Standard 3775 ("ASTM 3775") is the appropriate method for counting threads in a sheet. (Doc. 87 at PageID# 1459). The standard is not self-executing. Plaintiff argues Macy's counting method contravenes the ASTM 3775; Macy's argues its counting method is consistent with the ASTM 3775. (Doc. 64 at ¶124). Plaintiff alleges AQ and Macy's know they are pumping up the thread counts using an idiosyncratic thread-count method. (Doc. 87). The parties have summoned experts to opine in support of their respective positions.

The proceeding itself has already gone on a twisting journey. Initially, Plaintiff Sara Hawes filed this case with a Missouri-based Plaintiff, Amy Hill. (Doc. 1). Plaintiffs initially named AQ and Creative as co-Defendants with Macy's. (*Id.*). The Court dismissed AQ and Creative for a lack of personal jurisdiction. (Doc. 38). Amy Hill, the Missouri Plaintiff, voluntarily dismissed her claims. (Doc. 73). The Court also dismissed several of Plaintiff's causes of action, including those arising out of the Magnusson-Moss Warranty Act and a Breach of Warranty of Merchantability claim. (Doc. 39). Now, with these motions to dismiss settled, there is one Plaintiff, Sara Hawes, and one Defendant, Macy's. Omitting dismissed claims and those belonging only to former Plaintiff Amy Hill, Plaintiff's third amended complaint alleges causes of action under the California Unfair Competition Law ("UCL"), California's misleading and deceptive advertising law (also known as the False Advertising Law, or "FAL"); California's Consumer Legal

Remedies Act ("CLRA"); breach of express warranty; fraud; and unjust enrichment. (Doc. 64).

Plaintiff seeks a class described as follows: "Each person in California who purchased from Macy's a CVC (cotton-polyester blend) sheet supplied by AQ Textiles between November 8, 2013, and the date the class is certified." (Doc. 84 at PageID# 1086).

Also before the Court are several motions to exclude experts and strike their reports. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Since at least some of these pending *Daubert* motions seek to strike expert testimony that is "critical to class certification," the Court will address the *Daubert* motions—and for organizational simplicity, address the merits *Daubert* motions as well—before resolving the motion on class certification.[4]

## II. MOTIONS TO EXCLUDE EXPERT REPORTS

Pursuant to Federal Rule of Evidence 602, Macy's has filed a motion to strike the report and exclude the opinions of Plaintiff's proposed experts Stefan Boedeker (Doc. 91) and Sean Cormier (Doc. 92). Macy's also moves to strike and exclude the "second" reports of Stefan Boedeker and Sean Cormier. (Docs. 116 and 117). Plaintiff has moved

---

[4] As noted by another court in this district, "[N]either the Supreme Court nor the Sixth Circuit have decided whether a district court must undertake a Daubert analysis when an expert's report is critical to class certification." *Kondash v. Kia Motors Am., Inc.*, No. 1:15-CV-506, 2020 WL 5816228, at *3 (S.D. Ohio Sept. 30, 2020). However, the Supreme Court has strongly implied that Courts ought to resolve certification-relevant Daubert motions before deciding class certification motions. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 354 (2011) ("The District Court concluded that Daubert did not apply to expert testimony at the certification stage of class-action proceedings. 222 F.R.D., at 191. We doubt that is so…").

to strike the reports and exclude the opinions of Macy's proposed experts Sean Iyer and

Dr. Tushar Ghosh. (Docs. 114 and 116). The reports of Boedeker and Iyer mostly

address Rule 23 certification issues. The reports of Cormier and Ghosh look more closely

to the merits. The Court will address all the *Daubert* motions here.

### A. Standard

Pursuant to Rule 702 of the Federal Rules of Evidence, a proposed expert's

opinion is admissible if the opinion satisfies the three requirements of qualification,

relevance, and reliability. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528-29 (6th

Cir. 2008). First, the witness must be "qualified as an expert by knowledge, skill,

experience, training or education." Fed. R. Evid. 702. "The issue with regard to expert

testimony is not the qualifications of a witness in the abstract, but whether those

qualifications provide a foundation for a witness to answer a specific question." *Rose v.

Truck Centers, Inc.*, 388 F. App'x 528, 533 (6th Cir. 2010). In turn, testimony is relevant

if there is a "'fit' between the inquiry in the case and the testimony," *United States v.

Bonds*, 12 F.3d 540, 555 (6th Cir. 1993), such that the expert will "help the trier of fact to

understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).

Pursuant to *Daubert*, the Court must serve as a gatekeeper to ensure that an

"expert's testimony both rests on a reliable foundation and is relevant to the task at

hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-94 (1993). *Daubert*

attempts to strike a balance between liberal admissibility for relevant evidence and the

need to exclude misleading "junk science." *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d

171, 176-77 (6th Cir. 2009). Rule 702 provides general standards to assess reliability,

including whether the testimony is "based on sufficient facts or data" and "is the product of reliable principles and methods," and whether the expert "has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. In addition, *Daubert* provides a "non-exclusive checklist" for evaluating the reliability of expert testimony: "testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific community." *In re Scrap Metal*, 527 F.3d at 529.

This Court is cognizant that "Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact," *Morales v. Am. Honda Motor Co.*, 151 F.3d 500, 516 (6th Cir. 1998), and that "rejection of expert testimony is the exception, rather than the rule." *In re Scrap Metal*, 527 F.3d at 529-30. The focus "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. Further, this Court's "role as gatekeeper is not intended to serve as a replacement for the adversary system." Fed. R. Evid. 702 advisory comm.'s note, 2000 amend. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Arguments regarding "mere weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility." *McLean v. 988011 Ontario*, Ltd., 224 F.3d 797, 801 (6th Cir. 2000). Similarly, attacks on the credibility or accuracy of an opinion do not impugn its reliability; rather, the task of "deciding whether an expert's opinion is reliable is not to determine whether it is correct,

but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *In re Scrap Metal*, 527 F.3d at 529-30. "In short, under Daubert and its progeny, a party proffering expert testimony must show by a 'preponderance of proof' that the expert whose testimony is being offered is qualified and will testify to scientific knowledge that will assist the trier of fact in understanding and disposing of issues relevant to the case." *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000).

### B. Analysis

#### 1. Macy's Motion to Exclude Stefan Boedeker

Macy's has moved to exclude Stefan Boedeker. Boedeker is a statistician and economist with 25 years of experience in creating economic and statistical models. (*See* Boedeker Report, Doc. 84-19 at ¶¶ 2-7). He routinely takes on damages modeling problems like the one at issue here. (*Id.* at ¶5). The Court finds he is qualified on the topic generally.[5]

Boedeker offers to conduct a model of the "economic loss" sustained by the putative Plaintiff class. (*Id.* at ¶). Boedeker will do this using a hedonic regression and a conjoint analysis. (*Id.* at ¶¶58-78, 79-114).[6] Using these tools, Boedeker proposes he will

---

[5] Macy's does not challenge Boedeker's qualifications to perform economic or financial modelling generally. The Court will thus not engage substantially on his qualifications except to say Boedeker's background is clearly a sufficient foundation on which to provide expert testimony relevant to this case. (See Doc. 113-1).

[6] The hedonic regression is a statistical exercise meant to isolate and measure the impact of, in this case, thread-count on price. (Doc. 84-19 at PageID# 1328). A conjoint analysis proceeds along the assumption that a product is the result of several distinguishable attributes and then seeks to measure consumer valuations of those distinguishable attributes. (*Id.* at Page ID# 1333).

isolate the "price premium" of thread-count. (*Id.* at ¶29). As will become apparent, hedonic regressions and conjoint analyses, often used in combination, are the standard tools used to model damages in consumer class actions. Boedeker's framework proceeds along the assumption that a proper measure of damages is the difference between what the putative class of consumers actually paid for the bed sheets and what they would have paid had the true thread-count been disclosed. (*Id.* at ¶22). To succeed, Boedeker's report must establish that "damages are capable of measurement on a classwide basis." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013).

For now, though, Boedeker's report is preliminary. He has conducted a "preliminary analysis" showing, without controls, "the higher the thread count, the higher the prices are." (Doc. 84-19 at ¶74). He has not combined the full datasets and issued his final findings. (*Id.* at 154) ("I conclude that the theoretical and empirical methods proposed and described in this report *can be used* to calculate class-wide damages in the merits phase of this case.") (emphasis added). He also has not conducted his proposed survey that will inform his conjoint analysis regarding the worth of threads to consumers. (*Id.*).

Nonetheless, the Court finds Boedeker's proposed method is a systematic and reliable way to determine class-wide damages. The Court examines Boedeker's report and the relevant law in more depth in response to Macy's arguments. Broadly categorized, the Court will designate Macy's argument as follows: Boedeker's work is incomplete; Boedeker's methodology is unreliable; and Boedeker fails to include "supply-side" considerations into his modelling. (*Id.*).

a. Boedeker's work is incomplete

The Court here agrees with a conclusion from another court in the Sixth Circuit that, at this point in the litigation, an expert is not required to have run the models they propose. *See In re FCA US LLC Monostable Elec. Gearshift Litig*., 382 F. Supp. 3d 687, 698 (E.D. Mich. 2019) ("The only purpose for her testimony here is to establish that a reliable method exists by which an appropriately designed and vetted survey could estimate class-wide damages."). That also appears to be the majority view of the state, California, which provides the substantive law. *See In re ConAgra Foods, Inc.,* 90 F. Supp. 3d 919, 947 (C.D. Cal. 2015) (also known as *ConAgra II*). ("[T]he fact that Weir has not yet conducted a hedonic regression analysis with respect to each of plaintiffs' proposed state classes does not render his methodology unreliable.").[7] Following the lead of these cases, the Court will not throw out the expert opinion just because the final damages computation is not incompleted. Instead, Macy's must show indicators of unreliability or another reason to exclude Boedeker.

And Macy's attempts to do so. But these arguments are unpersuasive because they do not challenge Boedeker's qualifications, reliability or persuasively argue that his methods constitute "junk science." *Best*, 563 F.3d at 176-77. Macy's contends, for example, that Boedeker has not identified the variables he will use in his regression.

---

[7] Macy's cites *ConAgra I* in support of its own position, which indeed found a particular hedonic regression proposal unreliable. 302 F.R.D. 537 (C.D. Cal. 2014). Interpolating between *ConAgra I* and *II*, the Court believes the law is best summarized as follows: an incomplete hedonic regression is not grounds for exclusion. At the same time, a hedonic regression proposal must itself be reliable and explain the pathway from the proposed method through the results. The Court finds Boedecker's report charts that course from method to results.

However, Boedeker does provide examples likely to be included: thread-count, size, weave and origin. (Doc. 84-19 at PageID#1332). Reasonably, he leaves the door open to other variables and suggests he will have to do an exploratory survey. (Deposition of Stefan Boedeker, Doc. 91-1, Tr. 156:7-8). Seizing on this point, Macy's complains that subjectivity will bleed into variable selection. (Doc. 91 at PageID# 1730). To the Court's eye, if a conjoint analysis and a hedonic regression are proper methods for determining price premiums—and Macy's does not seem to dispute this generally—variable selection is a necessary step, and one that will always include a risk of selecting the wrong variables. Accordingly, if Boedeker's variable selection skews his final results, Macy's may explore those shortcomings on cross-examination. *See Daubert*, 509 U.S. at 596. The mere possibility of errant variable selection is not a basis for exclusion.

Macy's prospective concern about "multi-collinearity" is also exaggerated. Multi-collinearity could result, in this case, if both thread-count and another attribute are themselves correlated. (Doc. 91 at PageID# 1730). Such would make it difficult to determine which attributes in bed sheets drive price and which are merely coincidental to any fluctuation in price. (*Id.*). Macy's states that "[m]ulticollinearity can lead to erroneous conclusions about how thread count affects prices." (*Id.*). Macy's also points to the possibility of a wide confidence interval that could result from multicollinearity. (*Id.*). Macy's seems to conclude that Boedeker would over-interpret multicollinear results.

There is no basis for this conclusion. Multi-collinearity may reflect that Plaintiff's general thesis—more threads, higher price—is weak. But that is not the same as

unreliable, and the Court has no reason to suspect that Boedeker's results would over-interpret a multicollinear relationship.  Similarly, a wide confidence interval would reflect uncertainty—a ripe ground for cross-examination—rather than junk science. Macy's argument is not well-taken.

> b. Boedeker's methods are unreliable

Separate from its attacks grounded on incompleteness, Macy's argues that Boedeker's study design is itself unreliable.

Specifically, Macy's argues: the datasets are based on ticket price rather than actual price; Boedeker fails to include important variables; his preliminary analysis excludes sateen sheets and does not account for color and other sheet attributes. (Doc. 91 at PageID# 1731-33).  Macy's levels these attacks against both Boedeker's proposed hedonic regression and proposed conjoint analysis. The Court looks at these in turn.

Macy's states that Boedeker "intends" to use ticket prices rather than actual prices—the price paid after markdowns—for his hedonic regression analysis. (*Id.* at PageID# 1732).  Initially, the Court is not sure if this is true.  Boedeker does use the ticket prices in his preliminary analysis, an analysis that perhaps anticipates a relationship of some kind between price and thread-count. (Doc. 84-19 at ¶74).  The Court is untroubled.  The preliminary analysis is simply in support of the idea that a class-wide damages model is possible.  *See In re Monostable Elec. Gearshift Litig.*, 382 F. Supp. 3d 687 at 698.  It is not the end-product.

Additionally, for his proposal, Boedeker says that he "…will calculate the weighted average sales price by dividing total revenue across all sales channels by the

12

units sold across all sales channels." (*Id.* at ¶75).  Unless Boedeker is here using an idiosyncratic definition of "revenue," Boedeker does propose to use data culled from actual sales prices in his final findings.[8]

As for the variable-selection, in the context of both the conjoint study and the hedonic regression, the Court finds it would go beyond its gate-keeping function to referee, for example, whether Boedeker should include "hand-feel" or "color" as a variable in his analysis.  Ultimately, this is a question of weight, not an impugnment of the method. *See McLean*, 224 F.3d at 801 (6th Cir. 2000).

Macy's is likewise asking this Court to pick nits rather than to keep gates when it complains of Boedeker's omission of sateen sheets from his preliminary analysis. (Doc. 91 at PageID# 1733-34).  The implication here is unclear. If Macy's suggests Boedeker's omission of sateen sheets from the preliminary analysis creates the illusion of a relationship between price and thread-count that otherwise would not exist, Macy's ought to say so.  Without any information about how this omission skews the process of developing a price premium for threads, the Court is inclined to pay little attention to it. Macy's complaints simply do not rise to the level required to exclude an expert and strike his report, especially given that "rejection of expert testimony is the exception, rather than the rule."  *In re Scrap Metal*, 527 F.3d at 529-30.

---

[8] Macy's cites to portions of Boedecker's deposition in support of the claim that Boedecker intends to use ticket price rather than actual price. The Court does not see Boedecker making that claim with regards to his final report.

c. _Boedeker fails to consider supply-side factors_

Macy's argues that Plaintiff's conjoint analysis fails to consider supply-side factors. (Doc. 91 at PageID# 1739). The supply-side argument is a recurring foil in consumer class actions. _See Hadley v. Kellogg Sales Co._, 324 F. Supp. 3d 1084, 1105 (N.D. Cal. 2018) (discussing cases). While the debate is sometimes obscured by econometric jargon, the conflict is not difficult to understand. Here, Boedeker proposes to calculate the damages as the difference between what was paid and what the seemingly reasonable consumer would have paid if she had known about the defect.

Macy's concern about the "supply side" simply reflects the reflexivity inherent in markets: if Boedeker evaluates damages by re-calculating the price consumers would have paid but-for the defect, then, according to Macy's, Boedeker must also re-evaluate the seller's willingness to sell at the same price point. (_See_ Doc. 91 at PageID# 1739). Macy's says Boedeker has not done so because Plaintiff has "fixed" the supply curve. In other words, Boedeker has wrongly assumed that Macy's would sell the sheets with the defect disclosed at the price consumers would willingly pay for it. (_Id._ at 1740). If supply-side factors are properly considered, Macy's suggests, the intersection between the supply and demand curves would move, thus reducing the proper price-point and potential damages. (_Id._).

Boedeker admits that he holds the supply curve constant. (Doc. 84-19 at ¶52). But Boedeker also claims he will incorporate supply side considerations in his final computation by using actual market prices paid by actual consumers and using actual volumes sold of the CVC sheets during the relevant class period. (_Id._ at ¶53). As noted,

14

this study is only in the preliminary phase, so just how this real-world data will inform or constrain Boedeker's model is yet to be determined.

The Court finds no reason to exclude Boedeker based on an alleged failure to consider supply-side considerations. A few reasons inform that decision.

First, the clear trend in the federal courts cuts against striking the report in these circumstances. While there are exceptions, a great majority of courts have declined to disqualify an expert who proposes to use real-word data as the vehicle for incorporating supply-side factors into an otherwise legitimate conjoint analysis.[9] In some cases, courts have held the inclusion or omission of supply-side factors in a class-wide damages model is a question of weight, not admissibility. *See In re Dial Complete Mktg. & Sales Pracs.*

---

[9] The Court is aware of the following cases that directly or indirectly support Boedeker's method: *Hadley*, 324 F. Supp. 3d at 1105; *In re MyFord Touch Consumer Litig.*, 291 F. Supp. 3d 936, 969 (N.D. Cal. 2018)*; Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592, 606 (N.D. Cal. 2018); *Allen v. ConAgra Foods, Inc.*, 331 F.R.D. 641, 673 (N.D. Cal. 2019); *Broomfield v. Craft Brew All., Inc.*, No. 17-CV-01027-BLF, 2018 WL 4952519, at *19 (N.D. Cal. Sept. 25, 2018); *Banh v. Am. Honda Motor Co.*, Inc., 2020 WL 4390371, at *18-19 (C.D. Cal. July 28, 2020); *Hilsley v. Ocean Spray Cranberries, Inc.*, 2019 WL 3006465, at *2-7 (S.D. Cal. July 10, 2019); *Johannessohn v. Polaris Indus., Inc.*, 2020 WL 1536416, at *22-23 (D. Minn. Mar. 31, 2020); *Martinelli v. Johnson & Johnson*, 2019 WL 1429653, at *3-4 (E.D. Cal. Mar. 29, 2019); *Schneider v. Chipotle Mexican Grill, Inc.*, 328 F.R.D. 520, 541 (N.D. Cal. 2018); *Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 576 (N.D. Cal. 2020); *Davidson v. Apple, Inc.*, 2018 WL 2325426, at *22 (N.D. Cal. May 8, 2018); *In re Dial Complete Mktg. & Sales Pracs. Litig.*, 320 F.R.D. 326, 334 (D.N.H. 2017) (sometimes referred to as "Dial II"*); Lerman v. Apple Inc.*, No. 15-cv-07381, Dkt. 132 (E.D.N.Y. Oct. 6, 2020); *Hudock v. LG Elecs. U.S.A., Inc.*, No. CV 16-1220, 2020 WL 1515233, at *15 (D. Minn. Mar. 30, 2020).

The Court is on notice of a few cases that would directly or indirectly support Macy's. *In re Gen. Motors LLC Ignition Switch Litigation* would seem to offer direct support. 407 F. Supp. 3d 212 (S.D.N.Y. 2019). Two other cases disqualify an expert for, among other reasons, failing to consider the supply-side, but both had unique circumstances not relevant here. In *Saavedra v. Eli Lilly*, the court recognized that in contradistinction to the pharmaceutical market at-issue there, in an "ordinary market," a conjoint analysis, tethered to actual market prices, would reflect proper market values. 2:12-CV-9366-SVW, 2014 WL 7338930, at *5 (C.D. Cal. Dec. 18, 2014). The court in *In re NJOY* faulted an expert of failing to consider the supply-side but noted that courts had approved of a damages models that use both a conjoint analysis *and* a hedonic regression such that the expert's model did not rely solely on consumers' subjective valuations in the conjoint analysis. *See* 120 F. Supp. 3d 1050, 1121 (C.D. Cal. 2015). Of course, here Boedeker is proposing to use both a hedonic regression and a conjoint analysis.

*Litig.,* 320 F.R.D. 326, 332 (D.N.H. 2017).[10]  Either way, the failure to fully reconstruct the supply curve has not routinely been held fatal to experts called to weigh in on similar questions as Boedeker does here.

Second, the "supply-side" arguments levelled by Defendants are divorced from any discussion of the proper measures of damages dictated by the causes of action. *See Comcast Corp. v. Behrend.* 569 U.S. 27 (2013).  *Comcast* instructs that a class-wide damages model must align with the damages available to the putative class under the legal theories asserted. *Id.* at 35.  In *Comcast*, it was the plaintiffs who failed to tailor their damages model to their theory of liability. *Id.*  Here, though, it is Defendant Macy's who raises objections unaligned to the damages available in the underlying causes of action.

 The UCL, to take one of Plaintiff's causes of action as an example, permits restitution "based on what a *purchaser would have paid at the time of purchase* had the purchaser received all the information." *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 989 (9th Cir. 2015) (emphasis added).  Furthermore, regarding damages under the UCL, "California law 'requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an

---

[10] This case addressed a study designed by the very same Boedeker, finding, in relevant part: "…while no doubt imperfect in some respects, weak in others, and subject to challenges on cross-examination, Boedeker's proffered means of calculating class wide damages is sufficient to demonstrate that a price premium for the allegedly falsely-claimed feature(s) exists, and that it can be reliably calculated, using means and methods generally understood and accepted in the fields of economics and statistics." *In re Dial Complete Mktg. & Sales Pracs. Litig.*, 320 F.R.D. 326, 337 (D.N.H. 2017). In a case noticed to the Court by Plaintiff, (*see* Notice of Supplemental Authority, Doc. 136), the Ninth Circuit Court of Appeals took a similar approach. *See MacDougall v. Am. Honda Motor Co.*, No. 20-56060, 2021 WL 6101256, at *1 (9th Cir. Dec. 21, 2021).

approximation.'" *Copart, Inc. v. Sparta Consulting, Inc.*, 339 F. Supp. 3d 959, 998 (E.D. Cal. 2018) (citing *Marsu, B.V. v. Walt Disney Co.*, 185 F.3d 932, 938–39 (9th Cir.1999)).

The Court fails to see why UCL damages calculations—projected for a class or rendered for a verdict—must include supply-curve reconstruction when restitution may be based on what a reasonable purchaser "would have paid at the time of purchase." *Pulaski*, 802 F.3d at 989 (9th Cir. 2015). In its narrow focus on a consumer's willingness to pay, the *Pulaski* formulation seems to reject the idea that the law *requires* consideration of the seller's willingness to sell. Perhaps just as compellingly, the Court has broad discretion to compute damages by any reasonable measure. This counsels against holding Boedeker to a higher standard for a class-wide model than may be appropriate in a hypothetical final verdict.

Ultimately, the Court finds Boedeker's proposal offers a reliable, broadly-accepted method to calculate class-wide damages. This is not to say that Boedeker is absolutely correct. But as the Ninth Circuit has recently held, "[t]he test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology. *MacDougall v. Am. Honda Motor Co.*, No. 20-56060, 2021 WL 6101256, at *1 (9th Cir. Dec. 21, 2021) (internal quotations omitted).[11] The Court finds Boedeker's methodology is indeed sound and will thus consider his report in resolving the motion for class certification.

---

[11] Per above, this case was handed down after briefing closed but was noticed to the Court as supplemental authority. (Doc. 136).

## 2. *Plaintiff's Motion to Exclude Sean Iyer*

Macy's proposes Sean Iyer as an expert largely to counter Boedeker. Plaintiff has moved to exclude him. (Doc. 114 at PageID# 2569). Plaintiff asserts that Iyer lacks experience and authoritative support; is unfamiliar with Boedeker's methodology; and contradicts his own earlier work. (Doc. 114). None of these criticisms justify striking Iyer's report.

Before addressing the criticisms, though, it is worth noting that Iyer meets Rule of Evidence 702's elements for qualification on his own terms. Iyer has expertise in conducting market research and in designing surveys. (Doc. 100-2 ¶¶ 2-4). Iyer has published chapters in scholarly volumes with such titles as "Conjoint Analysis in Litigation." (*Id.*). Because Plaintiff's damages model has not been run, Iyer is not able to empirically test the results in any way. But this Court finds Iyer is qualified to help a factfinder understand any reasons to doubt those ultimate calculations once they have been done. The Court now moves on to Plaintiff's arguments.

Plaintiff first attacks Iyer on the basis that Iyer has not himself conducted a conjoint survey. (Doc. 114 at PageID# 2572). This critique wrongly implies an expert could not credibly attack a proposed study unless that expert has conducted a similar study himself. Since Iyer has analyzed completed conjoint surveys, he could fairly infer what makes a good survey from the inputs and outputs in those studies. The argument simply does not hold up.

Next Plaintiff takes aim at Iyer's argument that Boedeker's complaint lacks consideration of Macy's "willingness-to-sell." (Doc.114 at PageID# 2573). The Court

has already addressed the "willingness-to-sell" concerns in deciding that Boedeker should not be excluded. To reiterate, the Court agrees that Boedeker's proposal will suffice because, among other reasons, Boedeker claims his final findings will incorporate supply-side factors. In the Court's eye, though, Iyer remains qualified to weigh whether Boedeker's finished product does what Boedekcer says it will.[12] Accordingly, the Court will not disqualify Iyer on that basis.

The Court is also unpersuaded by Plaintiff's claim that Iyer ought to be disqualified because he criticizes Boedeker's failure to have completed the analysis. (Doc. 114 at PageID# 2574). The Court has indicated its agreement that Boedeker does not have to proffer a completed damages calculation in order to be considered reliable on the question of a framework for class-wide damages. However, the Court will not fault Iyer for hitching his opinion to an idea with at least some traction within the federal courts. *See In re ConAgra Foods, Inc.,* 302 F.R.D. 537, 552 (C.D. Cal. 2014) (finding expert's report "so incomplete as to be inadmissible…"). Much more importantly, Iyer's commentary about the incompleteness of Boedeker's computations does not erode the Court's confidence in Iyer to answer "specific questions" about the final accuracy of Boedeker's model. *Rose v. Truck Centers, Inc.*, 388 F. App'x 528, 533 (6th Cir. 2010).

Plaintiff argues Iyer contradicts his past writing on conjoint analysis. (Doc. 114 at PageID# 2577). Yet it is not clear that Iyer has indeed contradicted himself. The passage

---

[12] The Court does recognize a dilemma here. It is past time to produce further expert reports. If Boedeker must eventually calculate damages, and if Iyer is afforded a chance to test those calculations, it is not clear how or when these things will happen. If necessary, the Court will take up this issue with the parties in due course.

of Iyer's quoted by Macy's reads much more like Iyer's description of what enfolds in litigation-based modelling rather than Iyer's endorsement of the accuracy of any method of conducting conjoint analysis.[13] Moreover, Iyer's opinion is not that Boedeker's methods are unreliable *per se* but that Boedeker has made errors in carrying out those methods. The Court is further persuaded by Macy's rejoinder that even a contrary statement by an expert would go to weight, not admissibility.

For these reasons, Macy's argument fails. The Court denies Plaintiff's motion to exclude Iyer and strike his report.

### 3. *Daubert motions regarding experts Sean Cormier and Tushar Gosh*

The Court analyzes these motions together. Both experts in question are industry veterans addressing the same topic—the question of what strands count towards a final thread-count in a bedsheet. They come to opposite conclusions based on the difference in method that is at the center of this case. But the Court finds each have the expertise to offer reliable opinions on the question.

#### a. **Macy's Motion to Disqualify Sean Cormier**

Sean Cormier is a textile industry veteran. (Doc. 84-16). He is currently a professor and chair of the textile development and marketing department at the Fashion Institute of Technology. (*Id.* at PageID# 1215). He has experience applying the standards of the ASTM 3775 to textiles; teaching courses on textiles; and working with numerous companies on quality assurance for textiles. (*Id.* at PageID# 1216). The Court finds

---

[13] And that is consistent with the gist of the article. (*See* Doc. 122-1)

Cormier is a qualified to offer an opinion on the appropriate way to determine thread-counts. Among other territory covered by Cormier's report, Cormier explains that he conducted a thread-count test, informed by the guidance of ASTM 3775, on four sets of AQ CVC sheets and found them all to have overinflated counts. (*Id.* at PageID# 1231).

Macy's argues Cormier is not qualified as an expert. (Doc. 92). It offers several reasons: he has not manufactured or sold bedsheets, worked with looms, or previously tested bedsheets specifically. (*Id.*). Macy's also says he is not familiar with the patented process that produces the AQ CVC sheets and its parallel threads. (*Id.* at PageID# 1784).

The Court fails to see a problem with Cormier's work history as is relevant to the question of how many threads the AQ CVC sheets contain. The parties agree the ASTM 3775 sets the standard. As Plaintiff points out, that standard applies to an assortment of textiles, not just bedsheets. (Doc. 114 at PageID# 2749). If there is a substantial difference between examining bed sheets and the textiles with which Cormier has more experience, Macy's fails to explore it.

Macy's also fails to connect Cormier's lack of knowledge about the patent process to Cormier's capacity, or lack thereof, to analyze thread-count in a reliable fashion. The patent in question regards an air-jet initiated process whereby a manufacturer can insert many polyester strands in a parallel in a single swoop—the exact process that leads to the thread-count discrepancy.[14] Cormier does not cast doubt on *how* the bundles of polyester strands are laid in parallel. Rather, his report provides a basis to suggest not every strand

---

[14] U.S. Patent No. 9,131,790. *See also* Doc. 100-11.

in the bundle is worthy of counting. (Doc. 84-16). Thus, the Court finds little relevance in Cormier's lack of experience in the patented method that produces the AQ CVC sheets.

Macy's further states that Cormier's central opinion is irrelevant because "[n]o party in this case contends that individual fibers, which make up yarns, should be counted as threads." (Doc. 92 at PageID# 1790). Macy's is simply using the jargon of textiles to paper over the conflict. The parties have a different understanding of what is fairly described as the "fiber'" and what is fairly described as the "yarn." Cormier makes clear that his visual inspection results in a much lower thread-count for at least the four types of the AQ CVC sheets he pulled off the shelf. The Court finds Cormier's report is helpful in illuminating one of the purported methods of determining thread-count. Macy's argument is unpersuasive.

Macy's also claims Cormier did not do an official test to the letter of the ASTM 3775 because he did not conduct every iteration in one sitting. (*Id.* at 13-14). The Court fails to see how this speaks to reliability, especially because Cormier has made his particular method transparent. He placed the sheets under a "pick-glass" and counted what he determined to be the "threads" running in the horizontal and vertical directions. (Doc. 84-16 at PageID# 1231). He even provides an 'under-the-pick-glass' view of the bedsheets in his report. (*Id.*). Macy's does not contest that counting threads magnified by a pick glass is one acceptable method listed by the ASTM 3775 for determining thread-count. Thus, the Court cannot adopt Macy's contention.

Next, Macy's claims Cormier has unfairly extrapolated from the set of four bedsheets he inspected to draw conclusions about all the AQ CVC sheets at issue in the

putative class. (Doc. 92 at PageID# 1794). If Cormier is indeed making a broad

extrapolation, it is one largely borne out by Macy's relative silence on the question.

Macy's does not seem to contest that AQ CVC sheets indeed contain thin strands inserted

in parallel simultaneously as one bundle. Rather, Macy's argues it is *fair* to count all the

parallel strands that compose the bundles. The Court finds it is therefore reasonable to

infer that Macy's and AQ are not labelling *some* of their CVC sheets according to the

"count-every-strand" method and other CVC sheets according to the "count-only-the-

bundles" method. Macy's would seem well-positioned to disabuse that inference—but it

does not do so. Macy's only says that Cormier has not tested enough sheets. The Court

finds the argument unpersuasive.

The Court agrees with Macy's on one point. Cormier has overstepped his grounds

when he speculates about the intent of Larry Queen in Queen's presentation to the ASTM

Committee and emails to testing labs. (*See* Doc. 84-16 at PageID# 1227-28). Cormier's

point seems to be that Queen tried to pressure the ASTM Committee and independent

labs to adopt his method of thread-counting. (*Id.*). The Court first notes that the record is

very murky on the materials to which Cormier refers. Queen's presentations and emails

are referred to throughout briefing and in depositions, but the record is devoid, at this

point, of competent evidence on the actual substance and context of the presentation and

the emails. Second, and more importantly, Cormier's speculation as to what Queen was

attempting to do is simply not the province of an expert—at least not one with Cormier's

expertise. Thus, the Court will strike those portions of Cormier's report where he

references and speculates on Queen's emails and presentations to the ASTM committee.

### b. Plaintiff's Motion to Exclude Macy's Expert Tushar Gosh

Defendant's proposed expert Dr. Tushar Ghosh is the Distinguished Professor of Textiles at the Wilson College of Textiles, North Carolina State University in Raleigh, NC. (Report of Tushar Ghosh, Doc. 100-3 at ¶1). He teaches courses of textiles and weaving technologies and he has researched several issues relating to fibers and textiles. (*Id.* at ¶2). His report demonstrates a deep familiarity with the intricacies of textiles and the weaving process. (Doc. 100-3). The Court finds he is qualified, by the terms of Rule 702, to opine on the proper method for determining thread-count for the sheets at-issue in this case.

And here, the Court finds it is particularly important to keep in mind the specific issue on which Dr. Ghosh is opining. *See Rose*, 388 F. App'x 528, 533 (6th Cir. 2010). Plaintiff makes a great deal of Dr. Ghosh's failure to have tested any of the relevant sheets. (Doc. 116 at PageID# 2817), and it is probably true that Dr. Ghosh does not have the expertise to conduct sheet-testing.

But Dr. Ghosh offers an informed perspective on the ASTM 3775—the mutually-agreed standard for determining thread-counts. Dr. Ghosh points to an allegedly updated version of the ASTM 3775, which states: "When two yarns are laid-in together and parallel, count each yarn separately, as a single unit, regardless of whether it is comprised of single or plied components." (Doc. 100-3). Largely for that reason, Dr. Ghosh opines that the thread-count method practiced by Macy's is legitimate. (*Id.*). Dr. Ghosh's qualifications seem to demand familiarity with the ASTM 3775 standard, and Dr. Ghosh sufficiently grounds his opinion in that same standard. While Dr. Ghosh is not broadly

24

testifying to every issue in the case, his testimony is well "fit" to the inquiry of how to apply the ASTM 3775. *United States v. Bonds*, 12 F.3d 540, 555 (6th Cir. 1993).

Accordingly, Plaintiff's various arguments fail. Plaintiff argues the foundation for Dr. Ghosh's opinion is lacking: a conversation with three Creative employees who manufacture the AQ CVC sheets. (Doc. 116 at PageID# 2817-18). But Dr. Ghosh's opinion does not depend on either Dr. Ghosh or the Court crediting the information relayed by Creative employees. The method by which the AQ CVC sheets are manufactured is not in dispute. The conversations with Creative employees, it seems, function as informational background. Rather, Dr. Ghosh's expert opinion has to do with how the ASTM regards 'laid-in-parallel' bundles of thread. That is an opinion he is qualified to give.

In a similar vein, while the Court agrees with Plaintiff that the patent says nothing about the propriety of the thread-count, the Court does not think that this is the point Dr. Ghosh is making. Dr. Ghosh explains the patented "multi-pick" method to distinguish it from traditional methods. (*See* Doc. 100-3 at PageID# 2000). Dr. Ghosh suggests that the traditional methods may produce more readily visible threads, but he also gives an informed basis, as explored above, for his opinion that "one should … count all of the yarns included in the ribbon-like bundle." (*Id.* at PageID# 2001).

In reply, Plaintiff intertextually cites between Cormier's and Dr. Ghosh's reports for the proposition that the relevant strands (or "fibers") are "interwoven" and "migrated" and thus not "in parallel." (Doc. 127 at PageID# 3822). Since the threads are not actually in parallel, Plaintiff argues, they cannot be counted pursuant to the language of the

25

ASTM 3775. The Court is left wondering if there is a definitive answer to the question of how to count threads if strands are "laid-in-parallel" at the point of manufacture but subsequently "migrate" such that they intersect at the time of inspection. That question is more properly put to a fact-finder, and the Court need not decide it here.

To be clear, Dr. Ghosh cannot (and has not) testified that he conducted a test of AQ CVC sheets by the ASTM standard for determining thread-count. However, he remains a qualified expert on how the patented weaving process produces textiles with laid-in-parallel strands and his basis for believing each strand ought to be counted according to the ASTM 3775. For these reasons, the Court denies Plaintiff's motion to exclude Dr. Ghosh and strike his report.

### 4. Motions to Strike "Second" Reports from Cormier and Boedeker

Plaintiff disclosed supplemental, or "second" reports from Cormier (Doc. 115-1) and Boedeker (Doc. 116-5) after the deadline established in the then-relevant calendar order. (Doc. 82). Macy's moves to strike these second reports. (Docs. 120 and 121). Plaintiff does not dispute that each of these second reports was disclosed significantly beyond the deadlines set in the calendar order. Additionally, Plaintiff never moved for leave to disclose further expert reports.

Each of these second reports acts functionally as a "rebuttal," with Cormier and Boedeker essentially replying to criticisms made by Macy's in their own *Daubert* motions or elsewhere. (*See* "Cormier Rebuttal Report", Docs. 115-1 and 116-5; "Boedeker Rebuttal Report," 113-2). But these second reports also expand upon arguments made in the original expert reports. (*Id.*).

The Court agrees with Macy's that these second reports should be struck as untimely.  Plaintiff did not seek leave of court to file these reports. As such, the calendar order should govern.   The Court will briefly address Plaintiff's arguments to the contrary.

Plaintiff states that Boedeker and Cormier, wearing the hat of rebuttal experts, need not be disclosed, according this Court's Standing Order, because "[w]itnesses whose testimony is limited to rebuttal of an opponent's case need not be listed."  (Doc. 128; *see* Judge Timothy S. Black's Cincinnati Civil Procedures at § 3).[15]   This misreads the standing order in several ways.  First, that section of the standing order clearly pertains to what witnesses must be listed on the Final Pretrial Order. *Id.*  Reading the sentence to override specific commands to disclose expert reports is a distortion. Second, the standing order functions mostly as a default rule, necessarily superseded by a calendar order, which is why the standing order itself begins its substantive portions on the default timelines for disclosures with the qualification "unless otherwise ordered by the Court." *Id.*

Finally, Macy's interpretation of the standing order would do away with the calendar order's command to disclose both the expert designations and "reports." (Doc. 82).  As dictated by the Sixth Circuit, "[c]ourts have stated that Rule 26(a)(2)(C) requires parties to disclose *written reports* of their proposed expert witnesses at the times and in the sequence directed by the court." *Vaughn v. City of Lebanon*, 18 F. App'x 252, 262

---

[15] https://www.ohsd.uscourts.gov/sites/ohsd/files//civil%20procedures%20in%20cincinnati%2011-13%20%282%29.pdf

(6th Cir. 2001) (emphasis added). Through its then-relevant calendar order, this Court directed Plaintiff's to disclose expert "reports," not merely disclosures or designations, by May 3, 2021. (Doc. 82). Plaintiff failed to do so and never sought leave of Court.

Plaintiff relies on the case cited immediately above, *Vaugh v. City of Lebanon*, to support her argument that "[a] violation of Rule 26(a)(2) will generally be harmless if it involves an honest mistake on the part of one party coupled with sufficient knowledge on the part of the other party." (Doc. 128 at PageID# 3830; *see* 18 Fed. Appx. 252 at 264). The Court initially notes that it can discern no evidence in support of an "honest mistake"—such as a misreading of the calendar order—on behalf of Plaintiff.

In any case, the Court finds another line from *Vaughn* even more prescient in the instant case: "Vaughn's real complaint should be with the district court's refusal to modify the scheduling order, not its decision to strike the affidavits." 18 F. App'x at 264. The sentiment is not perfectly on point because this Court has not refused to modify a scheduling order—in fact, it has indulged many requested amendments to the original calendar. But the clear implication is that litigants should ask permission to file expert reports out of time, front-loading their justifications, rather than asking the Court not to strike late reports. The Court further agrees with Macy's that it does stand to suffer prejudice because it had no chance to depose expert reports disclosed out of time.

The Court finds no need to address the remaining arguments of the parties on the point. The second reports will be struck.

## II. MOTION FOR CLASS CERTIFICATION

### A.  Standard

Class actions constitute "an exception to usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1978). "In order to justify a departure from that rule, 'a class representative must be part of the class and possess the same interest and suffer the same injury as the class members.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348-49 (2011) (quoting *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)). To obtain class certification, a plaintiff must meet each of the four prerequisites contained in Federal Rule of Civil Procedure 23(a)—numerosity, commonality, typicality, and adequate representation. *Zehentbauer Family Land, LP v. Chesapeake Expl. LLC*, 935 F.3d 496, 503 (6th Cir. 2019).

"[C]ertification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). This rigorous analysis may require "the court to probe behind the pleadings before coming to rest on the certification question." *Id.* However, courts do not have "license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

In addition to meeting the four criteria in Rule 23(a), a plaintiff must demonstrate that the putative class complies with at least one of the requirements of Rule 23(b). *Id.* Here, Plaintiff seeks certification of the class pursuant to Rule 23(b)(3). (Doc. 38 at 35). A court may certify a class under Rule 23(b)(3) only if it "finds that the questions of law

or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Finally, a Rule 23(b) class must also meet an implied ascertainability requirement. *Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 466 (6th Cir. 2017).

Macy's has now stipulated to numerosity. Accordingly, the Court must decide on commonality, typicality, adequacy of representation and predominance. Before analyzing those factors in turn, the Court inquires into whether the class is ascertainable.

## B. Analysis

### 1. *Ascertainability*

A class is sufficiently ascertainable when class members can be identified based on objective criteria. *See Rikos v. P&G*, 799 F.3d 497, 526 (6th Cir. 2015) (affirming finding of ascertainability where the identification of class members would involve "substantial review" of records, supplemented by the use of receipts and affidavits). The purpose of the ascertainability requirement is to ensure administrative feasibility, including the ability to notify absent class members in order to provide them an opportunity to opt out and avoid the potential collateral estoppel effects of a final judgment. *Cole v. City of Memphis*, 839 F.3d 530, 541 (6th Cir. 2016).

To reiterate, Plaintiff seeks certification of the following class: "Each person in California who purchased from Macy's a CVC (cotton-polyester blend) sheet supplied by AQ between November 8, 2013, and the date the class is certified." (Doc. 84 at PageID# 1086).

30

The Court agrees that Plaintiff's proposed class is ascertainable.  The class proposal lays out objective criteria.  It identifies class members as Californians who purchased the AQ CVC sheets within an appropriate timeframe.  Defendants do not oppose the motion on the grounds that the class is un-ascertainable.  The Court thus finds ascertainability is satisfied.

### 2. *Commonality and Predominance*

Rule 23(a)(2) requires that "there are questions of law or fact common to the class."  Although the Rule "speaks of 'questions' in the plural," the Sixth Circuit has held that "one question common to the class" satisfies this requirement.  *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998).  As the Supreme Court explained in *Tyson Foods, Inc. v. Bouaphakeo*, "[a]n individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'"  136 S. Ct. 1036, 1045 (2016) (quoting 2 W. Rubenstein, Newberg, *Newberg on Class Actions* § 4:50, pp. 196-197 (5th ed. 2012)).

Commonality does not require "the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation."  *Zehentbauer*, 935 F.3d at 503 (quoting *Wal-Mart*, 564 U.S. at 350).  Said another way, commonality is met when determining the "truth or falsity" of a common contention "will resolve an issue that is central to the

validity of each one of the claims in one stroke," advancing the litigation. *Wal-Mart*, 564 U.S. at 350; *Sprague*, 133 F.3d at 397.

At the certification stage, a plaintiff need not show that "all or most class members were in fact injured to meet this requirement." *Rikos*, 799 F.3d at 505. Rather, a plaintiff must demonstrate "that they *can prove* . . . that all members of the class have suffered the same injury." *Id.* at 505, 522. In addition, class members "need not be identically situated to meet the commonality requirement." *Swigart v. Fifth Third Bank*, 288 F.R.D. 177, 183 (S.D. Ohio 2012) (internal quotations omitted).

"Rule 23(a)(2)'s 'commonality' requirement is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions." *Zehentbauer*, 935 F.3d at 503 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997)). In order to assess predominance, "[a] court must first *characterize* the issues in the case as common or individual and then *weigh* which predominate." *Martin v. Behr Dayton Thermal Prods. LLC*, 896 F.3d 405, 413 (6th Cir. 2018) (quoting 2 W. Rubenstein, Newberg, *Newberg on Class Actions* § 4:50 (5th ed. 2010)). When "one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Id.* (quoting *Bouaphakeo*, 136 S. Ct. at 1045).

The Court finds that the members of the proposed class are held together by common questions, answers, and potential proofs. In fact, most of the litigation, from the

Court's view, hinges on the question of whether Macy's/AQ's method of counting untwisted polyester strands as individual threads accords with the industry standard of the ASTM 3775. If Macy's method is consistent with the ASTM 3775, the putative class will have difficulty showing the deception that underlies most, if not all, the causes of action. If counting the laid-in-parallel polyester fiber strands does not accord with the ASTM 3775, the door is open to more common questions—*i.e.*, what did Macy's know about AQ's thread-count labelling practices. Either way, common issues seem likely to determine the litigation.

Many of Macy's protestations regarding commonality are solely focused on the merits.[16] For example, Defendant argues "[b]ecause Plaintiff has not established that such a misrepresentation underpinning all her claims and questions framed as common to the class are indeed common, commonality cannot be established." (Doc. 87 at PageID# 1470-71).[17] Plaintiff does not need to establish the *misrepresentation* conclusively at this stage. Instead, Plaintiff must show that if a representation was indeed made, it would commonly apply to the putative class. As noted, the critical question is whether Plaintiffs "*can prove*—not that they have already shown—that all members of the class have

---

[16] The Court agrees with Macy's that there can be significant overlap between the merits and the Rule 23 factors. But in places Macy's arguments are directly addressed to the merits, not merely coincidental with Rule 23. *See Amgen*, 568 U.S. 455, 465–66 ("Although we have cautioned that a court's class-certification analysis must be rigorous and may entail some overlap with the merits of the plaintiff's underlying claim, Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.") (cleaning up).

[17] Macy's seeks support from *Kramer v. Toyota*. 668 F.App'x 765, 766 (9th Cir. 2016). The court in that case found there was no "evidence" of a common defect *after* it had already upheld the district court's summary judgment decision in favor of the defendant. Bringing that argument to this case, where the Court has yet to make factual judgments, gets things backward.

suffered the same injury." *Rikos*, 799 F.3d at 505 (6th Cir. 2015) (emphasis added).

In a similar fashion, Macy's, citing to AQ principal Larry Queen's declaration, states independent test reports demonstrate that thread-counts on their AQ CVC sheets comply with the ASTM 3775. (Doc. 87 at PageID# 1469). Queen's Declaration about AQ's sheets passing independent tests perhaps raises a factual dispute on the merits. It is not a persuasive argument on the class certification question.

Macy's argues additionally that Plaintiff's motion "presuppose[s] the existence of a fact that Plaintiff has not established: that there is an 'alternative counting method' that was used to determine the thread count of the sheets supplied." (*Id.*). Macy's says the parties agree there is only one method, the ASTM 3775. (*Id.*). Thus, to paraphrase Macy's argument, there is no common issue because there is no issue at all.

Macy's argument here approaches sophistry. Plaintiff and Macy's have staked out positions that would lead them to different final thread-counts on any given set of AQ's CVC sheets. Both claim legitimacy for their final tally under the ASTM 3775. It makes no difference for class certification whether the issue is framed as one of *different* methods—or as a question of *one* method *applied differently*. Macy's distinction lacks a difference, and its argument is not well-taken.

Next, Macy's states it is too far a logical leap to conclude all the AQ CVC sheets have an inflated thread-count from the sample of four tested by Plaintiff's expert. (*Id.* at PageID# 1470). The Court has addressed this question in resolving the *Daubert* motions. To reiterate, Plaintiff's class allegations are not dependent on the four sheets tested by Plaintiff's expert. Once again, the threshold question of whether to count each laid-in-

parallel strand seems to be the key issue in this case. Nothing in the record indicates Macy's or AQ counted polyester strands differently in different sets of CVC sheets.[18] Thus, Macy's argument is unconvincing.

Finally, Macy's offers a misguided parallel to *Wal-Mart Stores v. Dukes*. 564 U.S. 338 (2011). Macy's is correct that the Court in *Wal-Mart* determined that a class cannot cohere around several thousand employment decisions, even if they align in a pattern, unless a unified policy dictated those decisions. *Id.* at 352. But there is glue holding together Macy's conduct here: Macy's CVC sheets from AQ, according to Plaintiff's allegations, have inflated thread-counts because AQ overcounts the threads in a consistent fashion, as explained above. Again, the Court cannot now say who is correct. But the answer and the proofs will likely apply to every member in the proposed class.

The Court finds common issues and common proofs will drive the litigation in this case. Particularly, whether Macy's/AQ label their thread-counts in a manner that is consistent with the ASTM 3775 or, on the other hand, inconsistent and deceptive.

Thus, Plaintiff demonstrates the requisite commonality. The Court now moves on to the related question of predominance.

As Macy's notes, Rule 23(b)'s predominance requirement is more "demanding." *Zehentbauer*, 935 F.3d at 503. The demanding requirement notwithstanding, Plaintiff has met her burden in showing common issues predominate over individual ones. The Court

---

[18] If AQ/Macy's only used the "every polyester strand" counting method in the "Somerset"-label sheets purchased by Plaintiff, or only in a narrow subset of the CVC sheets supplied to Macy's, the Court would expect Macy's to say as much.

has already stated the primary reason. The overwhelmingly important question that looms over this litigation is a common one. It is either true or false that the thread-counting method used by Macy's deceptively overinflates thread-count by tallying each parallel strand in a bundle. Stated in the negative, it seems very unlikely that Macy's thread-count labelling would afford a claim to only *some* members of the proposed class. In large part, it is an all-or-nothing proposition.

Defendants raise collateral points on predominance. The Court will address them but, in large part, these points do not seriously challenge the predominance of the common question that anchors this case.

Macy's argues that inflated thread counts cannot be determined on a class-wide level because the alleged thread-count inflation is inconsistent. Referencing Plaintiff's expert report, Macy's contends "the extent of thread-count variance is not uniform in terms of either the number [or] percentage of threads." (Doc. 87 at PageID# 1483).

Macy's argument here implies that defects must manifest with mathematical precision to be appropriate for class treatment. The Court is aware of no basis in law for such an implication. To adopt such a rigid standard would cast doubt on the viability of the consumer class action writ-large. Furthermore, the Court is persuaded by Plaintiff's arguments that thread-count inflation is determinable on a systematic basis with reference to AQ's specifications sheets.[19] Plaintiff can theoretically offer evidence of over-counting, or Defendant could provide evidence tending to disprove the same, with

---

[19] Thread counts—or more specifically, the relevant thread-count inputs—are included on the specification's sheets AQ provides to Macy's. (Doc. 112 at PageID# 2213).

reference to these specifications. (Doc. 87 at PageID# 1483). Thus, Macy's argument is not well-taken.

Macy's contention about "materiality" is likewise too granular. Macys's argues it is not clear who bought sheets because of the thread-count and who bought them for other reasons. (Doc. 87 at PageID# 1485). Thus, according to Macy's, Plaintiff cannot show materiality of thread counts to the proposed class members' choices. The argument is meant to fracture the proposed class into several distinct consumers, each with their own preferences. And it is no doubt accurate that multiple considerations may run through the minds of Macy's sheet buyers.

Courts, however, have long applied the "reasonable consumer test" in response to this very problem. The doctrine allows plaintiffs to establish materiality "by showing that a reasonable person would have considered the defendant's representation material." *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1103 (C.D. Cal. 2015).

Applying the reasonable consumer test here, the Court finds there is sufficient evidence at least suggesting thread-count is a substantial factor in consumers' choice of bedsheets. First, Plaintiff's expert, as discussed, provides a "pre-analysis" showing a direct correlation between price and thread-count, a preliminary indication that consumers are willing to pay more money for more threads. (Doc. 84-19, at PageID# 1331). Next, Macy's marketing team, in at least some instances, is careful to make sure thread-count gets prime billing on the packaging, as revealed by their emails. (Doc. 84-21). Finally, Macy's own expert, Linwood E. Wright, wrote a letter to the FTC, prior to

this litigation, stating that, for consumers, thread-count is an important indicator of fabric quality for bedsheets. (*See* Wright Report, Doc. 117-7). The Court finds there is more than enough evidence suggesting thread-count is a material factor in consumers' choice of bedsheets.

Ultimately, though, materiality is probably a question best left to the merits. In *Amgen v. Connecticut Retirement Plans*, the court held "[w]hile [Plaintiff] certainly must prove materiality to prevail on the merits, we hold that such proof is not a prerequisite to class certification. Rule 23(b)(3) requires a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." 568 U.S. 455, 459 (2013). It is true that *Amgen* is a securities fraud case—as such, it is based on substantive laws not at issue here. But the Sixth Circuit has approvingly cited the above-quoted passage in a consumer class action. *See In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 858 (6th Cir. 2013).

Macy's also argues "thread count is just one of many factors that consumers consider when purchasing sheets." (Doc. 87 at PageID# 1485). In further support of this contention, Macy's contrasts the present facts with those of *Rikos*. *See* 799 F.3d 497 (6th Cir. 2015). Macy's argues that in *Rikos*, the supposed health benefits of a dietary supplement were the only reason to buy it—in other words, the allegedly deceptive labelling was the "but-for" cause of the purchase. (Doc. 87 at PageID# 1485). Comparing the present case to the facts in *Rikos,* Macy's asserts, "there is no evidence that thread count in general, much less a particular thread count value, is the sine qua non

of a reasonable consumer's purchase decision." (*Id.*).

Macy's overstates the holding of *Rikos* and the relevant law. Initially, the Court finds that grafting a "but-for" requirement onto an inquiry regarding "predominance" of common questions and proofs is a distortion of terms. As a California court, analyzing similar language and concepts put it, "it is not ... necessary that [the plaintiff's] reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor influencing his conduct.... It is enough that the representation has played a substantial part, and so had been a substantial factor, in influencing his decision." *In re Tobacco II Cases*, 46 Cal. 4th 298, 326, 207 P.3d 20, 39 (Cal. 2009).

As for *Rikos,* it is true that the Sixth Circuit's decision mentions the advertised health benefits at-issue as a "but-for" cause of the consumers' purchase. 799 F.3d at 506 (6th Cir. 2015). Nowhere, though, does the Sixth Circuit say that a deceptive label must be a "but-for" cause to establish predominance. Nor did this Court in the decision below.[20] Thus, Macy's attempted parallel to *Rikos* is unpersuasive.

Other cases relied on by Macy's provide instructive comparisons rather than direct support for Macy's. In *Lucas v. Breg,* the Court there found a reasonable consumer's choice of a cold therapy device very much depended on what each consumer's prescribing physician had said about the device. 212 F.Supp.3d 950 (S.D. Cal

---

[20] This Court wrote: "Here, the predominating common issues shared by Plaintiffs and each class member are whether Defendant represented through its advertising and labeling that Align promotes digestive health and whether the advertising message is truthful or not deceptive. The resolution of these questions does not rise or fall on the individualized conduct of class members, but on Defendant's conduct and the objective medical science about whether Align works." *Rikos v. Procter & Gamble Co.*, No. 1:11-CV-226, 2014 WL 11370455, at *11 (S.D. Ohio June 19, 2014), aff'd, 799 F.3d 497 (6th Cir. 2015).

2016).  There is not an equivalent intervening factor in this case.  In *Johnson v. Harley-Davidson Motor Co. Grp. LLC*., the plaintiffs essentially admitted that an alleged defect causing excessive heat in a motorcycle would not prevent them from buying the same motorcycle again. 285 F.R.D. 573, 581 (E.D. Cal. 2012).  Such constituted strong evidence against materiality and reliance. (*Id.*).  There is no parallel evidence here.  And in *Sanchez v. Walmart*, the alleged relationship between the omission of a safety warning and a consumer's decision to buy a stroller is more tenuous than the relationship between thread-count and consumers' valuation of bedsheets.  No. CIV 206CV02573JAMKJM, 2009 WL 1514435, at *2 (E.D. Cal. May 28, 2009).   Accordingly, these cases provide little support for Macy's here.

Macy's again skips to the merits when it argues it is not responsible for any misrepresentation.  (Doc. 87 at PageID#1485-86).  Macy's cites *In re Outlaw Lab'y, LLP* for the proposition that "a Defendant cannot be held liable under the UCL merely for placing the falsely advertised products on the shelf."  463 F. Supp. 3d 1068, 1089 (S.D. Cal. 2020).  Macy's makes essentially the same argument with regards to claims under the FAL and CLRA. (Doc. 87 at PageID# 1486).  Again, this is a question on the merits. And Macy's knowledge of any falsity is unlikely to apply to only *certain* sets of AQ CVC sheets.  Accordingly, if Macy's did not endorse the thread-counts, it can offer proof to that effect and possibly prevail over a commonly-situated class of plaintiffs.  The argument does not bear on whether this case is suited to class-wide resolution.

In something of a tacked-on concern regarding predominance, Macy's argues that not every purchaser of AQ CVC sheets is a "consumer." (Doc. 87 at PageID# 1491).

Under the CLRA, consumers must have purchased the goods for "personal, family or household purposes." (*Id.*). Macy's states, "there are many reasons why a person would buy sheets and not do so for personal, family, or household purpose, such as, and without limitation, for use at (1) hotels, (2) vacation rentals, (3) long-term care facilities, (4) camps, or (5) retreats." (*Id.*). From a common-sense perspective, the Court finds it unlikely that hotels, or the other categories of buyers mentioned by Macy's, buy sheets at Macy's retail locations. Additionally, the Court is unclear why the CLRA's "personal, family and household" limitation on use of the sheets must also impose a limit on a class seeking remedies under more than one cause of action. Thus, the Court rejects Macy's argument.

For reasons stated above, the Court finds Plaintiff has shown that common questions, as explained above, will predominate in this case.

### 3. *Typicality*

Federal Rule of Civil Procedure 23(a)(3) requires plaintiffs to demonstrate that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." "Typicality is met if the class members' claims are 'fairly encompassed by the named plaintiffs' claims.'" *Hendricks v. Total Quality Logistics*, LLC, No. 1:10-cv-649, 2019 WL 2387206, at *7 (S.D. Ohio Mar. 22, 2019) (quoting *Sprague*, 133 F.3d at 399). The purpose of the requirement is to ensure that the representatives' interests and the interests of the class members are aligned. *Id.* "Many courts have found typicality if the claims or defenses of the representatives and the members of the class stem from a single event or a unitary course of conduct, or if they are based on the same legal or

remedial theory." *Rikos*, 799 F.3d at 509 (quoting Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, 7A *Federal Practice and Procedure* § 1764 (3d ed. 2005)). Moreover, the typicality and commonality analysis "tend to merge," as both "serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claims and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Wal-Mart*, 131 S. Ct. at 2551 n.5.

Here, typicality is met largely for the same reasons that Plaintiff has demonstrated for commonality. Plaintiff's claims arise out of a single course of conduct—Macy's alleged practice of counting parallel polyester strands as individual threads. Each class member will have purchased the sheets in question in California. Plaintiff's and the class members' claims also rely on the same legal theory that Macy's knowingly endorsed an inaccurate thread-counting process for the sheets in question.

Macy's argues Plaintiff cannot establish typicality because Plaintiff lacks standing. (Doc. 87 at PageID# 71). This was resolved in this Court decision on Macy's motion to dismiss. (Doc. 39). There, this Court analyzed whether Plaintiff "may have standing to assert claims for unnamed class members based on products he or she did not purchase so long as the products and alleged misrepresentations are substantially similar." (Doc. 39 at 6). The Court found the products were substantially similar. (*Id.*). Implied in such a finding is the notion that Plaintiff would have standing to litigate based on alleged defects in the product *she herself purchased*. Accordingly, Macy's argument about Plaintiff's own standing must fail.

Macy's also argues Plaintiff lacks standing to represent those who purchased sheets other than those labelled "Somerset Collection." Macy's says:

> Plaintiff alleges that she purchased a set of Somerset Collection sheets with an advertised thread count of 900 that were manufactured by Creative, imported by AQ Textiles, and sold to her by Defendant. Yet, she seeks to represent a class of purchasers of all CVC sheets sold in Macy's that were supplied by AQ Textiles over a more than seven-year period.

(Doc. 38 at PageID# 1473). The Court also decided this issue in its order on Macy's motion to dismiss. Specifically, the Court found "that Plaintiffs have adequately alleged that the purchased and unpurchased products are substantially similar physically (bed sheets made/imported by AQ/Creative and sold at Macy's) and the alleged misrepresentations are similar (inflated thread counts) …. Thus, under the majority approach, Plaintiffs' claims based on products they did not purchase should not be dismissed …." (*Id.*). Thus, Macy's attempt to revive its standing arguments are unavailing.

Last, Macy's argues Plaintiff's claims are atypical of the class because Plaintiff has sensitive skin—the supposed real reason Plaintiff disliked the sheets. (Doc. 87 at PageID# 1479). This argument implies all consumers in a class must dislike the product in a similar fashion. Bluntly, that is not how it works. Plaintiff claims she paid more than she would have paid for a 200-thread sheet. In that way, her claims are typical of the proposed class. Accordingly, the Court finds Plaintiff's claims are typical of the proposed class members'.

#### 4. *Adequacy*

The adequacy of representation requirement of Rule 23(a)(4) ensures that "the representative parties will fairly and adequately protect the interests of the class." This requirement has two components: (1) the representatives must have common interests with the unnamed class members, and (2) it must appear that the representatives will vigorously prosecute the class action through qualified counsel. *See Rikos*, No. 1:11-cv-225, 2018 WL 2009681, at *5 (S.D. Ohio Apr. 30, 2018) (citing *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 524-25 (6th Cir. 1976)).

In terms of legal rights, Plaintiff does have common interests with the unnamed class members. She and the proposed plaintiff class were allegedly misled by inflated thread-counts. Macy's suggests, though, that a personal relationship may complicate Plaintiff's alignment with the class.

Specifically, Macy's contends that Plaintiff's friendship with a lawyer at one of Plaintiff's counsel's firms jeopardizes her adequacy as a class representative. (Doc. 87 at PageID# 1480). It is undisputed that Plaintiff Sara Hawes is friends with one of the attorneys at one of the firms representing her. Furthermore, the Court agrees that relationships between class counsel and the putative class representative are rightly subjected to scrutiny. *See e.g., Bohn v. Pharmavite, LLC*, 2013 WL 4517895, at *2 (S.D. Cal. Aug. 7, 2013).

Here, though, the Court's concerns are assuaged by other factors. Plaintiff's legal team is composed of five firms, all on contingency, making it unlikely Plaintiff could or would settle cheaply just to benefit her friend. (*See* Declaration of Attorney Drew

Legando, "Legando Declaration," Doc. 84-15). Second, the Court will have approval or any proposed class settlements. Third, for most relationships that pose a true problem for a representative's adequacy, there is usually something more sinister than a friendship. *Cf. London v. Wal-Mart Stores, Inc.,* 340 F.3d 1246, 1255 (11th Cir. 2003) ("After reviewing the record, we conclude that the district court abused its discretion by ignoring London and Ader's significant personal and *financial* ties.") (emphasis added).

Accordingly, the Court finds that Plaintiff's friendship with a single attorney on a multiple-firm team, without more, does not provide enough justification to disqualify Plaintiff as a class representative.

The Court finds, in addition, that proposed class counsel will adequately represent the class based on the uncontradicted facts in the attorney declaration appended to the motion for class certification. (*See* Legando Declaration, Doc. 84-15). The Court is persuaded, in other words, that the class representative will "vigorously prosecute the interests of the class through qualified counsel." *Senter*, 532 F.2d 511, 525 (6th Cir. 1976).

Because Plaintiff has met the requirements of Rule 23, the Court will certify a class with Sara Hawes as class representative and Plaintiff's counsel as class counsel.

### III. CONCLUSION

Based upon the foregoing:

1. Plaintiff's motion for class certification (Doc. 84) is **GRANTED**. The Court hereby certifies the following class:

> Each person in California who purchased from Macy's a CVC (cotton-polyester blend) sheet supplied by AQ between November 8, 2013, and the present.

2. The Court appoints Sara Hawes as class representative and her counsel from the law firms of Merriman Legando Williams and Klang, LLC; Cueno Gilbert & LaDuca, LLP; Levan Sedran & Berman; Audet and Partners; and Steckler Wayne Cochran PLLC as class counsel.

3. Defendant's motion to exclude and strike the first report of Stefan Boedeker is **DENIED.** (Doc. 91).

4. Defendant's motion to exclude and strike the first report of Daniel Cormier is **DENIED** (Doc. 92), **except that** the Court will strike Section 6 of Cormier's Report (Doc. 84-16, PageID# 1227-1229).

5. Plaintiff's motion to strike the report and exclude the opinion of Sean Iyer is **DENIED**. (Doc. 114).

6. Plaintiff's motion to strike the report and exclude the opinion of Tushar Ghosh is **DENIED**. (Doc. 116).

7. Defendant's motion to strike the second ("rebuttal") report of Daniel Cormier is **GRANTED**. (Doc. 120). Cormier's rebuttal report (Doc. 115-1 and 116-5) is **STRICKEN**.

8. Defendant's motion to strike the second ("rebuttal") report of Stefan Boedeker is **GRANTED**. (Doc. 121). Boedeker's rebuttal report (Docs. 113-2 and 114-4) is **STRICKEN**.

**IT IS SO ORDERED.**

Date:   1/22/2022                              *s/Timothy S. Black*
                                               Timothy S. Black
                                               United States District Judge