# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | |
|---|---|
| SARA HAWES and AMY HILL, individually, and on behalf of all others similarly situated, <br><br> PLAINTIFFS, <br><br> v. <br><br> MACY'S RETAIL HOLDINGS, INC. and MACY'S WEST STORES, INC., <br><br> DEFENDANTS. | Case No.: 1:17-cv-00754 <br><br> <u>CLASS ACTION</u> <br><br> Hon. Douglas R. Cole |
| CASSANDRA CHIARALUCE and JONATHAN FONTAINE, individually, and on behalf of all others similarly situated, <br><br> PLAINTIFFS, <br><br> v. <br><br> MACY'S INC, MACY'S RETAIL HOLDINGS, INC., MACY'S WEST STORES, INC. and MACYS.COM, <br><br> DEFENDANTS. | Case No.: 2:20-cv-00081 <br><br> <u>CLASS ACTION</u> <br><br> Hon. Douglas R. Cole |

**BRIEF OF *AMICUS CURIAE* HAMILTON LINCOLN LAW INSTITUTE
IN OPPOSITION TO THE CLASS SETTLEMENT**

Under the guise of delivering relief to those who purchased allegedly mislabeled and defective chief value cotton ("CVC") sheets from Macy's, the parties submitted a settlement proposal to the Court that will leave the class with barely a sheet to its name. The Settlement's miniscule claim caps and limited secondary distribution make any direct relief an effective façade. Instead, most of the money will wind up via *cy pres* with the Public Interest Research Group ("PIRG")—a third party nonprofit with no relevance to this case that publicly engages in left-leaning political advocacy. The Settlement and its *cy pres* component in particular is unlawful, running counter to Rule 23, this circuit's sparse caselaw, scholarly and judicial warnings about *cy pres*, and the First Amendment. *See Poblano v. Russell Cellular Inc.*, 543 F. Supp. 3d 1293, 1296 (M.D. Fla. 2021) (refusing to approve *cy pres* settlement "[g]iven the abiding debate"). Therefore, this Court should reject the Settlement in accordance with its independent obligation to the unnamed class members.

## INTEREST

HLLI's participation in this case arises out of concern with the Settlement, which is structured to funnel relief meant for the class to PIRG—an organization not affiliated with the class that engages in politicized advocacy. Settlement, ECF No. 143-2.

HLLI is a public interest organization dedicated to protecting free markets, free speech, limited government, and separation of powers against regulatory abuse and rent-seeking. Its subunit, the Center for Class Action Fairness ("CCAF"), represents class members *pro bono* in class actions when class counsel employ unfair class action

procedures to benefit themselves at the expense of the class. CCAF's primary mission is to act as a check on abusive and collusive class-action settlements. *See, e.g.*, *Briseño v. Henderson*, 998 F.3d 1014 (9th Cir. 2021) (sustaining CCAF's objection to improper class settlement approval); *Ark. Tchr. Ret. Sys. v. State St. Corp.*, 25 F.4th 55 (1st Cir. 2022) (appearing as amicus at request of the court to defend district court's decision imposing sanctions on plaintiffs' counsel for misconduct). Since 2009, CCAF has returned more than $200 million to class members, through improved settlements and reduced fees.

    HLLI's specific interest in this case is three-fold. First, HLLI has significant concerns about the Settlement's ability to deliver relief to the class, and its ongoing work representing class members nationwide is well-served by saving this class from this Settlement. HLLI is an experienced amicus curiae that has assisted courts before when important legal issues go unopposed, and asks to do so here as well. *See, e.g.*, *Ark. Tchr. Ret. Sys.*, 25 F.4th 55 (affirming the district court's order reducing fees in an otherwise *ex parte* appeal and describing HLLI's work at the district court). Second, HLLI is—if not the most active—then amongst the most active and experienced law firms litigating *cy pres*'s application in class settlements. *See, e.g., Frank v. Gaos*, 139 S. Ct. 1041 (2019). Because the Sixth Circuit has not previously addressed the substantive issue of *cy pres* directly, this Court's judgment regarding the Settlement will be an important and novel decision. Given its mission and experience, HLLI has an interest in ensuring the judgment best serves Rule 23 and the class members as it is likely to guide future decisions in the circuit in this area of the law. Finally, HLLI—which also

maintains a robust First Amendment practice—has grave concerns about the constitutionality of *cy pres* settlements which route class funds to organizations engaged in political advocacy as the proposed Settlement does here.

## ARGUMENT

I.  **The Settlement is structured so that most of the funds allocated to the class will instead be paid to PIRG via *cy pres*.**

While the Settlement obligates Macy's to pay $10,500,000 for selling allegedly mislabeled and defective CVC sheets, Settlement, ECF No. 143-2 at PageID 4104, its burdensome and unrewarding claims process will minimize direct relief to the class and instead reroute it to PIRG via *cy pres*. The Settlement requires Macy's to deliver relief directly to purchasers for whom it has records, but the parties "acknowledge Macy's does not have complete information about the identity" of most class members. Settlement, ECF No. 143-2 at PageID 4107. Knowing this, the parties negotiated a settlement which put the burden on the class members to seek out what amounts to very little individual relief—making it a foregone conclusion that PIRG, not class members, will get the bulk of the Settlement Amount.

In the primary distribution, the Settlement requires class members to take the time to "submit a completed and signed Claim Form and all supporting documentation and information," at which point they are eligible to receive a mere $7.50 per purchase of CVC sheets *provided they can demonstrate proof of purchase*. Settlement, ECF No. 143-2 at PageID 4108, 4111. But history demonstrates that a negligible number of claimants will

3

submit proof of purchase. *See McCrary v. Elations Co.*, 2016 WL 777865 (C.D. Cal. Feb. 25, 2016) (only 2 of 3,405 claimants submitting proof of purchase); Supplemental Declaration of Jeanne C. Finegan, APR, *Kumar v. Salov N. Am. Corp.*, No. 14-cv-02411, Dkt. 164 ¶ 4 (N.D. Cal. May 26, 2017) (attesting that only 33 of more than 53,000 valid claims were submitted with proof of purchase); *Holt v. Foodstate, Inc.*, No. 17-cv-00637, 2020 U.S. Dist. LEXIS 7265 (D.N.H. Jan. 16, 2020) (99.5% of claimants submitted claims without proof of purchase); *Kukorinis v. Walmart*, No. 19-cv-20592, Dkt. 97 at 16 n.9 (S.D. Fla. Sept. 20, 2021) (0.0012% of claims made were made with proof of purchase).

Class members who do not submit proof of purchase receive only $2.50—total, regardless of the number of sheets purchased—and must submit the same claim form and swear to the purchase(s) under penalty of perjury. Settlement, ECF No. 143-2 at Page ID 4108. Whatever remains of the Settlement Amount after the first distribution gets rerouted, on a *pro rata* basis, to class members who either (a) Macy's has a record of purchasing sheets (not many) or (b) are able to provide proof of purchase. Settlement, ECF No. 143-2 at PageID 4108. However, the secondary distribution also caps relief so that no class member can recoup, in total, more than 50% of the amount paid for CVC sheets. Settlement, ECF No. 143-2 at Page ID 4109.

Claim rates are "notoriously low" in "small-ticket item[]" consumer product class settlements. *Briseño v. Henderson,* 998 F.3d 1014, 1020, 1026 (9th Cir. 2021) (discussing a claim rate of "barely more than one-half of one percent"). Because of imperfect notice

4

and economic (dis)incentives, "class actions with little or no direct mail notice to consumers" like this one "have a median [claim] response rate of 0.023%." Daniel Fisher, *Odds Of A Payoff In Consumer Class Action? Less Than A Straight Flush*, FORBES (May 8, 2014) https://tinyurl.com/54k77wc3 (citing the analysis of Kurtzman Carson Consultants, which has administered hundreds of consumer class-action settlements). Few class members will take the time to file a claim form to get back $7.50 for each CVC sheet, provided they even know about the Settlement and can provide proof of purchase. Even fewer will do so for capped relief of $2.50 without proof of purchase.

## II. *Cy pres* relief and this Settlement specifically run counter to Rule 23(e)'s express distribution requirements.

At most, *cy pres* should be a mechanism of last and limited resort. *See BankAmerica,* 775 F.3d at 1064*; Pearson,* 772 F.3d at 784; American Law Institute, PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION § 3.07 (2010). This rule follows from the precept that "[t]he settlement-fund proceeds, generated by the value of the class members' claims, belong solely to the class members." *Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 474 (5th Cir. 2011) (citing ALI Principles §3.07 cmt. (b)). The 2018 Amendments to Rule 23 reinforced this rule by requiring the Court to assess "the effectiveness of any proposed method of distributing relief to the class…" Fed. R. Civ. P. 23(e)(2)(C)(ii). A settlement's distribution of relief to the class is not effective if it distributes the funds to a third party rather than the class members.

"Barring sufficient justification, *cy pres* awards should generally represent a small percentage of total settlement funds." *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 174 (3d Cir. 2013). If *cy pres* is an excessive share of the total relative to direct class recovery, as it will be under this Settlement, a district court should "urge the parties to implement a settlement structure that attempts to maintain an *appropriate* balance between payments to the class and *cy pres* awards." *Id.* (emphasis added). Here, there is no sufficient justification for resorting to *cy pres* ahead of any secondary distribution to claimants without proof of purchase, and ahead of a full secondary distribution to claimants with proof of purchase. There is no "windfall" to a greater award; after all, the operative complaint seeks "restitution of all monies paid to Defendant." Third Amended Complaint, ECF No. 64 at PageID 866. And to the extent that the parties have concerns about fraud then "other means" should be "explored" that do not arbitrarily give the class's money to non-class members. *Baby Prods.*, 708 F.3d at 175.

This Settlement does not satisfy Rule 23(e) because it prematurely reroutes significant settlement funds via *cy pres* to PIRG. ECF No. 143-2 at PageID 4109.

### III. **Cy pres is not appropriate relief for federal class action lawsuits, and the inclusion of PIRG as a beneficiary here does not advance the interests of the class.**

*Cy pres*—which is the gifting of "settlement funds to a charity," *Gascho v. Global Fitness Holdings, LLC*, 822 F.3d 269, 278 n.3 (6th Cir. 2016)—was never intended to be a form of relief in class settlements. *Gaos*, 139 S. Ct. at 1047 (Thomas, J., dissenting). There is no "charitable" objective in a Rule 23 class action. *In re Pet Food Prods. Liab.*

6

*Litig.*, 629 F.3d 333, 363 (3d Cir. 2010) (Weis, J., concurring and dissenting in part). Rather, a class action is a procedural device to aggregate private claims for compensation to class members—a "species" of "joinder"—not a charitable trust. *Shady Grove Orthopedic Assocs., P.A., v. Allstate Ins. Co.*, 559 U.S. 393, 408 (2010). Under the Rules Enabling Act, procedural rules like Rule 23 cannot amend the substantive law. No class action complaint seeks *cy pres* as a substantive remedy; indeed, none could do so consistent with Article III. It follows that "*cy pres* payments are not a form of relief to the absent class members and should not be treated as such." *Frank*, 139 S. Ct. at 1047 (Thomas, J., dissenting).

Thus, there is good reason to strictly limit if not entirely prohibit *cy pres* relief in class actions: For one, *cy pres* shifts the interests (or appearance thereof) away from delivering relief to the class. And in this Circuit, class compensation is what matters, not "whether [the settlement] provides relief to other people." *Dry Max Pampers*, 724 F.3d at 720 (reversing settlement that included *cy pres* component but no real relief for class members). The relief must be real, not "fictive," for "[c]ases are better decided on reality than on fiction." *Id.* at 721 (internal quotes omitted).

Second, when courts award attorneys' fees based on the size of the *cy pres* fund rather than the amount the class directly received, this "increase[s] the likelihood and absolute amount of attorneys' fees awarded without directly, or even indirectly, benefiting the plaintiff." Martin H. Redish et al., *Cy Pres Relief and the Pathologies of the Modern Class Action: A Normative and Empirical Analysis*, 62 FLA. L. REV. 617, 661 (2010).

7

That risks the "preferential treatment" for class counsel this Circuit forbids. *Dry Max Pampers*, 724 F.3d at 718, 721. Further, *cy pres* enables lawyers to promote their own personal, financial, political, or charitable preferences—manifesting publicity photographs of attorneys handing oversized checks to their selected *cy pres* recipients or public statements of gratitude from recipients to the class attorneys. *E.g.*, Chris J. Chasin, *Modernizing Class Action Cy Pres Through Democratic Inputs*, 163 U. PENN. L. REV. 1463, 1484 & n.114 (2015). The impartiality of judges is impinged by *cy pres*, too, as it tempts judges to play benefactor with money meant for the class and creates "a potential appearance of impropriety." *In re Google Inc. St. View Elec. Commc'ns. Litig.*, 21 F.4th 1102, 1123 (9th Cir. 2021) (Bade, J., concurring); *see also Ira Holtzman, C.P.A. & Assocs. v. Turza,* 728 F.3d 682, 689-90 (7th Cir. 2013) (Easterbrook, J.) (noting "many courts have expressed skepticism"); Adam Liptak, *Doling Out Other People's Money*, N.Y. TIMES (Nov. 26, 2007). And *cy pres* can give the parties a quick and easy way to reach settlement that avoids addressing more difficult questions that are nevertheless fundamental to adequate, fair, and reasonable relief.

Further, *cy pres* settlements suffer from significant "constitutional flaws." Redish, 62 FLA. L. REV. at 641. *Cy pres* (1) "unconstitutionally transforms the judicial process from a bilateral private rights adjudicatory model into a trilateral process;" (2) "violates separation of powers … [by] transforming" a settlement "from a compensatory remedial structure to the equivalent of a civil fine;" and, (3) threatens "to undermine the due process rights of both defendants and absent class plaintiffs." *Id.* Underscoring

these flaws in an "inherently deceptive manner," *cy pres* gives the "superficial appearance of the resolution of a live dispute," even though it delivers relief to a non-class member charity whose "legal rights have presumably been violated by no one." *Id.* at 643.

Nevertheless, to amicus's knowledge, other than in *Dry Max Pampers* the Sixth Circuit has never directly confronted a settlement deploying *cy pres*. (*Gascho* notes that the Sixth Circuit has addressed a question relating to fees in the context of a *cy pres* settlement. 822 F.3d at 283). While there is no Sixth Circuit test for discerning when or if a *cy pres* remedy is appropriate, scholars interpret the doctrine to at least require that "the group is really a substitute for the injured plaintiffs." Hon. Elaine Bucklo and Thomas R. Meites, *What Every Judge Should Know About a Rule 23 Settlement (But Probably Isn't Told)*, 41 LITIG. 1, 4 (2015). Even the Ninth Circuit—perhaps the most permissive regarding *cy pres*—requires demonstration of "a driving nexus between the plaintiff class and the cy pres beneficiaries." *Dennis v. Kellogg Co.,* 697 F.3d 858, 865 (9th Cir. 2012).

The inclusion of PIRG in this Settlement "is especially troubling because it is a powerful interest group…and conducts political activity in many fields wholly unrelated [to consumer protection]." D. Brooks Smith, *Class Action and Aggregate Litigation: A Comparative International Analysis*, 124 PENN ST. L. REV. 303, 337 (2020); *see also In re Agent Orange Prods. Liab. Litig.*, 818 F.2d 179, 186 (2d Cir. 1987) (refusing to allow *cy pres* funds be spent on "political advocacy" because that would be "inconsistent with the judicial function"). Simply, PIRG does not "advance the interests of the class" in any meaningful way. *Gascho*, 822 F.3d at 278 n.3. Between the Settlement and the parties'

9

joint motion in support of preliminary approval, PIRG is mentioned only once, as "a charitable organization which has as its purpose the advancement of consumer protections and rights." ECF No. 143-2 at PageID 4109. This one throwaway line does not demonstrate any "driving nexus" between the class and PIRG. *Dennis*, 697 F.3d at 865. And it is incorrect to suggest PIRG is simply a consumer protection organization when its mission equally extends to "democracy and government," "global warming," and "health," too. *Our Work*, Public Interest Action Group (accessed Aug. 27, 2023) https://tinyurl.com/mrynrjuc. This case is about allegedly mislabeled and defective bed sheets—even if one concedes, *arguendo*, that *cy pres* is appropriate, PIRG's vast scope of unrelated issue engagement means "the group is [not] really a substitute for the injured plaintiffs." Bucklo and Meites, 41 LITIG. at 4. And because PIRG engages in political advocacy to deliver on its mission, *infra* IV.A, the organization is even further disconnected from the class members—all of whom are represented here because they bought the wrong sheets, not because they've got the same political interests.

**IV. The Settlement's use of *cy pres* is especially concerning because it violates the First Amendment rights of the class members by funneling significant funds to a political advocacy group.**

Of particular concern in this Settlement is PIRG's political advocacy, because the funding scheme's redistribution of class funds to support PIRG's agenda violates the First Amendment rights of the class members.

### A. PIRG's left-wing activism.

While the parties refer to PIRG with the innocuous description of "a charitable organization which has as its purpose the advancement of consumer protections and rights," ECF No. 143-2 at PageID 4109, the reality under the hood is that the organization is a political actor. PIRG engages aggressively and vocally in anti-humanist climate-change activism, including advocating against fossil fuel investment and nuclear energy. *See, e.g.,* Tony Dutzik et al., *Building fossil fuel infrastructure locks us into a higher-carbon future*, PIRG, (Nov. 18, 2022) https://tinyurl.com/3vfvsvc5; *Nuclear Power, Not Worth the Risk*, PIRG, (Mar. 11, 2011) https://tinyurl.com/3ard2wn8. The parties' *ipse dixit* assertion that PIRG is a consumer watchdog is contradicted, of course, by an anti-energy agenda that would substantially raise the cost of living for Americans. PIRG has also championed more quixotic environmental causes like banning gas stoves and plastic bags that have nothing to do with consumer protection and that are deeply divisive among the general public. Matt Casale, *Congress: Protect the public from gas stove pollution*, PIRG (Sep. 13, 2022) https://tinyurl.com/5emuwejj; *Statement: Canada bans single-use plastics*, PIRG (June 22, 2022) https://tinyurl.com/dkncwxep. Unsurprisingly given these positions, PIRG's advocacy extends to partisan battles on Capitol Hill, where it has promoted some of the Democrats' highest priority legislative goals while rallying opposition to Republican proposals. *Statement: Inflation Reduction Act could be a 'game changer' for climate and clean energy*, PIRG (July 28, 2022)

11

https://tinyurl.com/h36ybb8r; *Letter Opposing HR 10, The Wrong Choice Act*, PIRG (June 8, 2017) https://tinyurl.com/2yrjecuz.

Separately, PIRG's political activism is independently disqualifying. For example, PIRG actively supports the "Black Lives Matter" political network. *Black Lives Matter.*, PIRG (June 8, 2020) https://tinyurl.com/42mthbm6. And it also uses its funding to support various socialist and racially discriminatory community organizations like DSNI and the Urban League of Portland, which push for "equal shares of resources" and "collective resident leadership and control" (DSNI), and "equity in our workforce, education, health, housing and economic prosperity" (Urban League of Portland). *Get Involved*, Urban League of Portland (accessed Aug. 27, 2023) https://tinyurl.com/555k4yft; *About Us*, DSNI (accessed Aug. 27, 2023) https://tinyurl.com/3jza2vs8. Another recipient of PIRG's funding, Measure, brags about its "all-[b]lack female [leadership] team," in a direct and public rebuke of Title VII. *About*, Measure (accessed Aug. 27, 2023) https://tinyurl.com/2h4cpv83. PIRG even promoted the COVID-19 lock-downs, "the greatest intrusions on civil liberties in the peacetime history of this country," *Arizona v. Mayorkas*, 143 S. Ct. 1312, 1314 (2023) (Statement by Gorsuch, J.)—and did so after the nation had already started "reopening" upon learning COVID-19's death rate was severely exaggerated. *Shut down, start over, do it right*, PIRG (July 17, 2020) https://tinyurl.com/5n6kxsyd (advocating for bans on non-essential business and interstate travel, in addition to mandatory masking (even outdoors), and shaming the Trump Administration).

### B. PIRG's political activity means the Settlement violates the First Amendment rights of the class members.

The parties cannot take money away from the class and give it to an advocacy group like PIRG without the members' "affirmative[] consent." *Janus v. Am. Fed'n of State, Cty., and Mun. Emps., Council 31*, 138 S. Ct. 2448, 2486 (2018). *See also Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 846 (1999) (approval of class settlements implicates due process, and thus is state action). And this consent may not be implied or "presumed." *Janus*, 138 S. Ct. at 2486. This principle arises out of the First Amendment, which bars the government from "compel[ing] the endorsement of ideas that it approves." *Harris v. Quinn*, 573 U.S. 616, 647 (2014) (quoting *Knox v. SEIU*, 567 U.S. 298, 309 (2012)). But the Settlement, if approved, will do exactly that, by forcing class members to subsidize PIRG's political advocacy. While class counsel and the parties are, of course, free to donate their own money to PIRG, their proximity to the Court does not enable them to gift the class members' money to PIRG.

While some assert "compelled speech jurisprudence" does not apply to class settlements because members *can* opt out, this argument has been soundly rejected and is contradicted by existing precedent. Gerson H. Smoger, *The importance of Cy Pres in Modern Class Action Jurisprudence and Myths Concerning its Use*, 24 LEWIS & CLARK L. REV. 595, 600-601 (2020) (making compelled speech jurisprudence argument). "Ascribing any meaning to silence in response to publication notice is untenable." Debra Lyn Bassett, *Class Action Silence*, 94 B.U. L. REV. 1781, 1799 (2014); *accord Redman v.*

13

*RadioShack Corp.*, 768 F.3d 622, 628 (7th Cir. 2014). Justice Alito has specifically rejected the idea that a failure to respond to opt-out notices constitutes consent. *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 574 (2013) (Alito J., concurring). "Courts do not presume acquiescence in the loss of fundamental rights" such as the First Amendment. *Knox*, 567 U.S. at 312. And if there was any doubt remaining, *Janus*'s holding that consent must be "affirmative" and cannot be "presumed" puts to rest the idea that class member silence constitutes a waiver of First Amendment rights. 138 S. Ct. at 2486.

*Cy pres* is "especially troubling" when it goes to a "powerful interest group" that "conducts political activity in many fields wholly unrelated" to the facts of the litigation. Smith, 124 PENN ST. L. REV. at 337. This Settlement—and its inevitable contribution to PIRG—is a perfect example of this concern.

## CONCLUSION

HLLI respectfully asks the Court to reject the Settlement for the foregoing reasons.

Respectfully submitted,

s/ Joseph P. Ashbrook
Joseph P. Ashbrook (0091279)
ASHBROOK BYRNE KRESGE LLC
PO Box 8248
Cincinnati, Ohio 45249
Tel: (513) 582-7424
Fax: (513) 216-9882
jpashbrook@ashbrookbk.com

14

HAMILTON LINCOLN LAW INSTITUTE
Max A. Schreiber
(*pro hac vice* application forthcoming)
5868 E. 71st Street, Suite E-709
Indianapolis, IN 46220
(703) 203-3848
max.schreiber@hlli.org

15