## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**SARA HAWES, et al.,**

      **Plaintiffs,**

      **v.**

**MACY'S INC., et al.,**

      **Defendant.**

**Case No. 1:17-cv-754 (Lead Case)
(Consolidated with 2:20-cv-81)**

**JUDGE DOUGLAS R. COLE**

### OPINION AND ORDER

This case is about sheets.[1] Specifically, Plaintiffs, on behalf of themselves and a proposed nationwide class, sued Macy's, along with various textile manufacturers,[2] alleging that Macy's misrepresented the thread count in some of the bed sheets it sells, in turn misleading consumers and violating consumer protection laws. (*See generally* Compl., Doc. 1). After litigating for more than five years, the parties seek to put the matter to bed. They have agreed to a global class action settlement that creates a $10,500,000 common fund to settle all claims of a nationwide class of consumers. They now jointly move the Court to approve that settlement under Federal Rule of Civil Procedure 23(e). (*See* Mtns. for Final Approval, Docs. 153, 155). As more fully discussed below, though, due to a concern about one aspect of the

---

[1] Technically, "this case" is actually two consolidated cases. Unless otherwise noted, though, the docket references are to the docket in 1:17-cv-754, which is the lead case.

[2] The textile manufacturers were eventually dismissed or dropped from the lawsuit. (*See* Doc. 38 (order dismissing Defendant AQ Textiles); Doc. 64 (amended complaint naming only different Macy's entities as defendants)).

Settlement Agreement—the proposed cy pres distribution—the Court **DENIES** the motions for final approval and **REJECTS** the class action settlement.

## BACKGROUND

### A.    Nature of the Suit and Procedural Background

The factual and procedural background to this case is lengthy and warrants only a cursory overview here. Sara Hawes and Amy Hill[3] filed this class action lawsuit[4] against Macy's and several upstream textile manufacturers alleging that they deceptively mislabeled the thread counts on bed sheets. (Doc. 1, #52–62). The crux of their claim was that the common industry standard is to count each yarn as one thread, regardless of whether that yarn was single-ply yarn or multi-ply yarn, such that the thread count captured the number of threads woven into the fabric. (*Id.* at #58–59). The defendants allegedly did not follow that practice, instead counting every strand twisted into a single thread of yarn (multi-ply yarn) as a separate thread for purposes of the weave thread count, thereby dramatically increasing the thread count beyond what it would otherwise be. (*Id.* at #58–62).

According to Plaintiffs, the allegedly overstated thread count substantially affected consumers' decisions because consumers often rely on thread count as a

---

[3] Amy Hill voluntarily dismissed her claims and is no longer a plaintiff. (*See* Doc. 73).

[4] As noted above, there is a related case, *Chiaraluce et al. v. Macy's, Inc. et al.*, No. 2:20-cv-81, that was filed on January 6, 2020. The Court consolidated the cases for purposes of administering the Settlement Agreement, and the filings in each case have been identical since mediation. For simplicity's sake, the Court collectively refers to the cases as one and disposes of the pending settlement motions in both matters. In light of the rest of this opinion, Macy's Motion to Dismiss (Case No. 2:20-cv-81, Doc. 10) and Chiaraluce's Motion for Leave to Conduct Jurisdictional Discovery (Case No. 2:20-cv-81, Doc. 13) are **DENIED** as moot.

proxy for quality. (*Id*. at #57). Because the defendants' practices allegedly inflated the reported thread count on their sheets, Plaintiffs claimed that they, along with millions of other consumers, overpaid for those sheets. (*Id*. at #62).

Litigation ensued. Plaintiffs filed their class action complaint in November 2017. (Doc. 1). AQ, the principal textile manufacturer, moved to dismiss for lack of personal jurisdiction, (Doc. 16), which the Court granted.[5] (Doc. 38). Macy's separately moved to dismiss, claiming Plaintiffs lacked standing and failed to state a plausible claim. (Doc. 17). The Court held that Plaintiffs had standing but failed to state a plausible claim for some of their counts. (Doc. 39, #392, 394, 396, 401). As a result, the Court dismissed some claims against Macy's but allowed others to go forward. (*Id*.).

After the Court denied in part Macy's motion to dismiss, Plaintiffs twice amended their complaint, dropping the textile manufacturers as defendants and seeking certification of a nationwide class or, alternatively, subclasses for every state. (*See* Am. Compl., Doc. 55; Third Am. Compl., Doc. 64). Following discovery, Plaintiffs moved to formally certify the case as a class action. (Doc. 84). Macy's then moved for summary judgment. (Doc. 117). The Court certified a California class, defined as everyone in California who bought CVC[6] sheets from Macy's between November 8, 2013, and January 22, 2022. (Doc. 137, #4011). And the Court also partially granted

---

[5] At that time, the matter was assigned to another judge. The case was reassigned to the undersigned on August 1, 2022. (Doc. 141).

[6] CVC stands for "chief value cotton," the type of sheets at issue in this lawsuit. (Doc. 84, #1076).

Macy's motion for summary judgment as to one claim, leaving the substantial portion of Plaintiffs' claims intact. (Op., Doc. 139, #4024).

The matter was then reassigned to the undersigned. (Doc. 141). Shortly thereafter, the parties engaged in mediation which produced the proposed class action settlement. The parties sought preliminary approval of the settlement (Doc. 143), which the Court granted, (Doc. 144). Since then, class counsel moved for an award of attorneys' fees and expenses, (Doc. 147), and sought final approval of the class action settlement, (Doc. 153). Macy's likewise moved for final approval of the settlement. (Doc. 155).

**B.      Terms of the Proposed Class Action Settlement**

Under the proposed Settlement Agreement, Macy's agreed to settle the claims of a nationwide class[7] for a total sum of $10.5 million. (Proposed Settlement Agmt., Doc. 143-2, #4107). It also agreed to change the packaging on its sheets to include the language: "Thread count determined from a sample of a representative sheet by counting cotton yarns and by separating and counting adjacent parallel polyester yarns." (*Id.*).

The Settlement Agreement distributes the $10.5 million fund as follows. First, the fund will satisfy any notice and administrative costs. (*Id.* at #4108). These costs include funding for the notice plan and claims administration. (*Id.*). Next, the

---

[7] As stated previously, the Court certified a California class before the parties engaged in mediation. (Doc. 137, #4011). The parties' Settlement Agreement proposes a nationwide class of consumers. (Doc. 143-2 ¶ 1.37, #4104). The Court provisionally certified the nationwide class when it preliminary approved the class action settlement. (Doc. 144, #4254–55).

4

remaining balance will go towards the class counsel's attorneys' fees, incentive payments for the named plaintiffs,[8] and payouts to the class members who submit eligible claims. (*Id.*).

Section 6.1 of the Settlement Agreement details the claim distribution process—the specifics of how absent class members will be compensated from the fund. The agreement creates three categories of claimants who can collect under the settlement:

- Class members whose purchases Macy's can verify through its own records will receive $7.50 per unit of CVC Sheets purchased (and could potentially receive a secondary distribution, as discussed below). [Category 1]

- Class members who provide proof of purchase through a receipt will receive $7.50 per unit of CVC Sheets purchased (and likewise may be eligible for a secondary distribution). [Category 2]

- Class members who attest under penalty of perjury that they purchased CVC sheets receive $2.50. This amount is capped at $2.50 per household (no matter how many sheets persons in the household claim to have purchased) and this category of claims is ineligible to receive a secondary distribution. [Category 3]

(*Id.*).

If, after attorneys' fees, named plaintiff incentive awards, administrative expenses, and a single round of distribution to all eligible claimants, funds remain from the original $10.5 million, and it is "economically feasible" to make a second distribution, then settlement class members in Categories 1 and 2 will receive a second distribution. (*Id.* at #4109). In that second distribution, Category 1 and 2 claimants will receive their pro-rata share of the remaining funds, weighted

---

[8] The named plaintiffs include Sara Hawes and the plaintiffs from the 2020 case: Jonathan Fontaine and Cassandra Chiaraluce.

according to the purchase price that each claimant paid for his or her sheets, but capped at 50% of that purchase price. (*Id.*). If it is not economically feasible to make a second distribution, or if funds remain even after a second distribution, the agreement provides that the remaining funds will go to the Public Interest Research Group (PIRG), a nonprofit advocacy organization that the parties chose. (*Id.*).[9]

The Settlement Agreement separately provides that any attorneys' fees and "[i]ncentive [a]ward[s]" to the class representatives will come out of the common fund but does not specify amounts. (*Id.* at #4113). Class counsel has since requested $3.5 million in fees and $216,561.44 in litigation expenses. (Doc. 147-1, #4296, 4314). They also request an incentive award of $3,500 for Plaintiff Hawes, $1,500 for Plaintiff Chiaraluce, and $1,500 for Plaintiff Fontaine. (*Id.* at #4313).

## C.    Notice Plan and Results

The Settlement Agreement tasks the claim administrator (here, Angeion Group, LLC) with notifying the class members of the settlement. Under the agreement, Angeion would effectuate notice by mail or email to ascertainable class members, maintenance of an informational website regarding the settlement, internet and print advertising, and a call center. (Doc. 143-2, #4134).

After the Court preliminarily approved the class action settlement and notice, the parties began the notice process. The template postcard designed for class notice informed the class members that a settlement had been reached with Macy's in a

---

[9] Based on the attorneys' representations at the fairness hearing, it appears that the Defendant was primarily responsible for identifying the organization.

class action lawsuit about Chief Value Cotton sheets sold by Macy's that were labeled with inaccurate thread counts. (Doc. 145-1, #4270). It also included details about who is in the settlement class, how to file a claim, and when the Court's fairness hearing was scheduled. (*Id.*).

Under a heading reading "What does the Settlement provide?", the notice read: "The Defendants have agreed to pay [$10,500,000] into a Settlement Fund. After payment of Attorneys' Fees and Costs, Incentive Payments, and Administrative Expenses, the funds remaining from the Settlement Amount will be used to pay all Eligible Claims." (*Id.*). The notice said nothing about the possibility of a cy pres award, did not disclose that any of the common fund could go to any third party, and did not name PIRG as the chosen recipient for such funds.

To help Angeion send out the above-mentioned postcard to the absent class members, Macy's provided Angeion with 3,161,381 purchase records involving the sheets at issue. (*Id.* at #4266). After analyzing them, Angeion determined that there were 405,879 unique mailing addresses and 1,582,574 unique email addresses associated with those records. (Doc 153–3, #4474). Angeion sent notice via mail (to the former) and email (to the latter) on July 8, 2023. (*Id.* at #4474–75). Around that time Angeion also began its print publication, press release, and internet advertising campaign. (*Id.* at #4475–76). On July 3, 2023, it set up the settlement website, which had 744,060 page views as of September 21, 2023. (*Id.* at #4477). At the fairness hearing, class counsel represented to the Court that, based on raw purchase record data, the estimated class size was around 2.5 million individuals. So considering only

the number of initial contacts Angeion made through the direct notice process, Angeion reached between roughly 63% (1,582,574 notice recipients assuming complete overlap between mailing and email addresses; 1,582,574/2,500,000=63.3%) and 80% of the class (1,988,453 notice recipients assuming no overlap between mailing and email addresses; 1,988,453/2,500,000=79.53%).

The notice plan has already proven remarkably successful at generating claim submissions. As of October 18, 2023, Angeion received 608,346 claim form submissions. (Doc. 159, #4606). Class counsel estimates that Angeion will receive over one million claims before the close of the claims period. While Angeion's report did not specify how many of those submissions included a proof of purchase, class counsel advised the Court at the fairness hearing that approximately 10% of the claims could be verified either by internal record or proof of purchase.

In response to the notice plan, as of September 21, 2023, only 59 class members opted out. (Doc. 153-3, #4480). No class members objected to the proposed settlement. (*Id.*; Doc. 153-1, #4458).

## JURISDICTION AND CHOICE OF LAW

This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because there are more than 100 class members, the amount in controversy exceeds $5,000,000, and minimal diversity exists.[10] Plaintiffs assert no

---

[10] Plaintiff Sara Hawes is a California citizen and Macy's is a citizen of Delaware and Ohio. (Doc. 64, #835).

live federal claims,[11] so the Court's jurisdiction at this point is exclusively diversity based.[12]

The Court notes that because, under the *Erie* doctrine, class action settlements in diversity actions present peculiar choice of law problems that courts often overlook.[13] Admittedly, it is perhaps unsurprising that happens. The parties have already agreed to a settlement amount and a distribution structure, so in some sense the parties no longer care what law applies, nor what claims are still live or viable. Beyond that, in cases involving far-flung or nationwide classes, class actions often potentially involve many states' laws, so determining what law controls is not always straightforward. Compounding the problem, the parties often tender a proposed (and often barebones) settlement approval order, which rarely addresses the choice-of-law issue. But that issue can matter. Both because of the constitutional implications that attend a court's choice of law, and because the claims alleged (and the choice of law that accompany them) may affect a district court's decision of whether to approve the class action settlement in at least two significant ways.

---

[11] Plaintiffs previously asserted a federal claim in the original complaint under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2310, but the Court dismissed that claim. (Doc. 39, #393–94). Plaintiffs have not asserted any other federal claims in their amended complaints.

[12] Given the earlier inclusion of a federal claim, the Court could perhaps instead exercise ongoing supplemental jurisdiction under 28 U.S.C. § 1367. The Court declines to do so, though, because federal courts should generally decline to assert supplemental jurisdiction when all federal claims have been dismissed. *Sharwell v. Selva*, 4 F. App'x 226, 227 (6th Cir. 2001).

[13] Ultimately it matters little whether the case is in this Court due to diversity jurisdiction or supplemental jurisdiction. Even if it is the latter, state substantive law still controls on the state law claims. *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966).

First, a district court must finally certify the settlement class before approving the settlement. *See Amchem Prods. Inc. v. Windsor,* 521 U.S. 591, 620 (1997). And for Rule 23(b)(3) class actions, a district court must first ensure that 23(b)(3)'s requirements are satisfied. One of those requirements, that "questions of law or fact common to class members predominate", necessarily requires reference to the claims for relief. *Id*. at 623 n.18. For how could a district court determine whether a common question predominates—or is "more prevalent or important"—than uncommon questions but by reference to their legal significance? *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453–54 (2016). But the significance of a given question may depend on the results of the choice of law analysis, rendering that analysis a potentially important part of the certification decision.

Second, and relatedly, in diversity cases, a federal court must apply substantive state law and federal procedural law. *Hanna v. Plumer*, 380 U.S. 460, 465 (1965); *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78–79 (1938). And attorneys' fees awards, particularly when they depend on the outcome of the suit (as is almost always the case in class actions) often fall on the "substantive" side of the *Erie* line. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 52 (1991). So the very standards and rules that govern a district court's award of attorneys' fees often stem from state law rather than federal law.

But which state's law? Plaintiffs here assert several state law claims, including a Missouri consumer protection law claim, several California consumer protection law claims, and several common law claims including common law fraud, breach of

10

express warranty, and unjust enrichment. (*See* Doc. 64, #853–866). The common law claims are universally pleaded. That is, Plaintiffs asserted generic common law claims recognized in all 50 states. While Plaintiffs attempt to universally plead their consumer protection claims, (*See id.* at #853 n.4), they cannot do so for the reasons expressed below. The Court will evaluate each category separately, starting with the consumer protection claims.

## A.      Consumer Protection Claims

The Court concludes that Plaintiffs fall short in their attempt to universally plead their consumer protection act claims because claiming that "substantially similar statutes" exist in all other states is insufficient. (*Id.*). Federal Rule of Civil Procedure 8(a)(2) requires a plaintiff to include in her pleading a "a short and plain statement of *the claim* showing that the pleader is entitled to relief." (Emphasis added). If the laws of different states involve the same elements and are sufficiently similar, a plaintiff's assertion of a general common law claim can satisfy Rule 8. But where one state's version of some claim (whether common law or otherwise) materially differs from the elements of other states' claims, ignoring that difference and simply alleging "substantial similarity" among various state laws does not satisfy Rule 8. That is so because when raising claims which differ across jurisdictions, Plaintiffs do not provide a short and plain statement of *the* claim. *Id.* Rather, they provide a short and plain statement of *a* claim and seek to raise numerous *other, dissimilar* claims by that statement—a statement which fails to describe those dissimilar claims in any meaningful way.

Those concerns apply to the consumer protection claim here. California and Missouri consumer protection law, which is what Plaintiffs cite in the Complaint, differ from other states' laws in significant ways. California's consumer protection law statute does not require proof of knowledge or intent, while Pennsylvania's or Ohio's, for example, do require such a showing. *See, e.g.*, *Cimoli v. Alacer Corp.*, 587 F. Supp. 3d 978, 990 (N.D. Cal. 2022) (contrasting California's and Pennsylvania's consumer protection laws); *Durnell's RV Sales Inc. v. Beckler*, 2023-Ohio-3565, ¶ 42 (3d Dist.) (Ohio's statute requires proof of knowledge). And Missouri's consumer protection statute does not require proof of justifiable reliance by the consumer, while California's does. *Tershakovec v. Ford Motor Co., Inc.*, 79 F.4th 1299, 1312 (11th Cir. 2023) (Missouri statute); *Cal. Med. Ass'n v. Aetna Health of Cal. Inc.*, 532 P.3d 250, 264 (Cal. 2023) (California statute). Because the statutes vary widely from state to state, Plaintiffs' attempt to plead generic nationwide claims under all 50 states' consumer protection laws fails Rule 8's requirement of a short and plain statement.[14]

Because the Court finds that Plaintiffs have *not* pleaded consumer protection claims from every state, they now face a new hurdle. The parties seek to certify a nationwide class—not just a California or Missouri class. (Doc. 143-2, #4104). To do so, Plaintiffs must assert claims that can govern the entire class. *In re*

---

[14] Moreover, even if Plaintiffs had pleaded 50 separate consumer protection law claims, one for each state, the Court would then face the question of whether the divergence among the states' laws renders such claims unsuited to class adjudication. *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1085 (6th Cir. 1996). The Court's problem is not so much that Plaintiffs were not sufficiently specific, but that, because of the divergent legal landscape and Rule 8's requirements, all that Plaintiffs *actually* pleaded were two causes of action: a California claim and a Missouri claim.

*Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1015 (7th Cir. 2002) ("No class action is proper unless all litigants are governed by the same legal rules."). So to certify a class as to the consumer protection claims, the Court must find that California or Missouri laws, which are the only specific consumer protection laws Plaintiffs cite, govern every consumer's purchase—nationwide—of Macy's CVC sheets during the relevant time period. But the Supreme Court's decision in *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985), forecloses that result here. *Shutts* involved a Kansas court applying Kansas law to a nationwide class action even though the nature of the suit—royalties over oil and gas leases—centered on contracts that almost entirely took place out of state. *Id.* at 814–16. The Supreme Court held that applying Kansas law violated the Due Process Clause and the Full Faith and Credit Clause because Kansas did not have "a significant contact or a significant aggregation of contacts" with the dispute that could create a legitimate state interest allowing Kansas law to apply. *Id.* at 818–23.

So too here. The parties have not shown that either California or Missouri has "significant contact" or an "aggregation of contacts" with the purchasing transactions of individuals outside their borders. Those transactions (relative to California and Missouri) took place by foreign citizens in a foreign state with a foreign corporation. The Court, therefore, cannot constitutionally apply California or Missouri consumer protection law to the entire nationwide class's claims.

B.    **Common Law & UCC Claims**

But all is not lost. Plaintiffs also assert two common law claims—fraud and unjust enrichment—along with a UCC breach of express warranty claim. (Doc. 64, #861–66). Federal courts sitting in diversity apply the choice of law principles of the forum state—in this case, Ohio. *Muncie Power Prods., Inc. v. United Tech. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003). But under Ohio's choice-of-law principles (and virtually every other state's), an extensive choice-of-law analysis is not necessary where no conflict exists between the laws at issue. *McDonald v. Williamson*, 2003-Ohio-6606, ¶ 7 (8th Dist.). And where no conflict exists, the Constitution does not prohibit the application of that state's law extraterritorially. *Shutts*, 472 U.S. at 816.[15]

Here no conflict exists as to these three claims. Ohio's version of common law fraud is virtually identical to the Restatement's.[16] *Compare State ex rel. The Illuminating Co. v. Cuyahoga Cnty. Ct. of Common Pleas*, 776 N.E.2d 92, 97–98 (Ohio 2002) *with* Restatement (Second) of Torts § 525 (Am. L. Inst. 1977). Same with unjust enrichment. *Compare Padula v. Wagner*, 37 N.E.3d 799, 813 (Ohio Ct. App. 2015) *with* Restatement (Third) of Restitution and Unjust Enrichment § 1 cmt. a (Am. L. Inst. 2011). As for the breach of warranty claim, Ohio has adopted Article 2 of the Uniform Commercial Code (UCC), which codifies the legal standards for the creation

---

[15] Or, perhaps more accurately, no cognizable injury results from extraterritorial application when the substance of the law in the various states is the same. *Shutts*, 472 U.S. at 816.

[16] The Court finds that the common law claims asserted are sufficiently uniform that reference to the Restatement suffices to demonstrate the lack of a conflict. Compiling 50 states' versions of common law claims is unnecessary and cumbersome, to say the least.

14

(and breach) of express warranties in § 2-313. *See* Ohio Rev. Code § 1302.26. The same is true of the vast majority of other states.[17] The Court finds that no conflict exists and will therefore apply Ohio law to the nationwide class for the common law and UCC claims.

## C.      Settlement Agreement

One final preliminary point. The Settlement Agreement contains a choice-of-law provision, stating that Ohio law will govern the contract and its terms. (Doc. 143-2, #4122). And that choice of law governs unless "the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice." *Schulke Radio Prods., Ltd., v. Midwestern Broad. Co.*, 453 N.E.2d 683, 686 (Ohio 1983) (citing Restatement (Second) of the Conflict of Laws § 187 (Am. L. Inst. 1971)). The parties had a reasonable basis for choosing Ohio law. During the time that Macy's sold the sheets at issue in its stores, Macy's was headquartered in Ohio, and its operational decisions were presumably based there. (Doc. 1, #55). The Court will therefore apply Ohio law in assessing the terms of the Settlement Agreement.

## LAW AND ANALYSIS

## A.      Final Class Action Certification

Before the Court can evaluate the fairness of the proposed settlement, it must certify the settlement class. *Amchem Prods., Inc.*, 521 U.S. at 620. For settlement

---

[17] Louisiana has not adopted Article 2 of the UCC, Sale of Goods, which is the applicable article here. And, as a civil law jurisdiction, rather than a common law one, some aspects of the other common law causes of action may be different in Louisiana.

purposes, the parties agreed to a nationwide class consisting of all persons in the United States who bought CVC sheets from Macy's, supplied by AQ, between November 8, 2013, and March 24, 2023. (Doc. 143-2, #4104). The Court provisionally certified that class when it preliminarily approved the settlement. (Doc. 144, #4254–55).

Under *Amchem*, the Court must ensure that the proposed settlement class meets the requirements of Rule 23 (other than manageability concerns of 23(b)(3)(D)). 521 U.S. at 620; *see also Whitlock v. FSL Mgmt., LLC*, 843 F.3d 1084, 1091 (6th Cir. 2016). Rule 23 allows a class to be certified only if:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). On top of the Rule 23(a) requirements, a class must satisfy one of the conditions of Rule 23(b). In this case, the parties point to Rule 23(b)(3), which requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

### 1. Numerosity, Commonality, Typicality, and Adequacy

The Court finds that all four Rule 23(a) requirements are met as to the common law and UCC breach of warranty claims. The parties stipulated to the numerosity requirement, (*see* Doc. 111), which is independently supported by the over 2.5 million

16

potential claimant class size. *See, e.g.*, *Hunter v. Booz Allen Hamilton Inc.*, No. 2:19-cv-00411, 2023 WL 3204684, *3 (S.D. Ohio May 2, 2023) (647 class members meets numerosity requirement).

Commonality is also satisfied. To demonstrate the existence of questions of law or fact common to the class, Plaintiffs must show that the claims of the class "depend upon a common contention" that is "of such a nature that it is capable of classwide resolution" such that determination of the contention's "truth or falsity" will resolve a central issue to the claims "in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). A central issue to Plaintiffs' common law and UCC claims[18] is whether Macy's misrepresented, by deviating from industry standards, the thread count in its sheets. *See Illuminating Co.*, 776 N.E.2d at 97–98 (requiring misrepresentation of material fact as an element of the common law tort of fraud). Whether Macy's did so is a question of fact capable of classwide resolution. Similarly, Macy's intent or knowledge of the purportedly inaccurate thread count is a common question, at least as to the common law claims,[19] the answer to which would not differ among class members.

The class also satisfies typicality because the named plaintiffs' claims "arise[] from the same event or practice or course of conduct that gives rise to the claims of

---

[18] Because the Court cannot constitutionally apply California or Missouri law to the nationwide class, the questions of fact or law related to Plaintiffs' consumer protection law claims do not meet the commonality requirement. Accordingly, the Court does not certify a nationwide class as to the consumer protection claims. *See* Fed. R. Civ. P. 23(c)(1)(B) ("An order that certifies a class action must define the class and the class claims.").

[19] Breach of warranty under the UCC does not have an intent requirement.

other class members." *Miller v. Charter Nex Films - Delaware, OH, Inc.*, No. 2:18-cv-1341, 2020 WL 2896913, *4 (S.D. Ohio June 2, 2020) (cleaned up). The named plaintiffs' theory of the case is virtually identical to that of every other class member—they bought mislabeled sheets for a higher price than they would have paid but for the mislabeling.

Lastly, the named plaintiffs "fairly and adequately protect[ed] the interests of the class." Fed. R. Civ. P. 23(a)(4). Class representatives adequately represent the rest of the class when (1) they share common interests with the absent class members, and (2) vigorously "prosecute the interests of the class through qualified counsel." *Hunter*, 2023 WL 3204684, at *4 (cleaned up). As to the first, the Court has some misgivings about whether the interests of the class representatives adequately align with the rest of the class when a proposed settlement agreement, like this one, handsomely rewards the representatives far more than the rest of the other class members. But despite the possibly perverse incentives that such a structure may produce, it seems that the award sought for the named plaintiffs did not impair the class's interests in this case. The named plaintiffs prosecuted this case for over five years to obtain relief for the rest of the class. Hawes herself was deposed. (Doc 84–11). Class counsel successfully defended the viability of the class action claims against a motion to dismiss and a motion for summary judgment. The Court finds that the class representatives, through their counsel, have adequately protected the interests of the class. Thus, the Court finds that all the Rule 23(a) factors have been satisfied.

18

## 2. Predominance and Superiority

The Court likewise finds that the class action meets Rule 23(b)(3)'s requirements: (1) that the common question to the class "predominate[s]," and (2) that a class action is superior to other adjudication methods.

To evaluate predominance, the Court must first determine which issues of fact or law are common to the class and then weigh their predominance against individual questions which vary from class member to class member. *Martin v. Behr Dayton Thermal Prods. LLC*, 896 F.3d 405, 413 (6th Cir. 2018). Factors relevant to that balancing test include: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; [and] (B) the extent and nature of any litigation concerning the controversy already begun by or against class members." Fed. R. Civ. P. 23(b)(3).

The common questions of fact outweigh any questions which may differ among class members. Using the common law tort of fraud as an example, the common questions of fact include (1) whether Macy's misrepresented the thread count of its sheets at all (the misrepresentation element) and (2) whether Macy's knew of the misrepresentation and intended to defraud its consumers (the scienter elements). *Illuminating Co.*, 776 N.E.2d at 97–98. Adverse answers to both questions come close to a prima facie case of fraud. Accordingly, class members have a significant interest in having those questions answered for the entire class, particularly considering the low value of any individual claims and the amount of discovery received during this litigation relevant to those elements.

19

The only *uncommon* questions are (1) whether the class member justifiably relied on the misrepresentation, and (2) damages. *Id.* Those questions do not tip the scale against certification. Individual answers to the reliance and damages elements are not difficult to prove, nor do they require extensive discovery.

As to superiority, the Court considers the difficulties of managing a class action, the alternative adjudication methods to a class action, and the nature of the class claims. *See Martin*, 896 F.3d at 415–16 (6th Cir. 2018) (citation omitted). Any manageability difficulties are irrelevant at this stage where the Court has already managed over five years of litigation and certifies the class for settlement purposes only. Alternative adjudication methods—presumably individual suits by individual claimants—would be inferior to class adjudication, especially given the nature of the class claims and the quantum of each claimant's potential damages here. Individual trials would be costly for both the judicial system and defendants. Plaintiffs would suffer too, as the small value of individual damages would likely dissuade most if not all class members from filing suit. *See id.* at 416 ("[S]mall awards weigh in favor of class suits.")). Class adjudication, therefore, is superior to all other methods at this stage.

The Court finds that the common questions of fact predominate and that a class action is superior to other adjudication methods. The Court accordingly finally certifies the nationwide class proposed in the Settlement Agreement. (*See* Doc. 143-2, #4104).[20]

---

[20] The Court also finally appoints Michael McShane of Audet & Partners LLP, Charles LaDuca of Cuneo Gilbert & LaDuca, Charles E. Schaffer of Levin Sedran & Berman, Stuart

**B.    Fairness of the Proposed Settlement**

Having certified the class, the Court next turns to the proposed settlement.

Unlike most settlements, class action settlements require court approval under

Federal Rule of Civil Procedure 23(e). Before approval, the Court must hold a hearing

on the proposed settlement and find that the settlement is "fair, reasonable, and

adequate." Fed. R. Civ. P. 23(e)(2). Factors that the Court must consider when

determining whether a settlement is "fair, reasonable, and adequate" include:

> (1) the risk of fraud or collusion; (2) the complexity, expense and likely
> duration of the litigation; (3) the amount of discovery engaged in by the
> parties; (4) the likelihood of success on the merits; (5) the opinions of
> class counsel and class representatives; (6) the reaction of absent class
> members; and (7) the public interest.

*Int'l Union, United Auto., Aerospace, and Agr. Implement Workers of Am., et al. v.*

*Gen. Motors Corp. et al.*, 497 F.3d 615, 631 (6th Cir. 2007).

*International Union*'s list of relevant factors predates amendments to Rule 23

in 2018. Before the amendments, Rule 23 required a court to find only that the

settlement was "fair, reasonable, and adequate," with no elaboration as to what

factors were relevant to that finding. The 2018 amendments instruct the Court to

consider whether:

> (A) the class representatives and class counsel have adequately
> represented the class;
>
> (B) the proposal was negotiated at arm's length;
>
> (C) the relief provided for the class is adequate, taking into account:
>      (i) the costs, risks, and delay of trial and appeal;

L. Cochran of Cochran Law PLLC, and Drew T. Legando of Merriman Legando Williams &
Klang, LLC as class counsel under Rule 23(c), (g). The Court has considered the factors in
Rule 23(g) and finds that counsel's conduct in this litigation warrants final appointment as
class counsel.

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

Comparing the two sets of factors reveals considerable overlap. *International Union* factor 1 folds into whether the proposal was "negotiated at arm's length." Factors 2–4 involve what is essentially a detailed inquiry into the "costs, risks, and delay of trial and appeal." Factors 5–6 assess the opinions of class counsel, named plaintiffs, and absent class members—a substantially similar consideration as to whether the "class representatives and class counsel have adequately represented the class." Factor 7, lastly, is a broadly formulated factor designed to ensure the adequacy of representation, the absence of fraud or collusion, and the equitable treatment of class members—something the totality of Rule 23(e)(2) ensures.

Because the *International Union* factors are largely subsumed in the 2018 amendments to Rule 23, the Court will not separately analyze each *International Union* factor but rather will evaluate the settlement under the four factors identified in Rule 23(e)(2) in sufficient detail to also satisfy *International Union*. As described more fully below, doing so, the Court finds that the class action settlement is not "fair, reasonable, and adequate" under Rule 23(e)(2), but solely in one regard. Specifically, the Settlement Agreement's cy pres award unfairly and unreasonably diverts class funds to an unrelated organization that does not benefit the class. But before

discussing the Court's reasoning with respect to the cy pres award, the Court will analyze the totality of the agreement to assist the parties in the event they wish to amend the Settlement Agreement or seek appeal of this decision.

### 1. Adequacy of Representation

Rule 23(e)(2)(A) instructs the Court to consider whether the class representatives and class counsel have "adequately represented the class." This provision mirrors the adequacy prong of Rule 23(a) that the Court analyzed when certifying the class. But Rule 23(e)(2)(A), as a settlement approval requirement, requires the Court to consider adequacy of representation in relation to the settlement terms and notice process.

The settlement terms and notice process show that class representatives and counsel have adequately represented the rest of the class. At the fairness hearing, counsel for both the class and Macy's disclosed that a key battle in the settlement negotiations was whether to structure the settlement as a common-fund settlement or a claims-made settlement. Class counsel pushed for, and ultimately achieved, a common-fund settlement to provide both adequate relief for the class and adequate deterrence against similar behavior on Macy's part in the future. The result of the negotiation was the deal described above.

The reaction of absent class members further supports the adequacy of class counsel's representation. Only 59 class members have opted out of a class of around 2.5 million people. (Doc. 153-3, #4480). Not a single class member has objected. (*Id.*; Doc. 153-1, #4458); *see Olden v. Gardner*, 294 F. App'x 210, 217 (6th Cir. 2008) (79

objectors out of an 11,000-member class "tend[ed] to support a finding that the settlement is fair").

## 2. Arm's Length Negotiations

The Court is satisfied based on counsel's representation at the fairness hearing that the settlement was negotiated at arm's length. Each party entered mediation with separate sets of goals and each extracted concessions from the other. The Court therefore presumes the settlement negotiations were not plagued by fraud or corruption. *See Todd S. Elwert, Inc. DC v. All. Healthcare Servs., Inc.*, 2018 WL 4539287, *2 (S.D. Ohio Sept. 21, 2018).

## 3. Adequacy of Relief

Rule 23(e)(2)(C) asks whether "the relief provided for the class is adequate." To assess the adequacy of relief, the Court considers: (1) "the costs, risks and delay of trial and appeal"; (2) "the effectiveness of any proposed method of distributing relief to the class"; and (3) "the terms of any proposed award of attorney's fees."[21] *Id.*

The relief provided in the settlement (at least for those whose purchases are verifiable by Macy's business records or who can provide proof of purchase) likely meets or exceeds what any class member could have procured by an individual lawsuit. While Plaintiffs' claim for relief could be construed as a request for complete refunds of the purchase price of their sheets, (*see* Doc. 64, #866–67), that request does

---

[21] The parties identified no agreements (other than the Settlement Agreement) that are relevant to the Court's consideration, so the fourth adequacy of relief prong is not relevant. *See* Fed. R. Civ. P. 23(e)(2)(C)(iv).

24

not present a viable theory of restitution.[22] *See* Restatement (Third) of Restitution and Unjust Enrichment § 51 (Am. L. Inst. 2011) ("[T]he unjust enrichment of a conscious wrongdoer … is the *net profit* attributable to the underlying wrong.") (emphasis added). The true theory of injury underlying Plaintiffs' claims was the failure to fully realize the represented and expected value of their sheets—an injury quantifiable by subtracting the purchase price from the expected value. At the fairness hearing, counsel estimated that the injury accounted for about 20% of the purchase price of the sheets.

Under this metric, the class members with Category 1 or 2 claims will fully recover (because they will likely receive 50% of the purchase price of their sheets through two distributions) and could not have done better at trial. Indeed, even the first distribution ($7.50), which represents about 20% of the average sale price for the bed sheets, probably constitutes near complete recovery for the reason noted immediately above. Admittedly, the rest of the class will receive less than that amount. But that discount reflects both (1) the risk discount of a settlement versus a trial and (2) the risk that unverified claims may wrongly deplete the common fund (as the claimant may not have actually purchased sheets)—a reasonable limitation on recovery.

---

[22] While the equitable remedy of rescission may allow for the undoing of a transaction (and thus the full refund of a purchase price upon the return of the product) under many circumstances, *see Versatile Helicopters, Inc. v. City of Columbus*, 548 F. App'x 337, 340 (6th Cir. 2013), class actions are unsuited to that remedy, *Gawry v. Countrywide Home Loans, Inc.*, 640 F. Supp.2d 942, 962 (N.D. Ohio 2009).

The adequacy of the settlement's proposed relief is further evidenced when considered against the costs of continued litigation. At the time the parties negotiated the Settlement Agreement, there were no low-cost steps remaining in the litigation. The Court had certified a California class and denied both a motion to dismiss and a motion for summary judgment. (*See* Docs. 137, Doc. 39,  139). The parties had engaged in discovery. The prospect of a jury trial loomed. The likely costs of trial compared to the possibility of marginally better recovery for the class show that the Settlement Agreement provides adequate relief.

The proposed relief under the settlement is not merely a nominal award unlikely to be distributed to the class. As detailed above, over 600,000 class members have already submitted claims. Class counsel estimates that number will exceed one million before the end of the claims period. That accounts for around 40% of the class. For low-value-claim class actions like this one, a 40% distribution rate weighs towards a finding of adequate relief.

Lastly, the proposed attorneys' fees award does not weigh against the adequacy of the class recovery. While the Court will not opine on whether it would approve the attorneys' fees awards (given that the Court is rejecting the settlement), it will note that the fees are reasonable enough for fairness purposes under Rule 23(e). And, in any event, the Settlement Agreement doesn't require payment of any specific *amount* of attorneys' fees, it just says that class counsel will seek them. So any unreasonableness as to that amount actually sought could be addressed separately.

### 4. Equitable Treatment Among Class Members

The settlement does not technically treat all class members equally. Category 1 and 2 claimants receive $7.50 on a first-round distribution and up to 50% of the purchase price of their sheets on a second round. (Doc. 143-2, #4108–09). Category 3 claimants receive a capped amount of $2.50. (*Id.*). But, while the distribution scheme may not treat members strictly *equally*, it does treat them *equitably*. Category 1 and 2 claimants receive more from the fund because either they or Macy's can prove that they in fact purchased the sheets at issue in the lawsuit. Category 3 claimants, while required to swear under penalty of perjury that they purchased sheets, need not provide actual proof. Because "[i]t is reasonable to allocate the settlement funds to class members based on … the strength of their claims on the merits," the Court finds that the distribution scheme treats class members equitably. *Grady v. RCM Tech., Inc.*, No. 5:22-cv-842, 2023 WL 3327093, *11 (C.D. Cal. May 2, 2023) (citation omitted).

Separately, the named plaintiffs' requested incentive award gives the Court some concerns about equitable treatment. But as the Court alluded to above in discussing attorneys' fees, the motions for final approval of the Settlement Agreement, (Docs. 153, 155), are distinct from the motion for attorneys' fees, incentive awards, and other expenses (Doc. 147). The Settlement Agreement itself says nothing about the *amount* of incentive awards, only that class counsel will seek them, and any awarded amount would come out of the common fund. (Doc. 143-2, #4113). So the only question at this juncture—in assessing whether the settlement treats class members equitably—is whether the inclusion of potential incentive awards

27

*categorically* renders a settlement agreement inequitable and invalid under Rule 23.[23]

The Court acknowledges that the Sixth Circuit has never explicitly authorized incentive awards in class actions. But it has not precluded them either. *In re Dry Max Pampers Litig.*, 724 F.3d 713, 722 (6th Cir. 2013). And many other circuits have approved the practice. *Moses v. New York Times Co.*, 79 F.4th 235, 253–56 (2d Cir. 2023); *Camp Drug Store, Inc. v. Cochran Wholesale Pharm., Inc.*, 897 F.3d 825, 834 (7th Cir. 2018); *Tussey v. ABB, Inc.*, 850 F.3d 951, 961–62 (8th Cir. 2017); *In re Apple Inc. Device Performance Litig.*, 50 F.4th 769, 785–87 (9th Cir. 2022); *but see Johnson v. NPAS Sols., LLC*, 975 F.3d 1244, 1255–61 (11th Cir. 2020) (holding that class action incentive awards are per se impermissible). Even the Supreme Court has hinted at their validity. *China Agritech, Inc. v. Resh*, 138 S. Ct. 1800, 1811 n.7 (2018). And the Court can see some pragmatic reasons supporting their use. Particularly in low-value-claim class actions, such awards help induce the named plaintiffs to step forward and participate in the suit when otherwise they would be economically disincentivized from bringing a legally valid claim. *See Camp Drug Store*, 897 F.3d at 834. And at the same time, they also help ensure that absent class members do not "free ride" off the class representatives' efforts. *Moses*, 79 F.4th at 245 (citation omitted).

---

[23] Whether a court's award of an incentive payment to class representatives is *authorized* by law or *permissible in scope* is of course distinct from whether such an award is *equitable* under Rule 23. The Court here analyzes only the latter.

The Court is persuaded by the consensus of authority and finds that Rule 23's equitable treatment requirement does not prohibit—indeed, it may be furthered—by appropriate incentive awards to class representatives. Because Rule 23 does not prohibit these awards categorically and because the Settlement Agreement does not guarantee any particular amount of such an award here, the Court finds the Settlement Agreement treats class members equitably relative to each other. (The Court acknowledges that the quantum of such awards may matter. And if the Settlement Agreement had specified an amount, that could have changed the analysis. As matters stand, though, the Court considers only the relevance of the incentive award's inclusion in the Settlement Agreement to settlement approval as a whole, not any appropriate amount the Court may award in its discretion if faced with a settlement it is inclined to approve.)

### 5. Cy Pres Award

Finally, the Court considers an aspect of the Settlement Agreement that does not fit neatly within any of the factors under Rule 23(e)(2), but that the Court nonetheless concludes is fatal to the request for approval. Specifically, the Settlement Agreement provides that, after a second distribution to the class claimants, or, if a second distribution is not economically feasible, after a single distribution, the rest of the settlement fund will be awarded to the Public Interest Research Group (PIRG), a nonprofit that purportedly "has as its purpose the advancement of consumer protections and rights." (Doc. 143-2, #4109). PIRG is not a party and is not a class member. It has not, so far as the Court knows, purchased any Macy's sheets. So it is

not receiving part of the common fund because of any injury it sustained at Macy's hands. Rather, PIRG will receive a portion of the class fund under what is termed the cy pres doctrine.

Cy pres—"as near as possible"—developed in the charitable trust context. *In re Airline Ticket Comm'n Antitrust Litig.*, 307 F.3d 679, 682 (8th Cir. 2002). It arose out of the need to distribute the assets of a trust in accordance with the trust's purpose when no beneficiaries had claimed the assets and they would otherwise lie dormant. *Id.* As applied to class actions, the doctrine provides a mechanism for parties to distribute proceeds of a common fund that, because of administrative difficulties, cannot be distributed to the class. *See id.*

The validity and scope of cy pres awards in class actions is a subject of debate. Some jurists decry cy pres awards as a form of civil fine, extracting more from a defendant than a lawsuit could justify under a compensatory framework. *See Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 481–82 (5th Cir. 2011) (Jones, C.J., concurring). Others view the doctrine as a useful tool to indirectly benefit the class. *In re Google Inc. Street View Elec. Commc'ns Litig.*, 21 F.4th 1102, 1116 (9th Cir. 2021). Two amici filed briefs with the Court to discuss the award here, one arguing that the cy pres award is unlawful, the other seeking its approval in the settlement. (Doc. 158; Doc. 165).

Before delving into that debate, the Court pauses to note yet another governing-law issue. When a class-action alleges state law claims and a federal court's jurisdiction is diversity based, whether cy pres awards are *substantively*

30

*authorized* (a state law question) is distinct from whether a cy pres award is *procedurally fair* (a federal law question). A state's substantive law may affect the availability of a cy pres distribution in certain cases. *See, e.g.*, *All Pls. v. All Defs.*, 645 F.3d 329, 331–37 (requiring the district court to apply Texas Unclaimed Property Act, under which abandoned property escheats to the State, to unclaimed settlement fund proceeds, thereby precluding cy pres distribution). But even where governing substantive law authorizes cy pres awards, a federal court may not approve a settlement providing for such an award unless that settlement is fair under Rule 23.

The Court begins with the first question—substantive authorization. In this case, the proposed Settlement Agreement[24] contractually provides for (assuming certain preconditions are met) a cy pres award to PIRG. (Doc. 143-2, #4109). Because the agreement provides that the cy pres recipient will receive the remaining funds as a matter of contractual right, the Court's authority to unilaterally order a cy pres distribution as a matter of Ohio common law is not at issue. Rather, the proper inquiry is whether such Ohio law permits and enforces such contracts. So far as the Court can tell, no Ohio cases address the issue of cy pres awards in class action settlement agreements. However, Ohio (like many other states) generally permits and enforces contracts creating third-party beneficiaries, *see Hill v. Sonitrol of Sw. Ohio, Inc.*, 521 N.E.2d 780, 784 (Ohio 1988), a similar structure to the contract here. And because courts do not normally scrutinize the adequacy of a contract's consideration, *see Sowry v. Todd*, 213 N.E.3d 212, 221 (Ohio Ct. App. 2023), the

---

[24] As stated previously, the Settlement Agreement is governed by Ohio law.

31

Court's only job at this juncture is to discern whether the Settlement Agreement is a valid contract. No party disputes that it is, which is sufficient for the Court to find that Ohio law substantively authorizes the Court to approve the cy pres award.

The second question—whether the proposed cy pres component renders the Settlement Agreement procedurally unfair for Rule 23 purposes—is harder. The Sixth Circuit has not considered whether cy pres awards are fair or equitable under Rule 23.[25] That said, every circuit to squarely consider the issue has found that Rule 23 does not preclude them altogether. *See In re Lupron Mktg. & Sales Pracs. Litig.*, 677 F.3d 21, 38 (1st Cir. 2012); *Hyland v. Navient Corp.*, 48 F.4th 110, 121–22 (2d Cir. 2022); *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 172 (3d Cir. 2013); *Hughes v. Kore of Ind. Enter., Inc.*, 731 F.3d 672, 675 (7th Cir. 2013); *In re BankAmerica Corp. Sec. Litig.*, 775 F.3d 1060, 1064 (8th Cir. 2015); *In re Google Inc. Street View*, 21 F.4th at 1120 (9th Cir.); *Poertner v. Gillette Co.*, 618 F. App'x 624, 629 (11th Cir. 2015). Consistent with that, no party has identified, and the Court has not found, any circuit that has found them categorically impermissible. In fact, based on this apparent consensus, the American Law Institute has compiled generally applicable principles of law related to cy pres awards in class action settlements. *See* Principles of the Law of Aggregate Litigation § 3.07 (2010) (stating that "[a] court may approve a settlement that proposes a cy pres remedy even if such a remedy could not be ordered in a

---

[25] *Gascho v. Glob. Fitness Holdings, LLC*, 822 F.3d 269 (6th Cir. 2016) considered whether an attorney's fee award should be based off the entire common fund (including the cy pres award) or only the portion of the fund distributed directly to class members. The *Gascho* Court did not have the occasion to consider the cy pres award's permissibility.

contested case"). For present purposes then, the Court is persuaded by the consensus of authority that cy pres awards *can*, under certain circumstances, be "fair" under Rule 23.

But that leads to the key question here. If a cy pres award can be fair under certain circumstances, what are those circumstances? The Eighth Circuit provides helpful limiting principles, rooted in the origins of the cy pres doctrine. First, in *Jones v. Monsanto Co.*, 38 F.4th 693 (8th Cir. 2022), and *BankAmerica*, 775 F.3d at 1064, that court concluded that cy pres awards are proper only when "existing class-member claimants have been fully compensated and further distribution to remaining class members is not feasible." *Jones*, 38 F.4th at 698–99 (citing *BankAmerica*, 775 F.3d at 1064). To be clear, fully compensated does not necessarily mean the class is afforded the entire relief sought in the complaint. *Id.* Rather, the Court must make its own assessment of the damages "that would be recoverable" by class members. *Id.* But, thus understood, the requirement for full compensation, flows from the logic of cy pres distributions. As implied by the name itself, cy pres awards are never a first resort. Cy pres awards exist to provide relief "as near as possible" to the relief that should actually occur—relief to class members. And this Court agrees that requiring the settlement to fully compensate the identified class members before making second-best distributions is reasonable. Moreover, in reaching that conclusion, the Court adds one gloss to the aspect of *Jones* and *BankAmerica* requiring the Court to assess the damages that would be recoverable by class members. In particular, the Court concludes that this means a district court should

33

calculate the strength of the plaintiffs' claims. A plaintiff with no or little evidence of injury could not likely recover in an individual trial. Likelihood of success on the merits is thus relevant to recoverability.

Separately, the Eighth Circuit adds a second limiting principle—one focused on the nature of the cy pres recipient. In *BankAmerica*, the Eighth Circuit held that cy pres distributions must be "for the next best use for indirect class benefit." 775 F.3d at 1067 (cleaned up). Accordingly, the use to which the funds are put must be "consistent with the nature of the underlying action and with the judicial function." *Id.* (citation omitted). To ensure that this will be the case, the recipient must be one that "relates directly to the injury alleged in [the] lawsuit and settled by the parties." *Id.* (cleaned up). Perfunctory allegations that such recipients are hard to identify or not "immediately apparent" do not absolve a court (or, in a settlement case, the parties) of their duty to find a qualified recipient. *Id.* Rather, a "thorough investigation" is often required. *Id.* Nor is the Eighth Circuit alone in imposing a next-best requirement. *Dennis v. Kellogg Co.*, 697 F.3d 858, 866–67 (9th Cir. 2012) (reversing cy pres award for food pantry in deceptive advertising suit over cereal packaging); *In re Google Inc. St. View Elec. Commc'ns Litig.*, 21 F.4th at 1116 (upholding cy pres distribution but noting that "the factors that guide judicial oversight of cy pres settlement provisions—whether the distributions account for the nature of the plaintiffs' lawsuit, the objectives of the underlying statutes, and the interests of the silent class members—are designed to ensure that cy pres payments particularly benefit the plaintiff class") (cleaned up); *Masters v. Wilhelmina Model*

34

*Agency, Inc.*, 473 F.3d 423, 436 (2d Cir. 2007) (noting that "the purpose of Cy Pres distribution is to put the unclaimed fund to its next best compensation use, e.g., for the aggregate, indirect, prospective benefit of the class") (cleaned up).

The Court finds that, here, the first threshold—whether the parties properly resorted to cy pres—is met. As detailed previously, the Settlement Agreement fully compensates Category 1 and 2 claimants. The Court also finds that Category 3 claimants are fully compensated for the purposes of the *Jones* test. While Category 3 claimants will only receive $2.50, which would fall short of a full recovery for a fully-proven claim, the claimants in that category would likely not succeed at trial because they would struggle to prove they actually bought sheets. Taking that into account, the Court finds that the existing class members in all three categories will be fully compensated for *Jones* purposes. Beyond that, further distributions to absent class members are also infeasible. Because the class action involves claims by anonymous retail customers, the class members are not ascertainable unless they submit a claim. And because the claims administrator cannot distribute to non-ascertainable class members, the parties properly resorted to cy pres as a secondary means of indirect class recovery.

But the next threshold—the choice of a permissible cy pres recipient—is where the parties go astray. As noted, the parties elected to direct any remaining funds to PIRG. As far as the Court can tell, though, PIRG does no work addressing false or misleading labeling for bed sheets, textiles more generally, or even false advertising as a category. As the Hamilton Lincoln Law Institute (one of the amici here) pointed

35

out in its brief (and as the Court independently confirmed through PIRG's website), PIRG's work appears to primarily focus on company or government policy related to toxins, waste, or climate change. (Supp. Brief of HLLI, Doc. 166, #4665). Delving into PIRG's "Consumer Protection" page (which is only one of many subpages under "Our work," including "Global warming", "Energy", "Health", and "Democracy & government") reveals that most of PIRG's consumer-related campaigns relate to product safety, food safety, and unfair loan practices. *See* https://perma.cc/984Z-WJC8. True, the bed sheets here may have had a rougher texture than the customers had been led to believe, but uncomfortable and unsafe are two different categories, and no one contends the sheets raised safety issues.

Perhaps even more troubling to the Court in its assessment of PIRG as a potential cy pres recipient, HLLI points out that PIRG uses portions of its funds to donate to *other* organizations—organizations whose missions are even a further cry from any issues this suit presents. In 2016, PIRG granted $40,000 to the People's Action Institute,[26] an organization that advocates for socialized medicine, pursues "climate justice," and fights against "the growing threat of authoritarianism in rural communities." (Doc. 166, #4667 (quotes from People's Action Institute website)). PIRG also donated over a million dollars to Environment America, an organization that seeks to ban plastic. (*Id.*). Last, but not least, PIRG donated $60,000 to "Onward Together," a PAC that supports progressive candidates in their runs for offices across the country. (*Id.*); https://perma.cc/QH5K-8BCB.

---

[26] HLLI accessed PIRG's public tax filings via a public record request.

36

Whatever one may think of the merits of such endeavors, it is hard to see how they have much to do with bed sheets, thread count mislabeling, or even consumer fraud more generally. In sum, the Court can discern no way in which a potential multi-million-dollar award to PIRG is the "next best use" for a class fund created to settle consumer fraud claims stemming from inaccurate bed sheet thread counts. *BankAmerica*, 775 F.3d at 1067. PIRG does not relate "directly to the injury" suffered by the class members and it would be an inappropriate exercise of the "judicial function" to divert class money to an unrelated organization that has nothing to do with the class or the injury its members suffered. *Id.* (cleaned up).

Compounding the problem, the parties have made little effort to defend their selection of PIRG. The Plaintiffs' motion for preliminary approval, for example, provided nothing beyond a vague, unsupported statement that PIRG "has as its purpose the advancement of consumer protections and rights." (Doc. 143-2, #4109). While such bland assurances may have sufficed for preliminary approval, more is needed now. But the motion for final approval fails to provide it, merely asserting that PIRG's Consumer Watchdog team "make[s] sure consumers are informed and empowered to protect themselves in today's rapidly changing marketplace," a sentence gleaned from PIRG's "Consumer protection" page on its website—a page, as the Court noted above, that is focused on product safety, not product mislabeling. (Doc. 153-1, #4461). Then, when the Court asked at the fairness hearing the basis for the parties' belief that PIRG is a consumer protection organization, Macy's counsel responded, "Macy's interprets it as a consumer protection organization." (Case No.

2:20-cv-81, Fairness Hrg. Trans., Doc. 45, #635). That's not enough. Asking the Court to rely on a snippet from PIRG's website coupled with the parties' subjective interpretations of PIRG's goals misunderstands the Court's role in class action settlement approval.

That said, because the Court was concerned that such questions may have caught the parties off-guard, the Court also offered them an opportunity to supply additional information supporting the choice. Specifically, the Court ordered supplemental briefing on whether "the proposed cy pres recipient meets the standards for such recipients as described in, for example, *In re BankAmerica Corp. Securities Litig.*, 775 F.3d 1060 (8th Cir. 2015)." Again, though, the parties came up short. The upshot of their argument? PIRG has represented that they will use any award "to promote accurate and truthful labeling and advertising of consumer bedding products … [to] educate consumers with a focus on truth in labeling … [to] serve as a marketplace watchdog … [and to] research and monitor the marketplace." (Doc. 168, #4686). They then attach a declaration from the Director of the Consumer Watchdog team for PIRG stating that PIRG will use the funds in the ways mentioned. (Doc. 168-2).

There are two problems with this argument. First, the promise is vague at best. How will the Court ensure that PIRG is using these funds to "promote[] accurate and truthful labeling" or "serve[] as a marketplace watchdog"? And even if the Court could, what recourse would there be if PIRG used the funds for other purposes? Second, the parties' efforts to show that *these* funds will be used only for identified

purposes ignores a fundamental economic principle: money is fungible. Any funds that go to PIRG as an entity (as opposed to being directed to some trust or segregated fund) necessarily free up dollars for PIRG generally. Accordingly, a cy pres award to PIRG funds *all* of PIRG's work, the vast majority of which is in no way relevant to the class issues here. (Indeed, as noted above, beyond its representations about what it will do with *these* moneys, the Court can find no evidence that PIRG has *ever* engaged in any work related to the issues here.)

Shifting gears, Plaintiffs argue for a less restrictive understanding of cy pres recipients. According to Plaintiffs, "while use of funds for purposes closely related to their origin is still *the best* cy pres application, the doctrine of cy pres and courts' broad equitable powers now permit use of funds for other public interest purposes by educational, charitable and other public service organizations." (Doc. 153-1, #4460 (quoting *Rosser v. A & S Cont.'g, Inc.*, No. 2:15-cv-711, 2017 WL 666121, *2 (S.D. Ohio Feb. 17, 2017) (cleaned up)) (emphasis added)). Plaintiffs then cite several district court decisions to bolster their claim. These decisions are unpersuasive, though, particularly because almost none of them include much, if any, discussion regarding the propriety of the cy pres award at issue in the given case, or much, if any, discussion of the appropriate limitations on the selection of cy pres recipients generally.[27]

---

[27] *See Rosser v. A & S Cont.'g, Inc.*, No. 2:15-cv-00711, 2017 WL 666121 (S.D. Ohio Feb. 17, 2017); *Shanahan v. KeyBank*, No. 1:19-cv-2477, 2021 WL 1034403 (N.D. Ohio Mar. 16, 2021); *Swigart v. Fifth Third Bank*, No. 1:11-cv-88, 2014 WL 3447947 (S.D. Ohio July 11, 2014); *Kritzer v. Safelite Sols., LLC*, No. 2:10-cv-0729, 2012 WL 1945144 (S.D. Ohio May 30, 2012).

Beyond that, as noted above, the Court's own survey of the case law suggests the standard is more demanding. The courts of appeals that have addressed the issue in any depth have consistently (or at minimum, frequently) required some sort of identifiable relationship between the class injury and the cy pres recipient. *See, e.g.*, *BankAmerica*, 775 F.3d at 1067 (reversing cy pres award for legal services organization in shareholder suit); *Dennis*, 697 F.3d at 866–67 (reversing cy pres award for food pantry in deceptive advertising suit over cereal packaging); *In re Airline Ticket Comm'n*, 268 F.3d 619, 625–26 (8th Cir. 2001) (reversing cy pres award for Minnesota law schools and charities in airline antitrust suit). True, the Sixth Circuit has yet to weigh in. But the discussion in such cases, coupled with the historical development of the cy pres doctrine, convinces the Court that this limitation is appropriate.

In sum, contrary to the parties' argument, the cy pres doctrine does not provide the Court with freewheeling authority to dole out class funds to unrelated parties, merely because they happen to be charitable organizations. Article III courts resolve cases and controversies; they are not a legislature that appropriates funds in pursuit of the public good. Consistent with that, the Court's role is to adjudicate the legal rights of the parties before it. In the class setting, that means the Court has an obligation to ensure that settlement proceeds benefit the class. The cy pres doctrine simply allows for a distribution that achieves those benefits indirectly. The question, then, is not what may be a *good* use of funds, or even the *best* use of funds, in some generic sense. Rather the sole question is the *next* best use from the class's

perspective as measured against a *direct distribution* to absent class members. To clear that threshold, the cy pres award must at least benefit the class indirectly by either (1) remedying the underlying harm, or (2) reducing similar harms in the future. The thrust of PIRG's work—which runs the gamut from climate change to product safety, but does not seem to have a meaningful consumer education or mislabeling component—is far too attenuated or remote from the interests underlying this suit. Compare PIRG's work with, for example, the National Advertising Division of the Better Business Bureau. The latter exists entirely to address false advertising, which it does by conducting its own investigations into advertising campaigns and referring certain practices to the FTC. *See* https://perma.cc/5WAK-BZ8D. While not a perfect fit, programs such as that one seem, at least at first glance, far more narrowly tailored to the class's interests here.

The bottom line is that the cy pres award included in the Settlement Agreement diverts class funds to an unrelated third party, whose use of the funds will not benefit the class's interests here, directly or indirectly. Thus, the Court concludes it must reject the settlement. Moreover, as the Settlement Agreement provides that any requested fee award, incentive payment, or litigation expense will come only from the (as yet non-existent) common fund, the Court finds that the motion for approval as to those items (Doc. 147; Case No. 2:20-cv-81, Doc. 26) is **MOOT**.

That said, as the above should make clear, the Court's concerns about the Proposed Settlement Agreement are limited to this single issue. The parties are free

to modify the Settlement Agreement to identify a new cy pres recipient, one that bears a closer relationship to the types of consumer protection issues that this case raises, or in other words, an organization that verifiably engages in meaningful work related to deceptive advertising. Alternatively, if the parties wish to seek an appeal of this Opinion and Order, they should move for certification under 28 U.S.C. § 1292(b).

One final issue bears mention. If the parties pursue the former course, the new settlement agreement will mean that new notice to the class is also necessary. On that front, the Court offers one additional observation: class action settlement notices must comply with the Due Process Clause. *Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402, 422 (6th Cir. 2012). To do so, the notice must (1) be "reasonably calculated to reach interested parties," and (2) "fairly apprise prospective members of the class of the terms of the proposed settlement so that class members may come to their own conclusions about whether the settlement serves their interests." *Id.* (cleaned up).

Upon further reflection, the Court has concerns that the notice here may not have "fairly apprised" the class of one of the terms of the settlement. Specifically, the settlement notice postcard distributed to potential class members included no mention of the cy pres award. In fact, the notice suggests that the settlement fund will go *only* towards attorneys' fees and costs, incentive payments, administrative costs, and distributions to the class itself. But, under the terms of the settlement, a potentially large amount of the settlement fund will go to a third party—the cy pres recipient. As such, the cy pres provision is a material term of the proposed settlement and should therefore be included in any future notice so that class members can raise

42

objections to that distribution if they wish. *In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 198 (5th Cir. 2010).

## CONCLUSION

For the above reasons, the Court **CERTIFIES** the nationwide class—as defined in the currently-rejected Settlement Agreement at Doc. 143-2, #4104—as to the asserted common law and UCC claims and **APPOINTS** the attorneys listed as class counsel. The Court, however, **DENIES** the motions for final approval (Docs. 153, 155; Case No. 2:20-cv-81, Doc. 32, Doc. 34) of the proposed class action settlement and **REJECTS** the proposed settlement as currently structured. And because the Court rejects the settlement, the Court also **DENIES** the motions for attorneys' fees, incentive awards, and expenses (Doc. 147; Case No. 2:20-cv-81, Doc. 26) as **MOOT**.

**SO ORDERED.**

December 20, 2023
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**